Kyle Malove
17950 Southwest 68th Court
Southwest Ranches, FL 33331
Phone: (720)-628-5510
Kyle.Malove@gmail.com



FILED BY ___ NP ___ D.C.

JUL 12 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

## U.S. DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

Kyle Malove

          Plaintiffs,

   v.

United States Central
Intelligence Agency, United
States Defense Advanced
Research Projects Agency,
United States Defense
Intelligence Agency, United
States Department of Defense:
National Reconnaissance Office,
United States Department of
Defense: Department of the
United States Air Force, United
States National Security Agency

        Defendants.

Case No.:  24-cv-61229-MD

**COMPLAINT FOR
COMPENSATORY
DAMAGES, EQUITABLE
DAMAGES, AND
REQUEST FOR
INJUNCTIVE RELIEF**

**JURY TRIAL
DEMANDED**

Judge:

Date Action filed:
Date set for trial:

- 1 -

## Table of Contents

| | | |
|---|---|---|
| I. | Introduction………………………………...…….... | 3-10 |
| II. | Jurisdiction and Venue……………………….......... | 11-14 |
| III. | Parties……………………………………………… | 15-22 |
| IV. | Legal Framework……………………………....…… | 23-49 |
| V. | Factual Allegations………………………....……… | 50-194 |
| VI. | Causes of Action…………………………….…....... | 195-241 |
| VII. | Request for Relief………………………………….. | 242 |
| VIII. | Jury Trial Demanded……………………………….. | 243 |
| IX. | *Pro Se* Reassurances………………..………...….... | 243 |

## I. Introduction

1.  Defendant United States Department of Defense United States Department of the Air Force's United States Space Force Branch (USSF) operates while deploying the US Department of Defense's Electromagnetic Spectrum Superiority Strategy of 2020. Their Field Disruptive EMS Capabilities and Electromagnetic Attack Capabilities are stated to be utilized in conjunction with their current deployment of the USAF's Joint All Domain Command 2 Platform, Proliferated Warfighter Space Architecture, Advanced Battle Management System, Electromagnetic Battle Management System, and their various satellite arrays, satellite constellations, and communications systems.

2.  Defendant United States DARPA (Defense Advanced Research Projects Agency) states they operate within the US Department of Defense as, "the central research and development organization of the Department of Defense," and both funds, and oversees their Neural Evidence Aggregation Tool Program (NEAT), Next-Generational Nonsurgical Neurotechnology Program (N3), and Radio Frequency Machine Learning System (RFMLS) program, in addition to their other projects. DARPA sponsors R&D in all aspects of TECHINT, imagery intelligence (IMINT), signals intelligence (SIGINT), human intelligence (HUMINT), and measurement and signature intelligence (MASINT). FM 2-22.401.

3.  TECHINT or, technical intelligence is defined, as, "Intelligence derived from exploitation of foreign material, produced for strategic, operational, and tactical level commanders." This, "technical intelligence," "begins when an individual Service member finds something new on the battlefield and takes the

- 3 -

proper steps to report it." General procedure of TECHINT states, this, "item is then exploited at succeedingly higher levels until a countermeasure is produced to neutralize the adversary's technological advantage." Joint Publication (JP) 1-02. Joint Publication (JP) 1-02 introduces TECHINT as, "TECHINT is the key to the early identification of an adversary's technical capabilities, vulnerabilities, and intent."

Joint Publication (JP) 1-02 states TECHINT,

> assets are task organized based on theater/national intelligence requirements, tactical and theater force structure, threat environment, and assigned mission and role TECHINT assets and other assets assigned to a TECHINT effort may consist of multiService and intra-agency components such as military tactical intelligence battalions, in-country exploitation teams (ICE), STILO from Naval Intelligence, Air Force foreign materiel exploitation teams, EOD teams, technical escort (TE) units, DIA, CIA, ATF, FBI, DOE, DTRA, DHS, Department of Health (DH), NSA, national laboratories, and others to include functional assets such as document exploitation (DOCEX), chemical and biological intelligence support team (CBIST), medical exploitation (MEDEX), HUMINT, hazardous material transportation office (HMTO), Combined Explosive Exploitation Cell (CEXC), and weapons intelligence teams (WIT).

4.    According to the National MASINT Office, MASINT or, "Measurement and Signature Intelligence, is an intelligence discipline built on capturing and measuring the intrinsic characteristics and components of an object or activity." DIA Measurement and Signature Intelligence. The National MASINT

- 4 -

Office states, "MASINT measures the way things are and how they actually perform." DoD Instruction 5105.58.

5. Defendant United States CIA (Central Intelligence Agency), "issues appropriate intelligence objectives, requirements and priorities to guide the conduct of all United States SIGINT activities," while operating in coordination with the Department of Defense and their CSA's (Combat Supporting Agencies). National Security Council Intelligence Directive No. 6.

6. Defendant United States CIA operates with a cross-discipline approach, through multi-INT: HUMINT, MASINT, SIGINT, IMINT, GEOINT, and TECHINT. Executive Order 12333. Presidential Policy Directive 28.

7. Defendant United States CIA operates in conjunction with Defendant NRO through their Directorate of Science and Technology (DS&T). According to the CIA,

> Researcher[s] within [the] CIA's Directorate of Science and Technology (DS&T) serving at the National Reconnaissance Office … apply …deep technical expertise to advancing research projects that … maintain strategic Space advantage in a rapidly changing world of emerging and disruptive technologies (EDTs).

8. Defendant United States NSA (National Security Agency) operates as, "a unified organization," with, "control (of) all of SIGINT collection and processing activities of the United States." National Security Council Intelligence Directive No. 6.

9. Defendant United States NSA and Defendant United States CIA's, "joint-coalition's group," the Special Collections Service or F6, a joint-coalition between HUMINT and SIGINT efforts, strategically partners with the DEA, DIA, NRO, FBI, State

Department, Secret Service, Law Enforcement, Homeland Security, Tailored Access Groups, COVCOM, Military, CLANSIG, and Second Party organizations. The Special Collections Service operates a, "Platform for Transformational Activity," for, "TECHHUMINT Teams, Deployed Analyst Teams, and NGW teams," while the group addresses, "Hard Targets," although most of the clandestine group's activities are privileged. The group was not formally acknowledged by either the CIA or NSA until 2015's National Security Archives FOIA release of NSA's, "Special Collections Service: Pacific SIGDEV Conference March 2011."

10.   Defendant United States Department of Defense National Reconnaissance Office (NRO) states they are, "responsible for research and development, acquisition, launch, deployment, and operation of overhead systems related processing facilities to collect intelligence and information to support national and departmental missions and other United States government needs." Executive Order 12333 1.7d. The NRO MASINT program, "aggressively ensures the broadest possible community involvement from data collection to processing to data distribution." NRO MASINT Collection and Processing FY 1996-2003. Defendant United States Department of Defense Department of the Air Force's Assistant Secretary of the Air Force for Space Acquisition and Integration, Mr. Frank Calvelli, states,

> NRO has a robust complement of acquisition professionals, including personnel from the CIA's Directorate of Science & Technology (DS&T) Office of Space Reconnaissance (OSR),

Active Duty Air Force, Navy, and Army personnel, and NRO's
new DoD Cadre workforce. [H.A.S.C. No. 114-110].

Mr. Calvelli states the NRO's,

Advanced Systems & Technology (AS&T) Directorate's research
and development in the area of time-dominant intelligence
collection using the SENTIENT automated mission management
schema has promoted new opportunities for future ground
architectures. SENTIENT modernizes intelligence collection by
introducing modular big-data analytic services in a highly
automated, multi-INT system, employing a ground architecture
controlling various sensors (strategic, tactical, commercial and
specialized systems). [H.A.S.C. No. 114-110].

Mr. Calvelli states, "SENTIENT," "is sort of an integrated set of
sensors in space, integrated ground providing data to our user
community," and, "The ADF-C, ADF-E [Aerospace Data Facility-
East], ADF-Southwest ... all play major roles in that." [H.A.S.C.
No. 114-110].

11. Defendant United States DIA (Defense Intelligence Agency)
operates with seven primary operating elements, their:
"Directorate for Human Intelligence, Directorate for MASINT and
Technical Collection, Directorate for Analysis, Directorate for
Information Management and Chief Information Officer,
Directorate for External Relations, Directorate for Intelligence,
Joint Staff (J2), and Directorate for Administration." DIA: Agency
Restructuring Jacoby, VADM Lowell E. These focus on
developing and utilizing, "Scientific and technical intelligence,
Overt human intelligence, Foundational intelligence analysis,
Defense cover, DIE training, Document and Media exploitation,

[and] Partner National intelligence planning." DIA: Agency Restructuring Jacoby, VADM Lowell E.

12.   Defendant CIA's Enhanced Interrogation Tactics were developed by private psychologists and contractors, Dr. Mitchell and Dr. Jessen, on behalf of the CIA following the 9/11 Terrorist Attacks and the passing of the 2001 Patriot Act. In Civil Action 2:15-CV-286-JLQ, the ACLU states Defendant CIA's private contractors, Dr. Jessen and Dr. Mitchell's torture program sought, "To create a torture program with a scientific veneer," where, "Defendants drew on experiments from the 1960s in which researchers taught dogs "helplessness" by subjecting them to uncontrollable pain," where, "human beings were subjected to systematic abuse, [and] the victims would become helpless and unable to resist an interrogator's demand for information." Dr. Jessen and Dr. Mitchell created and advanced US Intelligence's procedure for utilizing what can be equated to Nazi Schutzstaffel tactics, as an interrogator attempts to entrain subservience, break their victim's free will, and quell resistance amongst their victims as operations teams instill Dr. Seligman's theory of, "Learned Helplessness," in their victims, either directly extracting information from the victim, or preparing them for interrogation. Dr. Jessen and Dr. Mitchell's interrogation and torture program included elements of the German Stasi's, "Zersetzung," (Decomposition) program, through utilizing, "Operative Psychology," and psychological warfare tactics to destabilize, demoralize, depersonalize and disorient their victims to influence and extract information from them.

13.   Plaintiff Kyle Malove alleges Defendants US CIA, DARPA, DoD
      USAF, DoD NRO, DIA, and NSA, conducted non-consensual
      human experimentation, torture, illegal surveillance, harassment,
      attempted murder, human trafficking, coercion, and acts of
      terrorism while deploying NRO's SENTIENT and DARPA's N3,
      NEAT, and RFMLS programs through the JADC2 as the CIA and
      NSA commanded SIGINT, DIA and CIA commanded MASINT,
      and the NRO collected RF data while Defendants collectively
      tested and operated newly developed systems as the NSA and
      DIA processed, supported, organized, and monitored these
      activities. National Security Council Intelligence Directive No. 6.
      During this series of occurrences, Plaintiff states harmonic
      generation in the reflection of microwave radiation from
      semiconductor surfaces, second harmonic scattering, Thomson
      scattering, and reflection absorption/transient spectroscopy were
      utilized, and noticeably caused pain, sleep deprivation, dietary
      manipulation, mental anguish, and generated physical
      burns/irritation, as DARPA's RFMLS, NEAT, and N3 programs
      were deployed via the JADC2 through NRO's SENTIENT's, and
      DIA's and the USAF Starshield's use of Starlink's, "ancillary
      equipment." This was utilized to manipulate and control IoT
      during alleged equipment tests, personnel training, illegal
      surveillance, and during the deployment of optically enhanced
      interrogation techniques (OEITs). This occurred while Plaintiff
      was generally harmed and tortured. Plaintiff states he has and
      continues to be subjected to dangerous levels of electromagnetic
      radiation, electromagnetic interference, radio frequency
      interference, spike wave discharges, microwave band radiation

exposure, dangerous levels of electromagnetic field emissions, and radiative emissions throughout the duration of the alleged violations as these contributed to sleep deprivation, lack of concentration leading to academic failure, dietary manipulation, extreme sensations of vibrations and pulsation originating from Plaintiff's permanent metal implants being irradiated, copious salivation, unnatural modifications to Plaintiff's circadian rhythms, bioelectric gastrointestinal neuromodulation, Pavlovian aversion and fear conditioning, electrodermal aggression conditioning, excitability changes, changes in central state behavioral responses, high levels of transcranial electric stimuli, transcranial magnetic stimuli, magnetoelectric stimuli, ultrasonic acoustic heterodyne transmissions to the Coronal Section of his Temporal Bone, bone conduction, and various scattering methods.

14. Plaintiff Kyle Malove introduces this civil action *Pro se*, for Defendants' violations of coercion, illegal surveillance, attempted murder, human trafficking, non-consensual human experimentation, terrorism, cruel and unusual punishment, and torture. These actions generated personal injury and property damages which are tortious under the Federal Tort Claims Act, and violate Plaintiff's rights as bestowed upon him by the US Constitution's Amendments I, IV, V, and VIII.

## II. JURISDICTION and VENUE

1. This court has jurisdiction pertaining to this civil action under 28 U.S.C. § 1331 (Federal Question); 28 U.S.C. § 1332 (Diversity Jurisdiction); 28 U.S. Code § 1343 (Original Jurisdiction); 28 U.S. Code § 1402 (Exclusive Jurisdiction); and 38 CFR 14.600 (Federal Tort Claims Act).

2. The court has jurisdiction over Defendant US Defense Advanced Research Projects Agency due to the matter in controversy. The court has jurisdiction over Defendant US Defense Advanced Research Projects Agency because under the Federal Tort Claims Act, Defendant assumes the stature of a citizen and private person. The court has jurisdiction over Defendant US Defense Advanced Research Projects Agency because Plaintiff's rights are alleged to have been and to continuously be deprived. The court has jurisdiction over Defendant US Defense Advanced Research Projects Agency due to the location of Defendant's alleged transgressions. The court has jurisdiction over Defendant US Defense Advanced Research Projects Agency due to Plaintiff's current residency.

3. This court has jurisdiction over Defendant US Department of Defense: Department of the United States Air Force due to the matter in controversy. This court has jurisdiction over Defendant US Department of Defense: Department of the United States Air Force because under the Federal Tort Claims Act, Defendant assumes the stature of a citizen and private person. This court has jurisdiction over Defendant US Department of Defense: Department of the United States Air Force because Plaintiff's rights are alleged to have been and to continuously be deprived.

This court has jurisdiction over Defendant US Department of Defense: Department of the United States Air Force due to the location of Defendant's alleged transgressions. This court has jurisdiction over Defendant US Department of Defense: Department of the United States Air Force due to Plaintiff's current residency.

4. This court has jurisdiction over Defendant US Central Intelligence Agency due to the matter in controversy. This court has jurisdiction over Defendant US Central Intelligence Agency because under the Federal Tort Claims Act, Defendant assumes the stature of a citizen and private person. This court has jurisdiction over Defendant US Central Intelligence Agency because Plaintiff's rights are alleged to have been and to continuously be deprived. This court has jurisdiction over Defendant US Central Intelligence Agency due to the location of the defendant's alleged transgressions. This court has jurisdiction over Defendant US Central Intelligence Agency due to Plaintiff's current residency.

5. This court has jurisdiction over Defendant US Defense Intelligence Agency due to the matter in controversy. This court has jurisdiction over Defendant US Defense Intelligence Agency because under the Federal Tort Claims Act, Defendant assumes the stature of a citizen and private person. This court has jurisdiction over Defendant US Defense Intelligence Agency because Plaintiff's rights are alleged to have been and to continuously be deprived. This court has jurisdiction over Defendant US Defense Intelligence Agency due to the location of the defendant's alleged transgressions. This court has jurisdiction

over Defendant US Defense Intelligence Agency due to Plaintiff's current residency.

6.    This court has jurisdiction over Defendant US National Security Agency due to the matter in controversy. This court has jurisdiction over Defendant US National Security Agency because under the Federal Tort Claims Act, Defendant assumes the stature of a citizen and private person. This court has jurisdiction over Defendant US National Security Agency because Plaintiff's rights are alleged to have been and to continuously be deprived. This court has jurisdiction over Defendant US National Security Agency due to the location of the Defendant's alleged transgressions. This court has jurisdiction over Defendant US National Security Agency due to Plaintiff's current residency.

7.    This court has jurisdiction over Defendant US Department of Defense: National Reconnaissance Office due to the matter in controversy. This court has jurisdiction over Defendant US Department of Defense: National Reconnaissance Office because under the Federal Tort Claims Act, Defendant assumes the stature of a citizen and private person. This court has jurisdiction over Defendant US Department of Defense: National Reconnaissance Office because Plaintiff's rights are alleged to have been and to continuously be deprived. This court has jurisdiction over Defendant US Department of Defense: National Reconnaissance Office due to the location of the Defendant's alleged transgressions. This court has jurisdiction over Defendant US Department of Defense: National Reconnaissance Office due to Plaintiff's current residency.

8. The venue is proper pursuant to 28 U.S. Code § 1391(b)(2) as, "a substantial part of the events or omissions giving rise to the claim occurred," in Southwest Ranches, Florida, where, "a substantial part," of Defendant's violations occurred.

## III. PARTIES

1.  Plaintiff was born in Florida, and held Florida residency until
    2018. From 2018 to 2019, Plaintiff held Colorado residency.
    Plaintiff is currently a resident of Florida and has held Florida
    residency since 2020. Plaintiff Kyle Malove is a US citizen. Kyle
    Malove is twenty-five years old.

2.  Between September 2020 and December 2023 (or until present),
    Plaintiff recorded unnatural environmental factors in conjunction
    with Starlink's visible bright-light emissions viewed overhead.
    Plaintiff states he felt and recorded unnatural EMF and RF
    emitted from inside his residence, while he traveled or worked,
    and from inside his vehicle. During his time living in Florida
    between 2020 to 2022, 2023 until present, or attending university
    in Denver, CO from 2018 to 2019, and 2022 to 2023, he states he
    experienced unnatural environmental factors which contributed
    to high levels of unwarranted stimuli which he documented to
    the best of his abilities. He states this unnatural environmental
    stimuli modified multiple of his biological processes and
    subjected him to torture. He alleges EMF, EMI, RF interference,
    multi-channel RF activity, voltage microsurges, and various types
    of particle scattering were emitted from his surroundings,
    household's appliances, and his vehicle when it was struck with
    what is claimed to be, Starlink's, "ancillary equipment." Plaintiff's
    documentation and recording of the environmental stimuli and
    environmental factors which contributed to this series of events
    occurred as early as August 1, 2021 and as recent as December 6,
    2023 (although Plaintiff continuously gathers evidence). During
    March 2023, Plaintiff acquired a calibrated Keysight N9917a

- 15 -

microwave analyzer, and a calibrated Aaronia AG OmniLog Pro H antenna with its measurements adjusted to its factory specified antenna factor. Plaintiff spent the duration of 2023 recording microwave band presence, visible bright light emissions, EMI, and RF interference with professional audio and video recording equipment in conjunction with the use of professional meters and analyzers while he alleges to have documented unnatural and unwarranted stimuli. Plaintiff currently resides with Judith Malove and Harvey Malove, his mother and father, in Southwest Ranches, Florida.

3.   Plaintiff has previously been diagnosed with MDD, anxiety, and exhibits signs of trauma-induced-PTSD.

4.   Defendant US Department of Defense Department of the Air Force began their Space Force Branch in December 2019. The Department of Defense Department of the Air Force Space Force Branch comprises of both a newly founded branch with a newly developed structure, and has integrated previously existing groups from elsewhere within the Department of Defense and several of its CSAs (Combat Supporting Agencies). The Department of Defense Department of the Air Force Space Force Branch signed a contract with SpaceX's Starshield in December 2023.

5.   Defendant US Department of Defense Department of the Air Force's National Air and Space Intelligence Center's (NASIC) officially, "is the U.S. Air Force's service intelligence center, the nation's air and space intelligence center, and an operational wing in the Air Force ISR enterprise."

6.  Defendant US Department of Defense Department of the Air Force's National Air and Space Intelligence Center's (NASIC) Liaison to ADF-C, Michelle Hart, officially, "supports analytic and operational relations between NASIC and NSA, NRO and NGA, and joint agency coalition efforts."

7.  Defendant NRO's Office of Intelligence officially, "coordinates, consolidates, and synchronizes the various intelligence and threat functions performed across the NRO in support of research, design, acquisition, launch, operations, sustainment, and protection."

8.  Defendant NRO's Office of Intelligence Liaison to NASIC and NSIC, currently Joe Iungerman, functions to support operational relations between the NRO's Office of Intelligence, and the NASIC and NSIC in addition to Defendant United States Air Force's ISR enterprise.

9.  Defendant U.S. Defense Intelligence Agency is the principle MASINT, or measures and signals intelligence, operations group in the United States. According to the Office of the Director of National Intelligence, the DIA, "provides military intelligence to warfighters, defense policymakers and force planners in the Department of Defense and the Intelligence Community in support of U.S. military planning and operations, and weapon systems acquisition." The DIA operates primarily as a Department of Defense CSA (combat support agency), and supports the Department of Defense's ISR, IMINT, MASINT, HUMINT, and TECHINT efforts, as well as coordinates with the Special Collections Service. The United States DIA is, "DoD's all source intelligence agency." DoD Directive 5105.21. The,

"Intelligence A History of the Defense Agency," states the, "DIA has played a central role in gathering, processing, and producing intelligence used to defend the United States from foreign aggression." While, "Two key offices for developing technology, the Advanced Systems & Concepts Office and the Defense Advanced Research Project Agency (DARPA), have strong track records in ISR development," there is a well-established relationship between the DIA's implementation of DARPA's innovations. CRS 10924 Military Transformation Intelligence, Surveillance and Reconnaissance. This involvement was documented in their, "Demonstration and Development Facility," and as early as the initial integration of DARPA's EWAMS (Early Warning and Monitoring System) computer-based system. According to the DIA, "[DIA] Officers in this specialty apply specialized expertise in counterintelligence and human intelligence to conduct controlled technical operations, and use specialized CI and HUMINT devices and systems in the field," while this is achieved through collaboration, "with laboratories on emerging technologies .... systems engineering and project management approaches," as this, "evaluate[s] technical equipment, system efficiency and identifies creative solutions."

10. Defendant Department of Defense NRO presents their official mission statement, "NRO develops and operates the world's most capable and innovative overhead reconnaissance systems," and states they, "develop, acquire, launch, and operate space-based assets and ground systems to see, hear, and sense threats around the world in real time." The NRO operates both internally, and externally, to the United States Department of the Air Force's

Space Force Branch, operating in conjunction with their other CSAs. The NRO hosts CIA Directorate of Science and Technology researchers which enables the CIA's, "ability to maintain strategic Space advantage in a rapidly changing world of emerging and disruptive technologies (EDTs)." Defendant U.S. NRO is alleged to have purchased a contract with SpaceX's Starshield system in 2021. The NRO states its Directorate of Advanced Systems & Technology (AS&T) was founded, "to oversee research and development into new satellite reconnaissance technologies." The NRO's AS&T, "conceives and develops technologies and demonstrates new systems to increase actionable intelligence in support of the NRO mission and strategic goals." FY2009 Congressional Budget Justification Volume IV National Reconnaissance Program. The NRO's, "strategic vision is to accelerate the pace of innovative technologies, reduce the time to market, and develop new sources and methods." FY2009 Congressional Budget Justification Volume IV National Reconnaissance Program.

11. Defendant NSA, "leads the U.S. Government in cryptology that encompasses both Signals Intelligence (SIGINT) and Information Assurance (IA) products and services, and enables Computer Network Operations in order to gain a decision advantage for the nation and our allies under all circumstances." Office of the Director of National Intelligence. The NSA operates jointly with the CIA within the Special Collections Service (SCS), a HUMINT (human intelligence) and SIGINT (signals intelligence) "joint-agency," coalition which operates while relying upon, "Strategic Partnerships," as these enable collaborative effort in the pooling

of resources supporting or gaining support from both SIGINT and HUMINT operations. The NSA operates jointly with the NRO as they process the NRO's unprocessed and, "unminimized," data into SIGINT (signals intelligence). Through integrating, "joint-agency teaming," the NSA promotes cohesion and enables their, "unified and whole government approach."

12. Defendant NSA's "Director of the National Security Agency shall exercise full control over all SIGINT collection and processing activities, except the operation of mobile SIGINT platforms which will normally be exercised through appropriate elements of the military command structure." National Security Council Intelligence Directive 6. Though the NRO conducts, "RDT&E of Signals data, also known as radio frequency data," to support other, "elements of the Intelligence Community," the NSA utilizes this radiofrequency data when it is then analyzed and developed into signals intelligence capabilities for further processing, evaluation, and minimization in accordance with NSA procedures. Executive Order 14086. According to the Executive Order 12333, "The Director of the National Security Agency is designated ... [as the] Functional Manager for signals intelligence."

13. Defendant CIA, "engages in collection across all four disciplines (HUMINT, SIGINT, IMINT, and MASINT) through two of its Directorates-the Directorate of Operations and the Directorate of Science and Technology," as stated by, "The Federation of American Scientists." The CIA,

> shall use SIGINT collected in bulk only for the purposes of
> detecting or countering: espionage and other threats and

- 20 -

activities directed by foreign powers or their intelligence services against the United States and its interests; threats to the United States and its interests from terrorism; threats to the United States and its interests from the development, possession, proliferation, or use of weapons of mass destruction; cybersecurity threats; threats to U.S. or allied Armed Forces or other U.S. or allied personnel; transnational criminal threats, including illicit finance and sanctions evasion related to the other purposes identified in the section on 'Use of SIGINT Collection in Bulk'; and any threat to the national security determined to be a permissible use of SIGINT collected in bulk in the review process established by Section 2 of Presidential Policy Directive-28, or for any other lawful purpose, when approved by the President. Presidential Policy Directive 28.

14. Following the 9/11 terrorist attacks, and the ratification of the Patriot Act of 2001, Defendant CIA contracted psychologists Dr. Jessen and Dr. Mitchell through their private firm, "Mitchell, Jessen & Associates," to develop and field, "enhanced interrogation techniques." Study of the CIA's Detention and Interrogation Program ("SSCI Report"). Dr. Jessen and Dr. Mitchell's expertise in "non-standard means of interrogation," SSCI Report 32 n. 138 (citing CIA June 2013 Response 49) developed the foundation for the CIA's current, "Enhanced Interrogation Techniques (EIT's). In Civil Action 2:15-CV-286-JLQ, the ACLU describes Dr. Jessen and Dr. Mitchells program to have, "proposed a pseudoscientific theory of countering resistance that justified the use of torture and other forms of cruel, inhuman, and degrading treatment," and states, "Their theory

- 21 -

relied on the work of psychologist Dr. Martin Seligman, who in the 1960s pioneered studies on a concept called "learned helplessness."' Dr. Jessen and Dr. Mitchell's expertise in "non-standard means of interrogation," implements Dr. Martin Seligman's, "Learned Helplessness," while integrating Stasi, "Zersetzung," psychological warfare methods, to undermine the credibility of, psychologically gaslight manipulate, disorient, and psychologically torture their victim, opposition, criticism, and dissent.

## IV. Legal Framework

1.  Under the 79th United States Congress' Federal Tort Claims Act, "the federal government acts as a self-insurer, and recognizes liability for the negligent or wrongful acts or omissions of its employees acting within the scope of their official duties." Plaintiff has demonstrated he has sustained both personal injury, and property damages due to Defendants' malicious and wonton actions as these were perpetrated while acting under the Color of Federal Law. Plaintiff pursues relief concerning the causation of both the sustained personal injury, and property damages as these pertain to employees acting maliciously under the color of law. This is only after Plaintiff exhausted all other options.

2.  According to the findings of United States v. Kubrick, 444 U.S. 111 (1979), "A claim accrues within the meaning of § 2401(b) when Plaintiff knows both the existence and the cause of his injury," Plaintiff accrued injuries between 2018 and 2023 (or until present), and discovered the actual cause of injury and assigned blame during October 2023.

3.  Similarly to the findings of Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), where the Court could not confidently state, "that under the allegations of the pro se complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers," that, "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). See Dioguardi v. Durning, 139 F.2d 774 (CA2 1944). The district court may not assess the, "credibility of the plaintiff's allegations," Franklin II, 563 F. Supp. at 1324, although it may

determine whether Plaintiff's claim holds merit or is frivolous, defining a frivolous action under § 1915(d) as an action lacking arguable basis in law or in fact. Franklin, 745 F.2d at 1228 n. 9; Potter, 433 F.2d at 1088. Historically the Court has held the opinion,

> Whenever evidence is offered to the jury which is in its nature prima facie proof or presumptive proof, its character as such ought not to be disregarded, and no court has a right to direct the jury to disregard it or to view it under a different aspect from that in which it is actually presented to it. Crane v. Lessee of Morris, 31 U.S. 6 Pet. 598 598 (1832).

Also, as this pertains to the introduction of *prima facie* evidence, the US Supreme Court upheld this view, "Accordingly, although we intimate no view whatever on the merits of petitioner's allegations, we conclude that he is entitled to an opportunity to offer proof," Haines v. Kerner, 404 U.S. 519 (1972). Thus, upon the Court's determination pertaining to Plaintiff's claim either holding merit, or being frivolous, Plaintiff is either then permitted to present his evidence, *prima facie* or otherwise, and have his complaint objectively tried via Jury trial, or his complaint subjected to dismissal.

4.  When following the Federal Rules of Evidence, the "prima facie" evidence provisions, "nothing more or less than a rule of evidence which governs the sufficiency of the evidence to take the case for the jury." State v. Haremza, 213 Kan. 201. Plaintiff has clearly defined not only the burden of the evidence to bring this before a Jury, but also the quality and requirements of the evidence medium.

5.  While, "the D.C. Circuit has clearly held that courts must apply the 'official acknowledgment' exception 'strictly,' such that the 'official acknowledgment' only extends to the specific records that are acknowledged by the agency," National Security Counselors v. Central Intelligence Agency, No. 18-5047 (D.C. Cir. 2020), Plaintiff introduces Defendants, and their alleged methods, tactics, and technology which have been officially acknowledged, and their official capacity as stated in, "officially acknowledged," documents and records. Plaintiff introduces what has been explicitly unclassified, officially acknowledged, and what is already considered to be within, "public domain."

6.  The findings, "The burden of proof rests upon the party asserting the affirmative of an issue," Delaware Coach Co. v. Savage, 81 F. Supp. 293 (D. Del. 1948). describes the relationship between Plaintiff's requirement to not only bring forth evidence, but also to do so in a manner which satisfies this burden as he brings forth evidence.

7.  Upon Plaintiff's introduction of his prima facie evidence, or the establishment of a prima facie case, the defensive party is expected to meet the prima facie case which has been established. The defense is not required to, "produce evidence which preponderates or outweighs or surpasses the evidence of his adversary, but it is sufficient if such evidence is co-equal, leaving the proof in equilibrium." Thus,

> If the defensive party, either by a preponderance of evidence or
> evidence sufficient to establish equilibrium, has met and
> answered the prima facie case, then the burden of going forward
> with the evidence returns to the original proponent charged with

> the burden of proof who must in turn, by a preponderance or greater weight of evidence, overcome the equilibrium thus established, or otherwise support his burden of proof by a preponderance of the evidence. Delaware Coach Co. v. Savage, 81 F. Supp. 293 (D. Del. 1948).

8.   While, "the law requires that Plaintiff should establish his case by a preponderance, that is, by the greater weight of the testimony, and unless he has done that to your satisfaction [the jury], he cannot have your verdict," LeFevre v. Crossan, 3 Boyce 379, 396, 26 Del. 379, 396, 84 A. 128, 131, Plaintiff must meet both the provisions of his prima facie case, and the burden of preponderance for the Jury to favorably rule over his claim and evidence.

9.   While the burden of proof as associated with preponderance or plausibility is well defined, to maintain, "facial plausibility," Plaintiff's complaint and evidence must contain genuine fact in his or her complaint to state a claim to relief which is plausible on its face for it to be capable of avoiding dismissal for failing to state a claim. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002), Hernandez v. New York, 500 U.S. 352 (1991).

10.   According to Loumiet v. United States, 828 F.3d 935, 939 (D.C. Cir. 2016), "the discretionary-function exception does not categorically bar FTCA tort claims where the challenged exercise of discretion allegedly exceeded the government's constitutional authority to act." Plaintiff alleges Defendants' conduct directly violated his Constitutional freedoms while acting under the color of federal law, and thus cannot be barred

under the FTCA's discretionary-function. Pursuant to the
findings of Medina v. United States, 259 F.3d 220, 225 (4th Cir.
2001), these transgressions, "f[e]ll outside the FTCA's
discretionary-function exception because Plaintiff alleges they
were conducted in violation of the Constitution." When trying
under the FTCA, "The discretionary function exception does
not . . . shield conduct that transgresses the Constitution." Raz
v. United States, 343 F.3d 945, 948 (8th Cir. 2003).

11.     Because a succession of Constitutional violations are in
        question, the Court has ruled that a federal official's use of the
        FTCA's discretionary function exemption is limited and, "will
        not apply," to Plaintiff's complaint. Nurse v. United States, 226
        F.3d 996, 1002 n.2 (9th Cir. 2000).

12.     While the Court has ruled, "[t]he government has no discretion
        to violate the Federal Constitution; its dictates are absolute and
        imperative," Limone v. United States, 579 F.3d 79, 101 (1st Cir.
        2009), Defendants' actions are alleged to have directly violated
        Plaintiff's Constitutional freedoms and civil liberties.

13.     Where "the continuing-violations doctrine applies to
        extend the applicable statute of limitations where, as here,
        a plaintiff alleges continuing conduct causing
        cumulative harm," Loumiet v. United States, No. 15-5208,
        Plaintiff's timeline of damages is stated to be ongoing,
        providing evidence pursuant to the Federal Rules of Evidence
        collection that this, "cumulative harm," is claimed to be
        ongoing and is documented having started at latest in 2021, and
        is claimed to be continuous, with allegations of these violations

- 27 -

occurring before the first supplied documentation of Defendants' misconduct.

14. While FL 775.30 defines an act of terrorism as, "A violent act or an act dangerous to human life which is a violation of the criminal laws of this state or of the United States," and an act conducted with the intent to, "Intimidate, injure, or coerce a civilian population," Plaintiff alleges Defendants' misconduct and aforementioned activity was conducted with the intent to injure and coerce him, his family, and his surrounding community while burdening and suppressing dissent, criticism, and opposition.

15. In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. Pub. L. 93–595, §1, Jan. 2, 1975, 88 Stat. 1931; Apr. 26, 2011, eff. Dec. 1, 2011.

16. While Public Law 86-36, 50 U.S.C. 3605, "broadly exempts any information pertaining to the agency's [NSA's] 'activities' or 'functions,'" Elec. Priv. Info. Ctr. v. NSA, No. 11-5233, 2012 WL 1654943 (D.C. Cir. May 11, 2012), Plaintiff is neither requesting access to protected documents via the FOIA, nor is requesting Defendants to make statements pertaining to their activities or functions past information directly inferred from officially acknowledged documents and from the genuineness of Plaintiff's material evidence as presented for the Court and Jury. This evidence is subject to discovery, inquiry, and the Federal Rules of Evidence. In contrast to the findings of Elec. Priv. Info. Ctr. v. NSA, No. 11-5233, 2012 WL 1654943 (D.C. Cir.

May 11, 2012), where, "[t]he existence of a relationship or communications between the NSA and any private company certainly constitutes an 'activity' of the agency subject to protection under Section 6," where the NSA also successfully issued a *Glomar Response*, the National Security Council Intelligence Directive No. 6, Executive Order 12333, Executive Order 13526, Executive Order 14086, and Presidential Policy 28 are officially acknowledged documents within the, "public domain," where Defendant NSA recognizes its role, authority, operational capacity, and the extent of its privilege. Plaintiff states the Defendants must only acknowledge their official operational capacity while Plaintiff presents evidence of their actions' culpability in alleged violations.

17. While Plaintiff recognizes, respects, and understands the intricate and delicate nature of the military and intelligence's relationship as this pertains to privileged information, Plaintiff is not requesting access to this, and seeks a ruling similar to United States v. Reynolds, 345 U. S. 1, 10–11, or a *Reynolds decision*, to proceed without information protected under the State Secrets Privilege. Plaintiff seeks to introduce evidence, witness testimony, and what has been officially acknowledged by Defendants, their sister branches or agencies, or other CSA's. P. 345 U. S. 10.

18. The court decides, especially during a civil rights dispute, over the correct civil procedure as this pertains to compensation and relief, "it is . . . well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available

remedy to make good the wrong done." Bell v. Hood, 327 U.S., at 684.

19.   Under 42 U.S. Code § 1985(3), Defendants' misconduct, "deprived of having [and] exercising any right or privilege of a citizen of the United States," thus, "the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

20.   The alleged methods, tactics, and technology which Plaintiff states Defendant utilized whilst violating his civil liberties have been previously disclosed. These are either a Defendants' unclassified project, or a CSA's, is either previously disclosed involvement or activity, or is an unclassified project they have sponsored, thus establishing the methods, tactics, and technology utilized, as "public domain." North v. DOJ, No. 08-1439, 2012 WL 4373459. Defendants must only recognize the validity of the evidence as presented to have shared culpability while operating in their official capacity.

21.   Plaintiff is a US citizen, no foreign power was present or represented during the time his US residence is alleged to have been illegally surveilled, and most of Defendants' alleged transgressions occurred within territory under US control and governance. Plaintiff alleges illegal surveillance utilized in conjunction to non-consensual human experimentation, and was intended to gather and acquire communications data, human activity via measurement and signature data, in this instance human activity recognition data and ambient recognition activity sensing data (or similar data types), and

was utilized as the Starshield system and DARPA's SoSITE
STITCHES integration of their various programs were,
"tested."

22.    Under 50 U.S. Code § 1805(g)(3)(B), the capability to train
intelligence personnel with electronic surveillance equipment is
both limited in, "extent," and, "duration," and mustn't be
targeted against a singular individual or group. While 50 U.S.
Code § 1805(g) sets the limitation for intelligence personnel's
testing of electronic surveillance equipment on non-consenting
populations, unwarranted, Plaintiff's claims pertaining to the
Starshield's use spans for over three years while the newly
acquired systems were tested, which also puts Defendants in
direct violation of this statute regardless of if the Court rules
Plaintiff was individually targeted or not during the testing of
the Starshield system's, "ancillary equipment." Thus,
Defendants acted criminally while violating not only their own
guiding laws and statutes, but also Plaintiff's reasonable
expectation of privacy, his life, liberty, and property, in
addition to the allegations of having inflicted cruel and unusual
punishments. Plaintiff alleges there is genuine material fact
pertaining to Defendant Department of Defense Department of
the USAF's utilization of Starshield following their 2023
contract, and US Government operation of the system before
the Department of Defense Department of the USAF held the
Starshield contract. Plaintiff states Defendants actions violate 50
U.S. Code § 1805(g) as the activities explicated within his claim
require testing be conducted, which violate this clause as they

are, "targeted against the communications of any particular person or persons."

23. Pursuant to 50 USC 1881(a)(4) the FISA 702's, "Authorization Clause," is limited and while, "US intel may not intentionally acquire any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States," Plaintiff and his family were located in the US throughout the duration of Defendants' alleged violations.

24. While under 50 USC 1881(a)(5), any surveillance authorized under, "FISA 702 shall be conducted in a manner consistent with the fourth amendment to the Constitution of the United States," the aforementioned methods Defendants are stated to have utilized while conducting illegal surveillance are neither reasonable, nor granted via a warrant under probable cause.

25. Regardless of the testing, or implementation of electronic surveillance equipment, according to 50 USC 1805(g), Plaintiff states the Starshield's use, or if categorized as thus, "tests," were conducted for more than twice the allowed time for tests of electronic surveillance equipment. This is neither limited in, "extent," nor, "duration."

26. Defendants' actions are detected pursuant to Rule 92, with an IEC 61326 conforming calibrated Keysight N9917a microwave analyzer. Though, "off-the-wall vs. through-the-wall," discourse is pertinent and welcome to this instance of alleged electronic surveillance, it has been decided by the Court in Kyllo v. United States 533 U.S. 27 (2001), where similar surveillance "would leave the homeowner at the mercy of

advancing technology—including technology that could discern all human activity in the home." Thus, Defendants' alleged activity and misconduct constitutes a 4th amendment violation, regardless of Defendants' justification, be that electronic equipment testing, bulk data collection, or intelligence personnel training, as Plaintiff establishes that the, "duration," and, "extent," of the testing of the electronic equipment in question surpassed statutory allowances, civil rights were violated, and Defendants collectively acted unlawfully as torture, non-consensual human experimentation, and cruel and unusual punishment was administered remotely through optical methods Defendants have formally acknowledged either familiarity of, or expertise with, as the, "testing," was conducted.

27. The detection of Defendants' activity, subject to discovery, also inculcates Defendants' complicity in the other aforementioned violations as they tested the Starshield system's capabilities as these pertain to HUMINT, SIGINT, MASINT, IMINT, and TECHINT. Under Executive Order 12333 Section 2.4, "Elements of the Intelligence Community are not authorized to use such techniques as electronic surveillance, unconsented physical searches, mail surveillance, physical surveillance, or monitoring devices unless they are in accordance with procedures established by the head of the Intelligence Community element concerned or the head of a department containing such element and approved by the Attorney General, after consultation with the Director." While Plaintiff's allegation of Defendants' use of phased array imaging from the Starshield system is physically

observable, mentioning the Starshield's self-multiplexing phased array antenna with visible parabolic antenna emissions in addition to examining microwave analyzer data and introducing the LORO method as this pertains to moving target integration and tomography of moving targets. The testing of Defendant DARPA's N3, NEAT, RFMLS as integrated into the JADC2 via SoSITE's STITCHES, must have been guided and commanded by the CIA and DIA whilst deploying CIA and USAF psychological warfare and electronic warfare tactics concurrently optically deploying Defendant CIA's EIT's, "sleep deprivation," and, "dietary manipulation," via microwave band irradiation, while Defendant NSA and Defendant DIA enabled real-time updates to their JADC2 based upon Defendant NRO's RF data collection and SENTIENT system as each operates within their officially acknowledged operational capacity. Whether this is due to the Starshield system's Starlink resources and, "ancillary equipment," using the LORO (Lobe-On-Receive-Only) method whilst deploying Defendant DARPA's SoSITE STITCHES' integration of N3, NEAT, RFMLS, INSIGHT, and OVERSIGHT programs in conjunction with the utilization of reflection absorption spectroscopy, transient spectroscopy, electron energy loss spectroscopy, or Zeeman Spectroscopy, Plaintiff claims without further disclosure or access to privileged information, that data-driven inferences of Defendants' activities and evidence indicates their collective involvement and contribution to illegally conducted TECHINT, SIGINT, IMINT, MASINT, and HUMINT operations within the

operational capacity currently stated to be within, "public domain."

28.   Under 18 U.S. Code § 1385, the *Posse Comitatus Act*, which limits the powers of the United States Army, the Navy, the Marine Corps, the Air Force, and the Space Force as, "posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both," the United States Department of Defense acted criminally in addition to the CIA and NSA, while also violating Plaintiff's Constitutional Amendments I, IV, V, and VIII. This occurred while Defendants also damaged his health while generating personal injury and property damages.

29.   Although Presidential Policy Directive 28, Section 1(a) states, "The collection of signals intelligence shall be authorized by statute or Executive Order, proclamation, or other Presidential directive, and undertaken in accordance with the Constitution and applicable statutes, Executive Orders, proclamations, and Presidential directives," the extensive timeline indicating continuous detection of the Starshield's deployment of SpaceX Starlink's, "ancillary equipment," exhibits Defendant CIA DS&T's activities under Michael Griffin, Michael Kratsios, Terry Emmert, Heidi Shyu, and Nand Mulchandani, as they allegedly guided or commanded Defendant DoD Department of the USAF and Defendant DoD: NRO while utilizing their LORO method and deploying Defendant DARPA's N3, NEAT, and RFMLS while jointly operating with Defendant DIA's Joint Staff Targeting J2T, AI and Machine Learning Division personnel, Defendant NSA's CCC intelligence collection center

at the ADF-C, Defendant NRO's Office of Intelligence Liaison to NASIC, Defendant NRO's Space Delta groups, Defendant DoD: USAF's NASIC's ADF-C Liaison, and Defendant CIA's Directorate of Science and Technology staff at the NRO. This occurred while they violated the statutory and Executive Order-granted authorizations in addition to Constitutional freedoms as these pertain to SIGINT, MASINT, IMINT, TECHINT, and HUMINT.

30. Presidential Policy Directive 28, Section 1(b) states, "Privacy and civil liberties shall be integral considerations in the planning of U.S. signals intelligence activities. The United States shall not collect signals intelligence for the purpose of suppressing or burdening criticism or dissent, or for disadvantaging persons based on their ethnicity, race, gender, sexual orientation, or religion," and the SIGINT, "shall be collected exclusively where there is a foreign intelligence or counterintelligence purpose to support national and departmental missions and not for any other purposes," Plaintiff claims his permanent metal implants have been irradiated via MASINT, SIGINT, and IMINT for, "the purpose of suppressing or burdening criticism or dissent." This occurred in addition to the alleged collection of data pertaining to, "permanently implanted," animals or humans, as this pertains to a subject's exposure to different environmental stimuli. Plaintiff states this occurred publicly with what appeared to have been conducted in violation of Presidential Policy Directive 28, Section 1(b), as this is alleged to have violated Plaintiff's, "Privacy and civil liberties," while also

being utilized in conjunction with SIGINT conducted, "for the purpose of suppressing or burdening criticism or dissent." Regardless of Defendants' further disclosure, the activity of Defendant NRO's RF data collection and Defendant Department of Defense: Department of the United States Air Force is claimed to have been detected with a calibrated Microwave Analyzer which conforms to IEC 61326, and also with Line-Of-Sight observations as these pertain to aforementioned and openly disclosed methods, tactics, and technology Defendants formally acknowledge. Thus, Plaintiff's claims either maintain, "facial plausibility," or do not, upon the court assessing the plausibility of his evidence and claims, holding to the collection and presentation of this evidence being conducted in admissible manner according to the Federal Rules of Evidence and in accordance with the Federal Rules of Civil Procedure.

31.     Pursuant to the ruling of United States vs. Seward 68 F.2d 1270,1275 (10* Cir. 1982) 459 U.S. 1147 (1983), the court established the three conditions which describe when, "a defendant may successfully use a defense of necessity to excuse otherwise illegal acts if (1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship is reasonable anticipated to exist between defendant's action and the avoidance of harm." When concerning the defense of necessity, "one principle remains constant: if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse do the criminal act and also to avoid the threatened harm,' the defense will fail," Id. at 1276,

quoting United States v. Bai (ev. 444 U.S. 394 ((980). The defense must establish they were, "confronted with ... a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts," when attempting to prove there was no viable alternative to having violated the law.

32. Though 18 U.S.C. §§ 2340 formally integrates the United Nations Convention Against Torture and Other Cruel, Inhumane, or Degrading Treatment or Punishment, the Convention Against Torture limits its scope to defining, "torture," as, "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. §§ 2340(1). This statute adds conditions to, "torture," as this is derived from, "prolonged mental harm caused by or resulting from," "severe mental pain or suffering, which means the prolonged mental harm caused by or resulting from," "the intentional infliction or threatened infliction of severe physical pain or suffering," "the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality," "the threat of imminent death," and, "the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality." 18 U.S.C. §§ 2340(2).

Thus, Defendants' utilization of the Starshield system's Starlink resources, "ancillary equipment," constitutes torture, as this is alleged to be utilized to generate mental and physical pain and suffering through the weaponization of microwave band irradiation, electromagnetic radiation, and radio frequency interference as these affected permanent implants. This occurred as Plaintiff experienced Defendants' intentional deployment, testing, use, and deployment of the Starshield system while Plaintiff's permanent metal implants were irradiated and contributed to severe levels of pain, disruption, and suffering. This occurred concurrently to Plaintiff experiencing electrodermal conditioning, and Pavlovian aversion conditioning which are, "mind-altering ... procedures calculated to disrupt profoundly the senses or the personality." Due to the formally acknowledged AD0750271, Defendants' deliberate use, deployment, and weaponization of microwave band radiation constitutes a dose-dependent, mind-altering procedure which, "disrupts profoundly the senses or personality." Because of these, "mind-altering procedures," Plaintiff was under the threat of imminent death while the Starshield system was proven to be both tested, and in use over his surrounding area. Plaintiff establishes the threat of his family's continued exposure to dangerous levels of microwave radiation, radiofrequency interference, alleged second-harmonic scattering, alleged reflection absorption spectroscopy, and alleged transient spectroscopy as this constitutes a threat of their imminent death, severe physical pain and suffering, while several members have already demonstrated damages capably

attributed to or caused by Defendants' actions. Plaintiff has been exposed to dose-dependent mind-altering microwave radiation, this also has deliberately modified his behaviors and senses, with Defendants intending to propagate Dr. Seligman's, "Learned Helplessness," and Stasi, "Zersetzung," psychological warfare tactics as OEITs were administered.

33. When following the protocols of Executive Order 14086, Presidential Policy Directive 28, and the National Security Council Intelligence Directive No. 6, regardless of further disclosure or the capability to attain affirmation, or denial of activity, due to the operational capacity as introduced and defined by Executive Order 14086, Presidential Policy Directive 28, and the National Security Council Intelligence Directive No. 6, responsibility for these alleged Constitutional violations is directly assigned to those responsible; Defendant CIA, Defendant NSA and Defendant NRO for their organization's SIGINT, MASINT, TECHINT, IMINT, and HUMINT operations if the court recognizes the validity of Plaintiff's claims, *prima facie* evidence, allegations, and preponderances as these pertain to Defendant Department of Defense Department of the United States Air Force's alleged violations. These are alleged to be assigned to Defendant DARPA for their SoSITE STITCHES' integration and testing of the RFMLS, N3, and NEAT program's system's code as this integration occurred through DARPA's USSF Liaison, currently Dr. Ronald Aung, and through Jimmy "Reverend" Jones's STITCHES Warfighter Application Team.

34. Regardless of any possible method Defendants could have utilized to acquire the authorization to test the electronic surveillance equipment on Plaintiff, because Plaintiff is a US citizen, and was located in the US during the time of alleged misconduct and violations, Defendants violated Plaintiff's Constitutional freedoms (amendments I, IV, V, VIII) while under the color of federal law.

35. Through issuing each Defendant a claim via SF95 form and waiting for the appropriate duration before filing, Plaintiff followed FTCA procedure, and etiquette pursuant to Conley v. Gibson, 355 U. S. 41,47, to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."

36. Through perpetrating non-consensual human experimentation, cruel and unusual punishment, and torture, Defendants violated the Civil Conventions Against Torture, and "norms," of international law which are historically, "norms[s] that [are] specific, universal, and obligatory." Sosa v. Alvarez-Machain (03-339) 542 U.S. 692 (2004) 732.

37. Under 8 CFR § 208.18, due to the causation of the presence of unwarranted radio frequency presence, dangerous electromagnetic interference, dangerous electromagnetic field emissions, and dangerous radio frequency interference being attributed to the intended, malicious, and wanton actions of Defendants jointly operating under the Color of Law, and because Plaintiff introduces establishes this effect on his mental health unwellness, generation of electrodermal fear and aggression conditioning, and Pavlovian aversion conditioning,

Defendants' alleged actions constitute the label of torture. All of the elements of 8 CFR § 208.18(a)(4), each of which constitutes the label of torture, are met, and due to the operational capacity of Defendants as this pertains to their operational domains, these actions fall within and under the physical power, or control, of Defendants.

38. As demonstrated, Defendants violated Plaintiff's 4th Amendment rights to reasonable search and seizure and, Defendants' alleged search, "is objectively unreasonable in light of [the] clearly established constitutional right." Adams v. Metiva, 31 F.3d 375, 387 (6th Cir. 1994); see Dickerson v. McClellan, 101 F.3d 1151, 1158.

39. Where there are damages, and "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." Bell v. Hood, 327 U.S., at 684 Bemis Bros. Bag Co. v. United States, 289 U.S. 28, 36 (1933) (Cardozo, J.); The Western Maid, 257 U.S. 419, 433 (1922) (Holmes, J.).

40. Through elucidating Plaintiff's damages, his family's damages, his surrounding community's damages, and the possibility of the continuation of Defendants' alleged violations contributing to future damages, Plaintiff has satisfied the elements of the ruling of Hohe v. Casey, 868 F.2d 69, 72, while seeking relief, where he has "demonstrate(d) both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." Thus, Plaintiff should be entitled to preliminary injunction and other relief. Oburn, 521 F.2d at 150.

41. While the "necessity defense" requires, "there is no third and legal alternative available, that the harm to be prevented be imminent, and, that direct, causal relationship be reasonable anticipated to exist between Defendants' action and the avoidance of harm," Plaintiff demonstrates he exhausted legal options pertaining to seeking both financial and injunctive relief. Thus, Defendants' actions do not meet the criteria for the elements which satisfy the, "necessity defense," requirements. Defendants' alleged misconduct and violations do not meet the criteria between, "the direct, causal relationship between the action and the avoidance of harm." State v. Marley. 509 P.Td 1095,1097, 1973.

42. Due to the coercion Plaintiff was subjected to through Defendants' deployment of SpaceX's Starlink's, "ancillary equipment," via their Starshield system, Plaintiff experienced a, "loss of First Amendment freedoms, [which] for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689 (1976). Defendants' alleged activity, detected by the use of microwave analyzers, EMI Line Noise, EMF meters, data analyses, line of sight observations, professional audio- and video equipment recordings, while recording passive intermodulation distortion, spectrum emission mask tests, and subharmonic injection locking as exhibited through data analysis of IEC 61326 conforming microwave analyzers, indicates the presence of SIGINT, MASINT, and IMINT operation, indicates gross 1st, 4th, 5th, and 8th amendment violations constituting an injury or multiple injuries.

43.     Plaintiff seeks to recover damages due to both personal injury
        and property damages in addition to relief due to infringement
        of his Constitutional rights and civil liberties. While Plaintiff
        has the capability to assign a value to his property damages
        and personal injury damages, these also accompany gross
        statutory and constitutional violations which, when, "adding to
        the number of Amendments from which causes of actions may
        be inferred, the Court does not provide any guidance for
        deciding when a constitutional provision permits an inference
        that an individual may recover damages and when it does not."
        Austin v. United States, 509 U.S. 602 (1993).

44.     While Plaintiff does not require the use of the FOIA to access
        records pertaining to his allegations due to his introduction of
        evidence, *Prima Facie*, or otherwise, the court may require
        further insight and, "The Supreme Court has made clear that
        the federal courts are capable of reviewing military decisions,
        particularly when those decisions cause injury to civilians."
        Koohi v. United States, 976 F.2d 1328, 1331 (9th Cir. 1992.).

45.     Under the Straight Provocation Frame's definition of
        provocation, Plaintiff alleges Defendants' actions were,
        "deliberately calculated to lead to further conflict." La Farn v.
        State, 265 S.W.2d 816 (Tex. Crim. App. 1954). Defendants'
        actions were constructed to coerce, intimidate, and suppress
        dissent and opposition, which violates not only the Presidential
        Policy 28 and Executive Order 12333, but also Plaintiff's
        Constitutional freedoms and civil liberties as Plaintiff states
        these were perpetrated with designs to suppress opposition
        and freedoms through covert deployment of Department of

Defense Department of the United States Air Force's, Department of Defense National Reconnaissance Office's, CIA Directorate of Science and Technology's, and Defense Intelligence Agency's officially acknowledged methods, tactics, and technology.

46. Defendants' actions therefore constitute coercion, cyberharassment via IoT, illegal surveillance, attempted murder, human trafficking, non-consensual human experimentation, cruel and unusual punishment, and torture, which are clear violations of the 1st amendment, 4th amendment, 5th amendment, and 8th amendment of the US constitution, in addition to the Convention Against Torture and the Outer Space Treaty. These violations caused Plaintiff to sustain both personal injuries, and property damage.

47. Defendant US Department of Defense: Department of the USAF is liable for Plaintiff's personal injuries, and property damage due to the USAF's 4th EWS, USSF Space Delta 3, NASIC, and 544th ISRG's field disruption, electromagnetic attacks, and ISR activities utilized through extended operation and testing of the Starshield system, Starlink array's resources' and "ancillary equipment['s]," tests. Defendants' actions abridged Plaintiff's freedom of speech, press, aided and embedded in unreasonable and unwarranted search and seizure, deprived Plaintiff of his life, liberty, and property, and aided and embedded in cruel and unusual punishment, torture, non-consensual human experimentation, attempted murder, and human trafficking while Defendant acted under the Color of Law.

48.  Defendant US Department of Defense National Reconnaissance Office is liable for Plaintiff's personal injuries, and property damage due to the NRO's Advanced Systems & Technology (AS&T) Directorate's (OSR) and NRO 544th ISRG 5th detachment's Starshield system, Starlink array's resources and "ancillary equipment," tests, intelligence personnel training, and general SIGINT, MASINT, and IMINT operations as they integrated this system into their SENTIENT program and JADC2 platform, while utilizing the LORO (lobe-on-receive-only) method, collecting, "bulk data," for IMINT and MASINT. They surpassed the legal extent and duration of electronic surveillance equipment testing, and illegally utilized microwave band irradiation and electromagnetic irradiation against Plaintiff. Defendants' actions abridged Plaintiff's freedom of speech and press, aided and embedded in unreasonable and unwarranted search and seizure, deprived Plaintiff of his life, liberty, and property, and aided and embedded in cruel and unusual punishment, non-consensual human experimentation, torture, attempted murder, and human trafficking, while Defendant acted under the Color of Law.

49.  Defendant US Defense Intelligence Agency is liable for Plaintiff's personal injuries, and property damage due to their Starshield system, Starlink array's resources and "ancillary equipment," tests, intelligence personnel training, and general MASINT, RINT, IMINT, and HUMINT operations as their Artificial Intelligence and Machine Learning Division and JADC2's integration team jointly deployed DARPA's SoSITE

STITCHES, integrating their RFMLS, N3, and NEAT programs into the JADC2 while utilizing optically, "enhanced interrogation techniques," and coercive interrogation techniques. Defendants' actions abridged Plaintiff's freedom of speech and press, aided and embedded in unreasonable and unwarranted search and seizure, deprived Plaintiff of his life, liberty, and property, and aided and embedded in cruel and unusual punishment, non-consensual human experimentation, attempted murder, and human trafficking while Defendant acted under the Color of Law.

50.   Defendant US Central Intelligence Agency is liable for Plaintiff's personal injuries, and property damage due to the CIA's Directorate of Science and Technology Office of Space Reconnaissance hosted by Defendant NRO, and Defendant CIA and Defendant NSA's Special Collections Service's use of the Starshield system, Starlink array's resources and "ancillary equipment," tests, intelligence personnel training, and general operations in HUMINT, MASINT, RINT, IMINT, TECHINT, and SIGINT. Defendants jointly deployed DARPA's SoSITE STITCHES, integrating their RFMLS, N3, and NEAT programs into the JADC2 while utilizing, optically, "enhanced interrogation techniques," and coercive interrogation techniques. Defendant CIA's actions abridged Plaintiff's freedom of speech and press, aided and embedded in unreasonable and unwarranted search and seizure, deprived Plaintiff of his life, liberty, and property, and aided and embedded in cruel and unusual punishment, non-consensual

human experimentation, attempted murder, and human trafficking while Defendant acted under the Color of Law.

51. Defendant US Defense Advanced Research Projects Agency is liable for Plaintiff's personal injuries, and property damage due to DARPA's use of the Starshield system, Starlink array's resources and "ancillary equipment's," tests, intelligence personnel training, and general operations as their USSF and USAF Liaisons, Lt. Col. Ronald Aung and Col John Paul Mintz, enabled the Department of the United States Air Force and their Combat Support Agencies to deploy their SoSITE program's STITCHES implementation of their OVERSIGHT, Insight, RFMLS, N3, and NEAT programs as tested and integrated into the JADC2, while DARPA's MTO and BTO office's system's code supported the deployment of, optically, "enhanced interrogation techniques," and coercive interrogation techniques while collecting data. Defendants' actions abridged Plaintiff's freedom of speech and press, aided and embedded in unreasonable and unwarranted search and seizure, deprived Plaintiff of his life, liberty, and property, and aided and embedded in cruel and unusual punishment, non-consensual human experimentation, attempted murder, and human trafficking while Defendant acted under the Color of Law.

52. Defendant US National Security Agency is liable for Plaintiff's personal injuries, and property damage due the NSA CCC's involvement in the use of the Starshield system, Starlink array's resources and "ancillary equipment," tests, intelligence personnel training, and general SIGINT operations while

integrating the Starshield system into the SENTIENT program through the JADC2 platform. This occurred while operating warrantless surveillance and detecting exploitable signals and equipment. Defendants' actions abridged Plaintiff's freedom of speech and press, aided and embedded in unreasonable and unwarranted search and seizure, deprived Plaintiff of his life, liberty, and property, and aided and embedded in cruel and unusual punishment, non-consensual human experimentation, attempted murder, and human trafficking, while Defendant acted under the Color of Law.

53. This Court has jurisdiction under the Federal Tort Claims Act to adjudicate Plaintiff's claims because Plaintiff holds citizenship in the US, Defendants are US Federal organizations and agencies, and the violations, acts, or omissions in question occurred within US territorial bounds.

## V. FACTUAL ALLEGATIONS

**DEFINITIONS – For purposes of this section**

1. The, "adjacent channel power measurement," measures, "the amount of interference, or power, in an adjacent frequency channel." Garza, *Make Fast and Accurate Adjacent Channel Power Measurements*, https://www.keysight.com/blogs/en/tech/rfmw/2019/02/22/make-fast-and-accurate-adjacent-channel-power-measurements.

2. The, "afferent neuron," is a defined as a classification of Neurons, "which conduct nerve impulses to the central nervous system." *Afferent Neuron*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D009475.

3. The, "amygdala," is the, "almond-shaped group of basal nuclei anterior to the interior horn of the lateral ventricle of the temporal lobe, and is part of the limbic system." *Amygdala*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D000679.

4. "Ancillary equipment," is defined as an, "instrument which may be functionally related to the foreign instrument but is not operationally linked to it." 15 CFR § 301.2 (j).

5. "Association Cortices," are defined as,

> most of the cerebral surface of the human brain and are largely responsible for the complex processing that goes on between the arrival of input in the primary sensory cortices and the generation of behavior.

*Association Cortices*, Neuroscience (2nd ed. 2001).

6.    The, "axions," are defined as, "Nerve fibers that are capable of rapidly conducting impulses away from the neuron cell body." *Axions*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D001369.

7.    The, "basilar-membrane," is defined as,

> a basement membrane in the cochlea that supports the hair cells of the organ of corti, consisting keratin-like fibrils. It stretches from the spiral lamina to the basilar crest. The movement of fluid in the cochlea, induced by sound, causes displacement of the basilar membrane and subsequent stimulation of the attached hair cells which transform the mechanical signal into neural activity.

*Basilar-membrane*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D001489.

8.    The, "bed nucleus of the stria terminalis," (BNST) is defined as, "a heterogeneous and complex limbic forebrain structure, which plays an important role in controlling autonomic, neuroendocrine and behavioral responses." Curr Neuropharmacol; 11(2): 141–159 (2013).

9.    "Betz cells," are defined as, "a type of large pyramidal cell found in the fifth layer of the cerebral cortex, mainly in motor cortex," which, "are associated with muscle movement and have a low threshold of stimulation." *Betz cells*, APA Dictionary of Psychology, https://dictionary.apa.org/betz-cell.

10.   "Binaural unmasking," is defined as, "phenomenon in which a monaural sound that masks another monaural sound loses its masking property when it is heard binaurally." *Binaural unmasking*, Oxford Reference,

https://www.oxfordreference.com/display/10.1093/oi/authority.20110803095506356.

11.    "Bioelectric Gastrointestinal Neuromodulation," is defined as a,

> form of neuromodulation [which] has been applied at several sites on nerves innervating the gastrointestinal tract in experimental clinical settings to treat several gastrointestinal disorders, including vagal nerve stimulation for inflammatory bowel disease, vagal block for obesity, gastric electrical stimulation for nausea and gastroparesis, sacral nerve stimulation (SNS) and transcutaneous interferential electrical nerve stimulation for constipation/fecal incontinence, and percutaneous electrical nerve field stimulation (PENFS) for visceral hyperalgesia.

Nat Rev Gastroenterol Hepatol; 16:89–105 (2019).

12.    "Bioelectric neuromodulation," is defined as, "the therapeutic use of electrical stimulation of nerves or brain centers." Saudi J Gastroenterol. 28(6): 403–412 (2022).

13.    "Bioelectromagnetism," is defined as, "electromagnetosensitive processes at the fundamental interaction of energetical fields with the matter." Rev Med Chir Soc Med Nat Iasi. ;114(1):266-70 (2010).

14.    "Blood oxygen level dependent responses," are defined as, "changes in deoxyhemoglobin driven by localized changes in brain blood flow and blood oxygenation, which are coupled to underlying neuronal activity by a process termed neurovascular coupling." Annu Rev Neurosci. 37: 161–181 (2014).

15.    "Bone conduction," is defined as,

> the transmission of sound waves through vibration of bones in
> the skull to the inner ear (cochlea). By using bone conduction
> stimulation and by bypassing any outer ear or middle ear
> abnormalities, hearing thresholds of the cochlea can be
> determined. Bone conduction hearing differs from normal
> hearing which is based on air conduction stimulation via the ear
> canal and the tympanic membrane.

National Library of Medicine MeSH, *Bone Conduction*,
http://id.nlm.nih.gov/mesh/D001844.

16. The, "Cassegrain antenna (or system)," is defined as an, "arrangement of mirrors, lenses, etc. used in reflecting telescopes and microwave antennas, having its focus or transmission point near or behind the center of the main mirror." *Cassegrain antenna*, Webster's New World College Dictionary, 4th Edition.

17. The, "caudate," is defined as the, "elongated gray mass of the neostriatum located adjacent to the lateral ventricle of the brain." *Caudate*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D002421.

18. The, "cavernous nerves," are stated to, "have parasympathetic fibers that innervate the helicine arteries which supply erectile tissue. Treasure Island (FL): StatPearls Publishing (2024).

19. The, "central nervous system," is defined as the, "main information-processing organs of the nervous system, consisting of the brain, spinal cord, and meninges." *Central nervous system*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D002490.

20.   The, "central state materialism," is the philosophy of mind that, "identifies mental events with physical events occurring in the brain and central nervous system. It is thus a form of physicalism. The two forms most commonly distinguished are token-token identity theory, and type-type identity theory." *Materialism*, Encyclopedia Britannica, https://www.britannica.com/topic/materialism-philosophy/Twentieth-century-materialism.

21.   The, "cerebellothalamocortical system," is defined as, "cerebellum projections to the premotor and prefrontal cortices via the thalamus." Med Devices Diagn Eng, (2020).

22.   The, "short Ciliary nerve short," is defined as the, "The short ciliary nerves arise from the ciliary ganglion and carry sensory (from nasociliary), sympathetic and parasympathetic fibres (derived predominantly from nerve III, but also from VII). The Eye (Fourth ed. 2016).

23.   The, "cingulate cortex functions," is defined as, "one of the convolutions on the medial surface of the cerebral hemispheres. It surrounds the rostral part of the brain and corpus callosum and forms part of the limbic system." *Gyrus Cinguli*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D006179.

24.   The, "circadian rhythm," is defined as the, "regular recurrence, in cycles of about 24 hours, of biological processes or activities, such as sensitivity to drugs or environmental and physiological stimuli." *Circadian rhythm*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D002940.

25.  "Conditional signal models," are defined as, "instantaneous
     signal-to-noise ratio and other statistical parameter equations."
     Mayo, *Digital Photon Correlation Data Processing Techniques*,
     DTIC (1976), Internet Archive.
     https://archive.org/details/DTIC_ADA027195.

26.  "Conduction current," is defined as, "the movement of
     electricity in an electric conductor." *Conduction current*,
     Merriam-Webster Dictionary, https://www.merriam-
     webster.com/dictionary/conduction%20current.

27.  "Corneal Nerves," or, "Corneal sensory nerves," "originate
     from the ophthalmic division of the trigeminal ganglion [3],
     traveling in the nasociliary nerve and its long ciliary nerve
     branches, and ultimately branching into nerve fibers that
     penetrate the cornea," which, "In response to external threats
     and stimuli, such as dust, pathogens, or xenobiotics, corneal
     nerves not only induce tear production, but also stimulate the
     blinking reflex through an elaborate interplay between the
     corneal surface and lacrimal glands." Yale J Biol Med. 91(1): 13–
     21 (2018).

28.  "Cyclotron," is defined as an accelerator in which, "charged
     particles (such as protons, deuterons, or ions) are propelled by
     an alternating electric field in a constant magnetic field."
     *Cyclotron*, Merriam-Webster Dictionary,
     https://www.merriam-webster.com/dictionary/cyclotron.

29.  "Delta waves," are defined as,

     > high amplitude electrical rhythm of the brain with a low
     > frequency of less than four cycles per second that occurs
     > especially in slow-wave sleep, is most prominent in infancy and

- 55 -

> early childhood, and may exhibit abnormal activity in various conditions.

*Delta Waves*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/delta%20wave.

30. "Dendrites," are defined as, "extensions of the nerve cell body. They are short and branched and receive stimuli from other neurons." *Dendrites*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D003712.

31. "Dielectric," is defined as, "a nonconductor of direct electric current." *Dielectric*, Encyclopedia Britannica, https://www.britannica.com/science/dielectric.

32. "Distributed feedback lasers," are defined as a,

> A DFB laser is a type of diode laser that uses diffraction gratings rather than mirrors to produce resonance and oscillation in the cavity. The goal of a distributed feedback (DFB) laser is to sharpen the output of traditional Fabry-Perot lasers.
>
> The two primary forms of distributed feedback lasers are DFB fiber lasers and DFB semiconductor lasers. Semiconductor lasers generate laser oscillations by feeding an electric current through semiconductors, whereas fiber lasers channel and magnify light via fiber optic cable.

Inphenix, *DFB Laser Diode For Optical Fiber Communication System*, https://www.inphenix.com/en/dfb-laser-for-optical-fiber-communication-system/#:~:text=A%20DFB%20laser%20is%20a,of%20traditional%20Fabry%2DPerot%20lasers.

33. "Drain-source voltage," is defined as, "dc voltage between the drain terminal and the source terminal." *Drain-source-voltage* JEDEC, https://www.jedec.org/standards-documents/dictionary/terms/drain-source-voltage-dc-vds.

34. "Efferent Neurons," are defined as, "Neurons which send impulses peripherally to activate muscles or secretory cells." *Efferent Neurons*, National Library of Medicine MeSH, https://meshb.nlm.nih.gov/record/ui?ui=D009476.

35. "Electrochemical," is defined as, "relating to the production of chemical changes using electricity, or the electricity produced by chemical changes." *Electrochemical*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/electrochemical.

36. "Electrodermal," is defined as, "the change in electrical resistance of the skin, occurring in emotion and in certain other conditions." *Electrodermal*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D005712.

37. "Electromagnetic," is defined as, "the electrical and magnetic forces produced by an electric current." *Electromagnetic*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/electromagnetic.

38. "Electromagnetic Field," is defined as,

> a property of space caused by the motion of an electric charge. A stationary charge will produce only an electric field in the surrounding space. If the charge is moving, a magnetic field is also produced. An electric field can be produced also by a changing magnetic field. The mutual interaction of electric and

- 57 -

> magnetic fields produces an electromagnetic field, which is
> considered as having its own existence in space apart from the
> charges or currents (a stream of moving charges) with which it
> may be related. Under certain circumstances, this
> electromagnetic field can be described as a wave transporting
> electromagnetic energy.

*Electromagnetic Field*, Encyclopedia Britannica,
https://www.britannica.com/science/electromagnetic-field.

39.   "Electron energy loss spectroscopy," is defined as, "a characterization technique to measure kinetic energy change of electrons after inelastic interactions with materials, which provides structural and chemical information of the materials studied." Li, W., Ni, C. (2013). Electron Energy Loss Spectroscopy (EELS). In: Wang, Q.J., Chung, YW. (eds) Encyclopedia of Tribology. Springer, Boston, MA. https://doi.org/10.1007/978-0-387-92897-5_1223.

40.   "Electrophysiological," is defined as, "physiology that is concerned with the electrical aspects of physiological phenomena." *Electrophysiological*, Merriam-Webster, https://www.merriam-webster.com/dictionary/electrophysiology.

41.   "Evoked potentials," are defined as,

> electrical responses recorded from nerve, muscle, sensory
> receptor, or area of the central nervous system following
> stimulation. They range from less than a microvolt to several
> microvolts. The evoked potential can be auditory (evoked
> potentials, auditory), somatosensory (evoked potentials,
> somatosensory), visual (evoked potentials, visual), or motor

(evoked potentials, motor), or other modalities that have been
reported.

*Evoked potentials*, National Library of Medicine MeSH,
http://id.nlm.nih.gov/mesh/68005071.

42.    "Facial nerve," is defined as,

the 7th cranial nerve...[which] has two parts, the larger motor
root which may be called the facial nerve proper, and the smaller
intermediate or sensory root. Together they provide efferent
innervation to the muscles of facial expression and to the
lacrimal and salivary glands, and convey afferent information for
taste from the anterior two-thirds of the tongue and for touch
from the external ear.

*Facial Nerve*, National Library of Medicine MeSH,
http://id.nlm.nih.gov/mesh/D005154.

43.    "Femtosecond," is defined as, "one quadrillionth of a second."
*Femtosecond*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/femtosecond#:~:text=noun,one%20qu
adrillionth%20of%20a%20second.

44.    "Ferromagnetism," is defined as, "the physical phenomenon in
which certain electrically uncharged materials strongly attract
others." *Ferromagnetism*, Encyclopedia Britannica,
https://www.britannica.com/science/ferromagnetism.

45.    "FETs," are, "field-effect transistors," which are defined as, "a
transistor in which the output current is controlled by a
variable electric field." *field-effect transistors*. Merriam-Webster,
https://www.merriam-webster.com/dictionary/field-
effect%20transistor.

46. "Gamma Waves," are defined as, "Gamma oscillations (30–120 Hz)," and,

> are present in nearly all structures and all brain states, although they dominate in the aroused, attentive brain. The transient ripple pattern (130–200 Hz), most prominent in the hippocampus, serves to transfer memories and action plans from the hippocampus to the neocortex. These and other rhythms can temporally coexist in the same or in different structures and interact with each other.

*Gamma Wave*, Encyclopedia Britannica, https://www.britannica.com/science/gamma-wave.

47. "Gasotransmitters," are defined as, "endogenously produced lipid-soluble gaseous molecules which function as neurotransmitters and signal mediators targeting ion channels and transporters." *Gasotransmitter*, National Library of Medicine MeSH, https://www.ncbi.nlm.nih.gov/mesh/D064426.

48. "Goblet cells," are defined as,

> glandular epithelial cell or a unicellular gland. Goblet cells secrete MUCUS. They are scattered in the epithelial linings of many organs, especially the small intestine and the respiratory tract.

*Goblet cells*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D020397.

49. "$H_2S$," or Hydrogen Sulfide, is defined as a, "flammable, poisonous gas with a characteristic odor of rotten eggs. It is used in the manufacture of chemicals, in metallurgy, and as an

analytical reagent." *H₂S*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D006862.

50.    "Harmonic generation," is defined as, "a process to convert a number of low-energy photons to one high-energy photon in a strong laser electric field." Encyclopedia of Interfacial Chemistry (2018).

51.    "Heterodyne," is defined as,

> of or relating to the production of an electrical beat between two radio frequencies of which one usually is that of a received signal-carrying current and the other that of an uninterrupted current introduced into the apparatus also: of or relating to the production of a beat between two optical frequencies.

*Heterodyne*, Merriam-Webster, https://www.merriam-webster.com/dictionary/heterodyne.

52.    "Hypothalamus," is defined as, "the Ventral part of the diencephalon extending from the region of the optic chiasm to the caudal border of the mammillary bodies and forming the inferior and lateral walls of the third ventricle." *Hypothalamus*, National Library of Medicine MeSH, https://www.ncbi.nlm.nih.gov/mesh/D007031.

53.    "Idiotypic cortex," is defined as,

> the areas of [the] neocortex, which either receive direct projections from the specific sensory relay nuclei of the thalamus (primary sensory cortex) or represent the final common pathway for motor fibers (primary motor cortex) prior to their entering the corticobulbar and corticospinal tracts of the internal capsule.

Mesulam, M.-M. (2000). Behavioral neuroanatomy: large-scale networks, association cortex, frontal syndromes, the limbic

system, and hemispheric specialization. In M. Mesulam (Ed.),
Principles of behavioral and cognitive neurology (Chapter 1,
pp. 1–120). New York: Oxford University Press.

54.    "IEC 61326," is defined as and specifies,

> requirements for immunity and emissions regarding
> electromagnetic compatibility (EMC) for electrical equipment,
> operating from a supply or battery of less than 1000 V AC or
> 1500 V DC or from the circuit being measured. Equipment
> intended for professional, industrial-process, industrial-
> manufacturing and educational use is covered by this part. It
> includes equipment and computing devices for: measurement
> and test; controls; laboratory use; accessories intended for use
> with the above (such as sample handling equipment); intended
> to be used in industrial and non-industrial locations.

International Electrotechnical Commission, *IEC 61326-1:2020
RLV* (2020).

55.    "Infrared spectroscopy," is defined as,

> the technique which covers the region of the electromagnetic
> spectrum between the visible (wavelength of 800 nanometres)
> and the short-wavelength microwave (0.3 millimetre). The
> spectra observed in this region are primarily associated with the
> internal vibrational motion of molecules, but a few light
> molecules will have rotational transitions lying in the region. For
> the infrared region, the wavenumber ($\bar{v}$, the reciprocal of the
> wavelength) is commonly used to measure energy. Infrared
> spectroscopy historically has been divided into three regions: the
> near infrared (4,000–12,500 inverse centimetres [cm−1]), the mid-
> infrared (400–4,000 cm−1), and the far infrared (10–400 cm−1).

*Infrared spectroscopy*, Encyclopedia Britannica,
https://www.britannica.com/science/spectroscopy/Infrared-
spectroscopy#ref620336.

56.     "Interferometer," is defined as, "an apparatus that utilizes
the interference of waves (as of light) for precise determinations
(as of distance or wavelength)." *Interferometer*, Merriam-
Webster, https://www.merriam-
webster.com/dictionary/interferometer.

57.     "Interneuron," are defined as,

> any NEURONS which are not motor or sensory. Interneurons
> may also refer to neurons whose axons remain within a
> particular brain region in contrast to projection neurons, which
> have axons projecting to other brain regions.

*Interneuron*, National Library of Medicine MeSH,
http://id.nlm.nih.gov/mesh/D007395.

58.     "Interoperability," is, "the ability of a system (such as a
weapons system) to work with or use the parts or equipment of
another system." *Interoperability*, Merriam-Webster,
https://www.merriam-
webster.com/dictionary/interoperability.

59.     "Intersubband excitations," or, "Intersubband polaritons," are
defined as, "light-matter excitations originating from the strong
coupling between an intersubband quantum well electronic
transition and a microcavity photon mode." Luc Nguyen-Thê,
Simone de Liberato, Motoaki Bamba, Cristiano Ciuti. Many-
body physics of intersubband polaritons (2012).

60.     "Intersystem crossing," is defined as,

a process in which a singlet excited electronic state makes a transition to a triplet excited state at the point where the potential energy curves for the excited singlet and triplet states cross. This transition is forbidden in the absence of spin-orbit coupling but occurs in the presence of spin-orbit coupling. A triplet formed in this way is frequently in an excited vibrational state. This excited triplet state can reach its lowest vibrational state by collisions with other molecules. The transition from this state to the singlet state is forbidden in the absence of spin-orbit coupling but allowed when there is spin-orbit coupling. This gives rise to the slow emission of electromagnetic radiation known as phosphorescence.

*Intersystem crossing*, A Dictionary of Chemistry (6th ed. 2008).

61.     "Internet of Things," is defined as, "the network of devices that contain the hardware, software, firmware, and actuators which allow the devices to connect, interact, and freely exchange data and information." NIST SP 800-172.

62.     "Kinetics," are defined as, "the mechanism by which a physical or chemical change is affected." *Kinetics*, Merriam-Webster, https://www.merriam-webster.com/dictionary/kinetics.

63.     "KLS Martin Titanium," is defined as, "Pure titanium in implant quality. Titanium alloy in implant quality. Ti-6Al-4V." KLS Martin, Osteosynthesis 2.0 - 2.7 Fracture and Reconstruction Osteosynthesis 2.0 - 2.7 Fracture and Reconstruction Threadlock.

64.     "Laser," is defined as, "a device that utilizes the natural oscillations of atoms or molecules between energy levels for generating a beam of coherent electromagnetic radiation

usually in the ultraviolet, visible, or infrared regions of the spectrum." *Laser*, Merriam-Webster, https://www.merriam-webster.com/dictionary/laser.

65.     "Light induced excited spin state trapping," process is defined as,

> allows tuning the electronic state of spin-crossover materials from low (LS) to high spin (HS) states. The photoinduced HS state is long-lived, up to a characteristic temperature, T(LIESST), above which the system relaxes rapidly to the LS state. We study the effect of light irradiance on competing LS → HS up-conversion and HS → LS thermal relaxation on the [Fe(phen)2(NCS)2] system. Raman spectroscopy and magnetic measurements are used to investigate this phenomenon.

Chemical Physics Letters, Volume 791, 16 (2022).

66.     "Limbic system," is defined as,

> a set of forebrain structures common to all mammals that is defined functionally and anatomically. It is implicated in the higher integration of visceral, olfactory, and somatic information as well as homeostatic responses including fundamental survival behaviors (feeding, mating, emotion). For most authors, it includes the amygdala; epithalamus; gyrus cinguli; hippocampal formation (see hippocampus); hypothalamus; parahippocampal gyrus; septal nuclei; anterior nuclear group of thalamus, and portions of the basal ganglia. (Parent, Carpenter's Human Neuroanatomy, 9th ed, p744; NeuroNames).

*Limbic* system, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D008032.

67.   "Line noise," are defined as, "the spurious characters which travel down a transmission line because of a hardware fault or electrical interference." *Line Noise*, A Dictionary of the Internet (2nd ed. 2009).

68.   "Local field potential measurement," is defined as, "defined as the Recording of brain electrical activities recorded by a small-size electrode in the brain. It measures electric potential in the extracellular medium around neurons generated by small electric currents of local origin." *Local field potential*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D008032D000094382.

69.   "Lux," is defined as, "a unit of illumination equal to the direct illumination on a surface that is everywhere one meter from a uniform point source of one candle intensity or equal to one lumen per square meter." *Lux*, Merriam-Webster. https://www.merriam-webster.com/dictionary/lux.

70.   "Magnetoelectric," can be defined as, "relating to or characterized by electromotive forces developed by magnetic means. *Magnetoelectric*, Merriam-Webster, https://www.merriam-webster.com/dictionary/magnetoelectric.

71.   "Magneto-genetic," is defined as, "the remote activation of cellular functions triggered by magnetic switches." Nanoscale; 14(6): 2091–2118 (2022).

72.   "Magneto-mechano-electric-mechanism," is defined as a, "Magneto-mechano-electric (MME) generator [which] converts magnetic energy into electrical energy via mechanical

strain/stress mediated magnetoelectric coupling effect." Nano Energy Volume 101 (2022).

73.    A MASER is defined as, "microwave amplification by stimulated emission of radiation." *Maser*, Merriam-Webster, https://www.merriam-webster.com/dictionary/maser.

74.    Microglia is defined as,

> the third type of glial cell, along with astrocytes and oligodendrocytes (which together form the macroglia). Microglia vary in appearance depending on developmental stage, functional state, and anatomical location; subtype terms include ramified, perivascular, ameboid, resting, and activated. Microglia clearly are capable of phagocytosis and play an important role in a wide spectrum of neuropathologies. They have also been suggested to act in several other roles including in secretion (e.g., of cytokines and neural growth factors), in immunological processing (e.g., antigen presentation), and in central nervous system development and remodeling.

*Microglia*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D017628.

75.    "Microwave band radiation," is defined as,

> recognized as nonionizing radiation, with a broad frequency spectrum ranging from 300 MHz to 300 GHz. Specifically, the bands from 300 MHz to 3 GHz are UHF (ultra-high-frequency), 3–30 GHz are SHF (super-high-frequency), and those from 30 to 300 GHz are EHF (extremely high-frequency). Additionally, microwaves that exceed a peak power of 100 MW with an operation frequency lying between 1 to 300 GHz are generally considered high-power microwaves (HPMs).

Mumtaz S, Rana JN, Choi EH, Han I. Microwave Radiation and the Brain: Mechanisms, Current Status, and Future Prospects. International Journal of Molecular Sciences. (23rd ed. 2022). https://doi.org/10.3390/ijms23169288.

76. "Microwave Radiation," is defined as, "a section of the electromagnetic spectrum that ranges in frequency from 300MHz to 300GHz." Khafaji, Electromagnetic Waves-Based Cancer Diagnosis and Therapy (1st ed. 2023).

77. "Molecular acoustics," is defined as, "the study of molecules and their interactions by means ultrasonic shear of longitudinal waves." Annual Reports on the Progress of Chemistry, Section A: General Physical and Inorganic Chemistry Volume 68 (1971).

78. "MOSFET," stands for, "metal–oxide–semiconductor field-effect transistor. One method for a MOSFET to approach the behavior of an ideal switch is the use of two threshold voltages for one device." *MOSFET*, Encyclopedia of Materials: Science and Technology Volume 6 (2001).

79. A, "Motor neuron," is defined as, "a neuron which activates muscle cells." *Motor Neuron*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D009046.

80. "MRT Training," Master Resilience Training (MRT), is defined as,

> a key component of the Comprehensive Airman Fitness (CAF) and the Army's Ready and Resilient (R2) Program. Master Resilience Training teaches resilience skills to enhance performance and increase resiliency, both individually and collectively. The Master Resilience Training Course is an established training program that has demonstrated efficacy in

> reducing behavioral health problems. Resilience is critical for success and well-being, and patrons will learn about the core factors that predict resilience, with a specific focus on the factors that are amenable to change. Service members who attend will serve as subject matter experts for their commanders. Skills learned include goal setting, energy management, emotion awareness and regulation, impulse control, de-catastrophizing, putting it in perspective, effective communication, challenging negative beliefs, problem solving, and real time resilience. Additionally, several techniques proven successful by elite sports figures and athletes will be introduced, such as imagining success, goal setting, and energy management. Joint Base San Antonio.

81. "Multifractal detrended fluctuation analysis," (MFDFA) is defined as,

> an efficient method to investigate the long-term correlations of the power law of non-stationary time series, in which the elimination of local trends usually depends upon a fixed-constant polynomial order.

Physica A: Statistical Mechanics and its Applications, Volume 565, 125611 (2021).

82. "Myocytes, Smooth Muscle," are defined as Non-striated, elongated, spindle-shaped cells found lining the digestive tract, uterus, and blood vessels. They are derived from specialized myoblasts." *Myocytes*, National Library of Medicine MESH, http://id.nlm.nih.gov/mesh/D032389.

83. "Neuroethics," is defined as the, "study of the ethical, legal, and social implications of neuroscience and neurotechnology,

- 69 -

as well as the neurobiological basis of human ethical norms and individual moral values." *Neuroethics*, Encyclopedia Britannica, https://www.britannica.com/topic/neuroethics.

84. "Neurofibrillary tangles," are defined as,

> abnormal structures located in various parts of the brain and composed of dense arrays of paired helical filaments (neurofilaments and microtubules). These double helical stacks of transverse subunits are twisted into left-handed ribbon-like filaments that likely incorporate the following proteins: (1) the intermediate filaments: medium- and high-molecular-weight neurofilaments; (2) the microtubule-associated proteins map-2 and tau; (3) actin; and (4) ubiquitins. As one of the hallmarks of Alzheimer disease, the neurofibrillary tangles eventually occupy the whole of the cytoplasm in certain classes of cell in the neocortex, hippocampus, brain stem, and diencephalon. The number of these tangles, as seen in post mortem histology, correlates with the degree of dementia during life. Some studies suggest that tangle antigens leak into the systemic circulation both in the course of normal aging and in cases of Alzheimer disease.

*Neurofibrillary Tangles*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D016874.

85. "Neuroplasticity," is defined as the, "capacity of the nervous system to change its reactivity as the result of successive activation." *Neuroplasticity*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D009473.

86. "Neurorights," can be defined,

- 70 -

as the ethical, legal, social, or natural principles of freedom or entitlement related to a person's cerebral and mental domain; that is, the fundamental normative rules for the protection and preservation of the human brain and mind.

Ienca M. *On Neurorights.* Front Hum Neurosci. 15:701258 (2021).

87.    "NO," is defined as a,

free radical gas produced endogenously by a variety of mammalian cells, synthesized from arginine by nitric oxide synthase. Nitric oxide is one of the endothelium-dependent relaxing factors released by the vascular endothelium and mediates vasodilation. It also inhibits platelet aggregation, induces disaggregation of aggregated platelets, and inhibits platelet adhesion to the vascular endothelium. Nitric oxide activates cytosolic guanylate cyclase and thus elevates intracellular levels of cyclic GMP.

*Nitric* Oxide, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D009569.

88.    "NOX," is defined as, "NADPH-dependent enzyme that catalyzes the conversion of L-arginine and oxygen to produce citrulline and nitric oxide." *Nitric Oxide Synthase*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D019001.

89.    "Nucleus accumbens," is defined as,

the collection of pleomorphic cells in the caudal part of the anterior horn of the lateral ventricle, in the region of the olfactory tubercle, lying between the head of the caudate nucleus and the anterior perforated substance. It is part of the so-called ventral

> striatum, a composite structure considered part of the basal
> ganglia.

*Nucleus accumbens*, National Library of Medicine MeSH,
http://id.nlm.nih.gov/mesh/D009714.

90. "Optical frequency comb," is defined,

> as a system that could synthesize 105–106 harmonically related
> optical modes from either an electronic or optical reference with
> a fidelity better than 1 part in 1018... OFCs enabled the direct
> conversion of optical-to-microwave frequencies and vice versa,
> enabling the extraction of microwave timing signals from optical
> atomic clocks. Beyond their application to precision optical
> metrology, OFCs were quickly recognized for their versatility as
> high-fidelity optical frequency converters and as sources of
> precisely timed ultra-short pulses.

Communications Physics Volume 2, Article number: 153 (2019).

91. "Optical pumping," is defined as, "the excitation of a resonant
atomic transition wherein the rate of light absorption depends
on the electronic spin state of the atom." Progress in Nuclear
Magnetic Resonance Spectroscopy (2005).

92. "Optical rectification," is defined as, "an effect whereby one or
more electromagnetic waves propagating in a nonlinear
medium produce a second-order polarization that does not
oscillate and, in turn, produces an electrical voltage." *Optical
rectification*, McGraw-
Hill Dictionary of Scientific & Technical Terms, (6th ed.).

93. "Oscillation," is defined as,
"a regular change in strength or direction in
a wave or electric current." *Oscillation*, Cambridge Dictionary.

http://dictionary.cambridge.org/us/dictionary/english/oscill
ation#google_vignette.

94.     "Paramagnetism," is defined as, "a kind
of magnetism characteristic of materials weakly attracted by a
strong magnet." Paramagnetism, Encyclopedia Britannica,
https://www.britannica.com/science/paramagnetism.

95.     "Parietal cortex," is defined as,

> a strip posterior to the central sulcus that is specialized for
> somatosensory function (Brodmann areas [BAs] 1, 2, 3, and 5) as
> well as regions posterior to that strip that are known as posterior
> parietal cortex and may be grossly divided into a medial and a
> lateral portion.

Nat Rev Neurosci; 9(8): 613–625 (2008).

96.     "Passive intermodulation distortion," (PIM) is defined as,

> a form of intermodulation distortion that occurs in passive
> components normally thought of as linear, such as filters,
> combiners, surge protectors, cables, connectors, and antennas.
> When subject to the high RF powers found in cellular systems,
> these devices can generate spurious signals. PIM shows up as a
> set of unwanted signals created by the mixing of two or more
> strong RF signals in a non-linear device, such as in a loose or
> corroded connector, or in nearby rust. Other names for PIM
> include the diode effect and the rusty bolt effect. Anritsu
> Company.

97.     "Pavlovian Aversion Conditioning," is defined as,

> a pairing (of) an initially neutral conditioned stimulus (CS) (e.g.,
> tone, light, or context) to an aversive unconditioned stimulus
> (US) (e.g., a footshock or tailshock) leads to the formation of a

> fear memory such that later presentation of the CS in the absence
> of the US elicits a conditioned response (Pavlov, 1927).

Reichelt, *Memory Reconsolidation*, Frontiers in Behavioral Neuroscience (7th ed. 2013).

98. "Periaqueductal grey matter," is defined as,

> Central gray matter surrounding the cerebral aqueduct in the
> mesencephalon. Physiologically it is probably involved in rage
> reactions, the lordosis reflex; feeding responses, bladder tonus,
> and pain.

*Periaqueductal grey*, National Library of Medicine MeSH. http://id.nlm.nih.gov/mesh/D010487.

99. "Phase conjugation," or "Optical phase conjugation," is defined as,

> time reversal or wavefront reversal, [which] is a technique
> involving the creation of an optical beam that has the variations
> in its wavefront, or phase, reversed relative to a reference beam.

Phase Conjugation, Encyclopedia of Physical Science and Technology (3rd ed. 2003).

100. "Phased-lock loop," is defined as, "a feedback loop which locks two waveforms with same frequency but shifted in phase." Lacoste, *The Darker Side* (2010).

101. "Photoexcitation," is defined as, "the act or process of raising an atom or molecule to a higher energy state by interaction with a photon." *Photoexcitation*, Oxford Dictionary of Biochemistry and Molecular Biology (2nd ed.).

102. "Piezoelectric transducers," are defined as, "devices that produces an acoustic wave from a radio-frequency (RF) input or, conversely, converts an acoustic wave to an RF output."

*Piezoelectric transducers*, Encyclopedia Britannica,
https://www.britannica.com/technology/piezoelectric-
device#:~:text=A%20piezoelectric%20transducer%20is%20a,ele
ctromechanical%20coupling%20factors%2C%20have%20low%E
2%80%A6.

103.   "Plane wave scattering," is defined as,

> A source radiates a field, and ultimately, in the far field of the
> source, the field resembles a spherical wave which in turn
> resembles a plane wave. When a plane wave impinges on an
> object or a scatterer, the energy carried by the plane wave is
> deflected to other directions which is the process of scattering.
> Purdue University.

104.   "Polarization," is defined as, "a property of certain
electromagnetic radiations in which the direction and
magnitude of the vibrating electric field are related in a
specified way." *Polarization*, Encyclopedia Britannica,
https://www.britannica.com/science/polarization-physics.

105.   "Prefrontotemporopolar networks," are defined as the portions
of the prefrontal and the anterior temporal cortex, which
"Information retrieval (or ecphory) … depend [s] on."
Principles of behavioral and Cognitive Neurology. Oxford
University Press (2000).

106.   "Prefrontal cortex," is defined as,

> The rostral part of the frontal lobe, bounded by the inferior
> precentral fissure in humans, which receives projection fibers
> from the mediodorsal nucleus of the thalamus. The prefrontal
> cortex receives afferent fibers from numerous structures of the

> diencephalon; mesencephalon; and limbic system as well as
>
> cortical afferents of visual, auditory, and somatic origin.

*Prefrontal Cortex*, National Library of Medicine MeSH,
http://id.nlm.nih.gov/mesh/D017397.

107. "Psychosexual," is defined as, "of or relating to the mental,
emotional, and behavioral aspects of sexual development."
*Psychosexual*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/psychosexual.

108. "Pyramidal cell," are defined as,

> Projection neurons in the cerebral cortex and the hippocampus.
> Pyramidal cells have a pyramid-shaped soma with the apex and
> an apical dendrite pointed toward the pial surface and other
> dendrites and an axon emerging from the base. The axons may
> have local collaterals but also project outside their cortical
> region.

*Pyramidal Cell*, National Library of Medicine MeSH,
http://id.nlm.nih.gov/mesh/D017966.

109. "Quantum confined Stark effect," is defined as, "the change in
the quantized energy in a quantum well when an electrical field
is applied across the quantum well." Chua, Li. Optical
Switches (2010).

110. "Quantum dot," are defined as, "nanostructures containing few
conduction band electrons or valence band holes, or both
bound into excitons." *Quantum* Dot, Encyclopedia of
Condensed Matter Physics (2nd ed. 2024).

111. "Quantum tunnelling," is defined as,

> a quantum mechanical effect in which particles have a finite
> probability of crossing an energy barrier, such as the energy

- 76 -

> needed to break a bond with another particle, even though the
> particle's energy is less than the energy barrier. Quantum
> tunneling has no counterpart in classical mechanics, in which a
> particle can never cross an energy barrier with a higher energy
> level than the particle has. The emission of alpha rays in
> radioactive decay is a case of quantum tunneling; though the
> alpha particles are strongly bound to the nucleus and don't have
> as much energy as the bond does, they still have a finite
> probability of escaping the nucleus. The design of transistors and
> many diodes makes use of this effect.

https://www.dictionary.com/browse/quantum-tunneling.

112. "Raman spectroscopy," is defined as, "based on the absorption of photons of a specific frequency followed by scattering at a higher or lower frequency." *Raman spectroscopy*, Encyclopedia Britannica, https://www.britannica.com/science/spectroscopy/Infrared-spectroscopy#ref620367.

113. "Rectifiers," are defined as, "devices that convert alternating electric current into direct current." *Rectifiers*, Encyclopedia Britannica, https://www.britannica.com/technology/rectifier.

114. "Resonant scattering," is defined as, "an electron impact phenomenon which involves the formation of a transient atomic or molecular negative ion." *Resonant Scattering*, Encyclopedia of Materials: Science and Technology (2nd ed. 2001).

115. "Rotman lens," is defined as, "a beam-forming network, used in wide-angle scanners to feed an antenna array." Ibbotson, A.

The Design and Analysis of a Rotman Lens with Reduced Conjugate-Port Coupling (2012).

116. "Sacral nervous system," is defined to innervate, "pelvic organs, including colon, anorectum, bladder and genital organs in addition to the lower extremities. These nerves lie on the back of the pelvis in front of the piriformis muscle and the pelvic fascia." J Transl Int Med; 11(2): 115–127 (2023).

117. "Second harmonic generation scattering," is defined as, "frequency doubling... a nonlinear optical process, in which photons interacting with a nonlinear material are effectively 'combined' to form new photons having twice the frequency of initial photons." Physical Properties and Applications of Polymer Nanocomposites (2010).

118. "Semiconductor," is defined as, "any of a class of crystalline solids intermediate in electrical conductivity between a conductor and an insulator." *Semiconductor*, Encyclopedia Britannica, https://www.britannica.com/science/semiconductor.

119. "Somatosensory neuron," is defined as, "salient information about our external environment and internal state to the central nervous system, allowing us to detect, perceive, and react to a wide range of innocuous and noxious stimuli." Neuron; 109(23): 3736–3757 (2021).

120. "Spectrum Emission mask measurement," is defined as, "a relative measurement of the out-of-channel emissions to the in-channel power. The SEM measurement is used to measure the excess emissions that would interfere to other channels or to other systems." Keysight Spectrum Emission Mask (SEM)

Measurement,

https://rfmw.em.keysight.com/rfcomms/refdocs/tdscdma/s
pectrum_emission_mask_(sem)_measurement.html.

121. "Stokes beam," is defined as, "a light beam which is expressible
as a superposition of a completely polarized and a completely
unpolarized beam." Horng, Li, Wolf, *Coherence properties of
Stokes beams*, Optics Communications 24-285 (2012).

122. "Stokes Parameters," are a,

> set of values that describe the polarization state of
> electromagnetic radiation (including visible light). They were
> introduced by George Gabriel Stokes in 1852, as a
> mathematically convenient alternative to the more common
> description of incoherent or partially polarized radiation in
> terms of its total intensity (I), (fractional) degree of polarization
> (p), and the shape parameters of the polarization ellipse.

H. C. van de Hulst, *Light scattering by small particles*, (1981).

123. The, "subharmonic injection-locked oscillator (s-ILO),"
approach, is defined as an,

> alternative choice for a high-frequency signal generation and is
> used for synchronization, amplification, phase shifting, or
> frequency division. An injection-locked oscillator is obtained by
> applying an external source to a free-running oscillator.

International Journal of Circuit Theory and Applications Int. J.
Circ. Theor. Appl. (2010).

124. "Supraorbital nerve," is defined as,

> the lateral and larger of the two branches of the frontal nerve, a
> branch of ophthalmic division of the trigeminal nerve," which,
> "courses through the superior aspect of the extraconal space of

> the orbit it exits the orbit through the supraorbital notch to
> supply the conjunctiva of the mid upper eyelid and superior
> fornix and the skin of the forehead and scalp.

*Supraorbital nerve*, Radiopaedia.org,
https://radiopaedia.org/articles/supraorbital-nerve?lang=us.

125. "Surface plasmonic polaritons," are defined as, "evanescent waves that propagate on the metal/dielectric interface as the result of collective oscillations of free electrons under external optical excitation." Encyclopedia of Nanomaterials (1st ed. 2023).

126. "Synchronization," is defined as, "the fact of happening at the same time, or the act of making things happen at the same time." *Synchronization*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/synchronization.

127. "Synthetic aperture processing," is defined as, "a complicated data process of receiving signals and phases of moving targets with a small antenna." Marghany, Advanced Algorithms for Mineral and Hydrocarbon Exploration Using Synthetic Aperture Radar (2022).

128. "Tesla," is defined as, "unit of magnetic induction or magnetic flux density in the metre–kilogram–second system (SI) of physical units." *Tesla*, Encyclopedia Britannica, https://www.britannica.com/science/tesla.

129. "Thomson scattering," is defined as, "If the incident photons are scattered without loss of energy and therefore possess the same wavelength, the scattering is known as a coherent

scattering or a Thomson scattering." Comprehensive Chirality (1st ed. 2012).

130. "Time correlated single photon detection," is defined as,

> a convenient statistical method for recording time-resolved fluorescence data, providing kinetic information on excited state photochemical reactions. This technique utilizes a high-repetition-rate pulsed laser which repeatedly excites the sample, typically at MHz excitation rates.

O'Connor, D.V.O., Phillips, D., Time-correlated Single Photon Counting, Academic Press, London (1984).

131. "TMEM16A," is defined as a, "a calcium-activated Cl− channel," which is a "key regulator of transepithelial Cl− transport and fluid secretion in lung cells." Thorax Jan; 76(1): 64–72. (2021).

132. "Tomography," is defined as, "a process for producing an image of a single plane of an object excluding all other planes, as by using CT scan or, ultrasound, in diagnostic medicine, seismic surveys, etc." *Tomography*, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/tomography.

133. "Transcranial," is defined as, "passing or performed through the skull." Transcranial, Merriam-Webster, https://www.merriam-webster.com/dictionary/transcranial.

134. "Transduction channels," are defined to participate in, "an amplificatory process that sensitizes and sharpens hearing." Proceedings of the National Academy of Sciences Vol. 97 No. 22.

135.　"Transepithelial," is defined as, "The passage of cells across the layer of epithelial cells, i.e. the epithelium." *transepithelial*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D057705.

136.　"Transient receptor potential cation channels subfamily V" are defined as,

> A subgroup of TRP cation channels named after the vanilloid receptor. They are very sensitive to temperature; hot spicy food, and capsaicin. They contain a TRP domain (a five-turn amphipathic helix with an invariant tryptophan) and ankyrin repeats. Selectivity for calcium over sodium ranges from 3 to 100 fold.

*Transient receptor potential cation channels subfamily V*. National Library of Medicine MeSH. http://id.nlm.nih.gov/mesh/D050916.

137.　"Trigeminal nerve," is defined as,

> the 5th and largest cranial nerve. The trigeminal nerve is a mixed motor and sensory nerve. The larger sensory part forms the ophthalmic, mandibular, and maxillary nerves which carry afferents sensitive to external or internal stimuli from the skin, muscles, and joints of the face and mouth and from the teeth. Most of these fibers originate from cells of the trigeminal ganglion and project to the trigeminal nucleus of the brain stem. The smaller motor part arises from the brain stem trigeminal motor nucleus and innervates the muscles of mastication.

*Trigeminal nerve*, National Library of Medicine MeSH, http://id.nlm.nih.gov/mesh/D014276.

138.　"Two-photon absorption," is defined as,

> a process where two photons (usually of the same energy) are
> absorbed simultaneously, exciting e.g. an atom or ion to a
> higher-lying state, with the energy increase being equal to the
> sum of the photon energies.

*Two-photon-absorption*, RP Photonics Encyclopedia,
https://www.rp-photonics.com/two_photon_absorption.html.

139.   "Two-photon calcium imaging," is defined as,

> a technique used for recording neuronal activity in the intact
> brain. It is based on the principle that, when neurons fire action
> potentials, intracellular calcium levels rise, which can be detected
> using fluorescent molecules that bind to calcium.

Nature Reviews Methods Primer;2(1):67 (2022).

140.   "Ultrasonic," is defined as having, "a frequency above the
human ear's audibility limit of about 20,000 hertz." *Ultrasonic*,
Merriam-Websters, https://www.merriam-
webster.com/dictionary/ultrasonic.

141.   "Unipolar neuron," is defined as,

> a neuron that has only a single extension of the cell body. This
> extension divides into two branches, oriented in opposite
> directions and representing the axon. One end is the receptive
> pole, and the other is the output zone. Unipolar neurons transmit
> touch information from the body surface to the spinal cord. Also
> called monopolar neuron.

*Unipolar Neuron*, APA Dictionary of Psychology,
https://dictionary.apa.org/unipolar-neuron.

142.   "Vagus nerve," is defined as,

> the 10th cranial nerve. The Vagus is a mixed nerve which
> contains somatic afferents (from skin in back of the ear and the

> conductance flattened out when the gate voltage exceeded the critical value.

Nano-Micro Letters, Volume 10, Issue 2, article id.25, 6 pp.

145. "Wavefields," are defined to be, "classified into two types, namely, scalar and vector waves." Naidu, Sensor Array Signal Processing (2nd ed. 2001).

146. "Wireless Power Transfer (WPT)," is defined as, "the process of transferring electrical energy from a power source to a load without an electrical connection." Power Electronics Handbook (4th ed. 2018).

147. "Working memory," is defined as, "a processing resource of limited capacity, involved in the preservation of information while simultaneously processing the same or other information." Cognition, Intelligence, and Achievement (2015).

**General Facts**

1. Plaintiff Kyle Malove is a United States citizen, and is a resident of Southwest Ranches, Florida.

2. Plaintiff has never been served with a warrant, charged with, or convicted of a crime.

3. Although briefly during June 2020, Plaintiff demonstrated interest in serving for the US Army and US Marines after visiting a local recruitment office, Plaintiff never became an individual who was consensually or contractually, "selected, employed, controlled, trained, or (and) paid," by the US Department of Defense. Thus, Plaintiff was not an employee of the US Central Intelligence Agency, Department of Defense, Defense Intelligence Agency, Defense Advanced Research

Projects Agency, or the National Security Agency. McClure v. Salvation Army, 460 F.2d 553.

4. Plaintiff has never signed a contract with a US Defense or Intelligence agency consenting to take part in a conditioning program or a training program. Plaintiff has not signed a contract to participate in any third-party program which remotely administers Survival Evade Resilience Escape (SERE) Training or Master in Resilience Training (MRT).

5. Between May 2018 and May 2019, Plaintiff worked as a registered MMJ Caregiver in the state of Colorado. During this time, Plaintiff alleges to have experienced non-consensual human experimentation, and exhibited symptoms of having been exposed to high levels of microwave radiation. This is alleged to have contributed to a resulting hospitalization.

6. During 2019 to 2020, Plaintiff took a medical leave from university, where he experienced heightened microwave band irradiation (documented with an electrosmog meter) electromagnetic interference, and electromagnetic field radiation, ultimately forcing him to relocate due to what he states was Pavlovian aversion conditioning, electrodermal aggression conditioning and electrodermal fear conditioning which he believes resulted in hospitalization. During this time, Plaintiff states radiation pulsation and certain levels of vibrations which originated from permanent metal implants, caused him distress in addition to psychological and mental anguish as he was also subjected to what he believes were extreme levels of Radio Frequency Interference, Electromagnetic radiation, quantum beats, and spike wave

discharges. From February 2020 through February 2021, Plaintiff continued to experience extreme levels of EMI, RF interference, and began recording environmental stimuli with meters, recording devices, and analyzers between his residence in Southwest Ranches, Florida and a temporary residence in Gainesville, Florida. As he traveled, Plaintiff states he was remotely subjected to non-consensual human experimentation and torture, harmonic generation in the reflection of microwave radiation in semiconductor surfaces, with changes to his cognitive central state behavioral responses and experimentation on his cognitive cortical higher order associations and general conditioning occurring in congruence with what he states was excruciating pain emanating from the bulk mass of his KLS Martin titanium permanent metal implants. This also occurred as he alleges to have been subjected to bone conduction, copious salivation, pulsation about the mandible bone and throughout his body, transcranial electric stimuli, transcranial magnetic stimuli, several types of scattering, high levels of RF interference, and multi-channel RF-activity described as contributing to an, "inundation of neuronal activity," as his permanent metal implants were irradiated. During February 12, 2021, Plaintiff underwent a cosmetic surgical procedure where the bulk mass of his KLS Martin titanium implants was removed, although not all of the mass of the KLS Martin titanium embedded in his mandible was removed. Shortly after this, Plaintiff began recording multiple environmental factors pertaining to radio frequency, power supply, wireless networks, electromagnetic interference,

radio frequency interference, and electromagnetic field presence. Plaintiff recorded emissions during two recording sessions a day between August 1, 2021, and December 10, 2021.

7. During September 2021, Plaintiff's brother, Spencer Hennings, who also spent a significant amount of time at Plaintiff's family estate in Florida, contracted Multiple Sclerosis after having been exposed to similar environmental stimuli for a lengthy duration.

8. Plaintiff's father, Harvey Malove, reported tinnitus-like symptoms between 2020 and 2022, and continuously exhibits signs of Pavlovian aversion conditioning with abnormal mucosal responses Plaintiff attributes to EMI and RF interference.

9. In early January 2022, Plaintiff relocated to Denver, Colorado to complete his education and research the phenomena and concepts pertaining to his experience. Plaintiff continued to record various environmental factors as these appeared to continue to ail him and interact with his KLS Martin titanium metal implants during his Colorado relocation, as he attempted to continue his college education. During early June 2022 to October 2022 when concerning Plaintiff's leisure time, he was subjected to unwarranted levels of microwave radiation, transcranial magnetic stimuli, EMF, EMI, and RF interference, which consequentially associated Pavlovian-esque aversions to the methods Plaintiff openly utilized as positive coping mechanisms, albeit without the same mass of KLS Martin Titanium implants embedded in his mandible. This overall contributed to his mental health unwellness.

10. During the months of April, May, and June 2022, Plaintiff recorded these emissions, and shortly after, Vista Apartments Denver was struck with what Plaintiff believes was an EMP weapon. The building's elevators were broken, the full block's power was damaged, the University reported a power failure, over ten thousand patrons were without power. Plaintiff's computer's logic board failed, and was ruled irreparable the first week of July in 2022. During this time, the Starshield system's Starlink resources, "ancillary equipment," i.e. parabolic antenna subreflector-to-main reflector's emissions were visibly observed while RF was physically recorded, with harmonic generation of microwave reflection in semiconductor surfaces, optical injection and optical pumping observed as this was continuously documented through recording EMI Line noise and voltage microsurges. Plaintiff claims this was accompanied by femtosecond pulses, spike wave discharges, pump-field scattering, and electromagnetic wavefield generation.

11. Defendant DARPA's Greg Witkop states DARPA's NEAT (Neural Evidence Aggregation Tool) program, "overcome(s) current limitations by developing a new cognitive science tool that identifies people at risk of suicide by using preconscious brain signals rather than asking questions and waiting for consciously filtered responses," through, "aggregating preconscious brain signals to stimuli," NEAT has the capability to determine, "what a person believes to be true, false, or indeterminate about specific types of knowledge that could be used to detect signs of depression, anxiety, or suicidal ideation

earlier and more reliably than ever before." Witkop, *Neural Evidence Aggregation Tool (NEAT)*, DARPA, https://www.darpa.mil/program/neural-evidence-aggregation-tool#:~:text=By%20aggregating%20preconscious%20brain%20signals,more%20reliably%20than%20ever%20before.

12. According to Defendant DARPA, their Next-Generation Nonsurgical Neurotechnology (N3) program, "aims to develop high-performance, bi-directional brain-machine interfaces for able-bodied service members." DARPA states that their N3 program, "would not require surgery and would be man-portable, thus making the technology accessible to a far wider population of potential users." According to DARPA, their N3 teams are pursuing a range of approaches that use optics, acoustics, and electromagnetics," with the organization having,

> awarded funding to six organizations to support the Next-Generation Nonsurgical Neurotechnology (N3) program, first announced in March 2018. Battelle Memorial Institute, Carnegie Mellon University, Johns Hopkins University Applied Physics Laboratory, Palo Alto Research Center (PARC), Rice University, and Teledyne Scientific are leading multidisciplinary teams to develop high-resolution, bidirectional brain-machine interfaces for use by able-bodied service members.

DARPA states their,

> Battelle team, under principal investigator Dr. Gaurav Sharma, aims to develop a minutely invasive interface system that pairs an external transceiver with electromagnetic nanotransducers that are nonsurgically delivered to neurons of interest. The

nanotransducers would convert electrical signals from the neurons into magnetic signals that can be recorded and processed by the external transceiver, and vice versa, to enable bidirectional communication.

DARPA introduces their,

Carnegie Mellon University team, [which] under principal investigator Dr. Pulkit Grover, aims to develop a completely noninvasive device that uses an acousto-optical approach to record from the brain and interfering electrical fields to write to specific neurons. The team will use ultrasound waves to guide light into and out of the brain to detect neural activity. The team's write approach exploits the non-linear response of neurons to electric fields to enable localized stimulation of specific cell types.

DARPA states their,

Johns Hopkins University Applied Physics Laboratory team, under principal investigator Dr. David Blodgett, aims to develop a completely noninvasive, coherent optical system for recording from the brain. The system will directly measure optical path-length changes in neural tissue that correlate with neural activity.

DARPA states their,

PARC team, under principal investigator Dr. Krishnan Thyagarajan, aims to develop a completely noninvasive acousto-magnetic device for writing to the brain. Their approach pairs ultrasound waves with magnetic fields to generate localized electric currents for neuromodulation. The hybrid approach

offers the potential for localized neuromodulation deeper in the brain.

DARPA introduces their,

Rice University team, [which] under principal investigator Dr. Jacob Robinson, aims to develop a minutely invasive, bidirectional system for recording from and writing to the brain. For the recording function, the interface will use diffuse optical tomography to infer neural activity by measuring light scattering in neural tissue. To enable the write function, the team will use a magneto-genetic approach to make neurons sensitive to magnetic fields.

Defendant DARPA states their,

Teledyne team, [which] under principal investigator Dr. Patrick Connolly, aims to develop a completely noninvasive, integrated device that uses micro optically pumped magnetometers to detect small, localized magnetic fields that correlate with neural activity. The team will use focused ultrasound for writing to neurons.

*Six Paths to the Nonsurgical Future of Brain-Machine Interfaces*, DARPA (2019), https://www.darpa.mil/news-events/2019-05-20.

13. Defendant DARPA's University of Miami College of Engineering, "BrainSTORMS," team led by Dr. Sakhrat Khizroev utilizes a, "wireless bidirectional interface [which] can be created with magnetoelectric nanoparticles (MENPs)." The BrainSTORMS team utilizes these MENPs to,

tap into the nervous system at the sub-neuronal level and provide a critical two-way communication link between the

- 92 -

> computer and the brain, which allows for efficient correlation between externally controlled magnetic fields and intrinsic local electric fields due to neural activity deep in the brain.

*Connecting Mind to Machine: University of Miami Team Moving Forward on DARPA Project to Revolutionize Non-surgical Brain-Computer Interface*, UM News (2020), https://news.miami.edu/coe/stories/2020/11/connecting-mind-to-machine-university-of-miami-team-moving-forward-on-darpa-project-to-revolutionize-non-surgical-brain-computer-interface.html.

14.  Defendant DARPA's John Davies states their Radio Frequency Machine Learning System program (RFMLS), "develop(s) the foundations for applying modern data-driven Machine Learning (ML) to the RF Spectrum domain." Davies states, "These innovations form the basis of a new wave of Signal Processing technologies to address performance limitations of conventionally designed radio frequency (RF) systems such as radar, signals intelligence, electronic warfare, and communications." Davies, *Radio Frequency Machine Learning Systems (RFMLS)*, DARPA, https://www.darpa.mil/program/radio-frequency-machine-learning-systems.

15.  Defendant DARPA states,

> the goals of the System of Systems (SoS) Integration Technology and Experimentation (SoSITE) program are to: develop SoS architectures to maintain U.S. air superiority in contested environments; demonstrate rapid integration of mission systems

into existing and new architectures; and demonstrate the combat
effectiveness and robustness of those architectures.
*System of Systems Integration Technology and Experimentation*
*(SoSITE),* https://www.darpa.mil/program/system-of-
systems-integration-technology-and-
experimentation#:~:text=The%20goals%20of%20the%20System
,architectures%3B%20and%20demonstrate%20the%20combat.

16. According to Apogee Research, their System of Systems
Technology Integration Tool Chain for Heterogeneous
Electronic Systems (STITCHES), is an answer and solution to,
"The 2021 National Defense Authorization Act, Sec. 804,"
which, "requires that the DoD rethink the way that it integrates
systems." The Department of Defense, "names STITCHES as a
key enabling technology, along with System of System
Integration Technology and Experimentation (SoSITE the
DARPA program that funded STITCHES)." Fortunado, *Stitches*
*SOS Technology Integration Tool Chain for Heterogeneous Electronic*
Systems, https://apogee-research.com/wp-
content/uploads/2021/07/STITCHES-Overview-Distro-A-
v2.pdf.

17. In, March 2023 Department of Defense Fiscal Year (FY) 2024
Budget Estimates Volume IV: Research, Development, Test &
Evaluation, Air Force, STITCHES is introduced by stating, "The
Electronic Warfare Integrated Reprogramming (EWIR)
program element hosts the DoD's first System of System
Technology Integration Tool Chain for Heterogeneous
Electronic Systems (STITCHES) Warfighter Application Team
(SWAT) at the 350th Spectrum Warfare Wing (350 SWW)."

While, "SWAT is an integration team employing, maintaining, and instructing other teams in the DoD how to use the STITCHES integration platform." The DoD states,

> STITCHES is a fully government developed, owned, and open-source Modular Open Systems Architecture (MOSA) toolchain and multi-classification information system that creates new capabilities by integrating incompatible DoD fielded systems and architectures together without the need to modify system source code.

Exhibit R-2, RDT&E Budget Item Justification: PB 2024, *Department of Defense Fiscal Year (FY) 2024 Budget Estimates Air Force Justification Book Volume IV Research, Development, Test & Evaluation*, USAF (2023).

18. The DoD's 2023 Department of Defense Fiscal Year (FY) 2024 Budget Estimates Volume IV: Research, Development, Test & Evaluation states Defendant DoD: Department of the USAF's, "SWAT is an agile software development team composed of a government tiger team, the STITCHES toolchain developer, and a secure cloud infrastructure and repository developer." Led by Jimmy "Reverend" Jones, "SWAT includes a revolving team of subsystem subject matter experts when adapting DoD systems using STITCHES." The DoD states, "SWAT is responsible for the execution of tasks employing STITCHES outlined in NDAA 2021 Section 804 and supports Joint All Domain Command and Control (JADC2) tasking and integration efforts in support of JADC2." Exhibit R-2, RDT&E Budget Item Justification: PB 2024, *Department of Defense Fiscal Year (FY) 2024 Budget Estimates*

*Air Force Justification Book Volume IV Research, Development, Test & Evaluation*, USAF (2023).

19. Defendant DoD Department of the USAF utilizes the STITCHES, "open-source Modular Open Systems Architecture (MOSA) toolchain and multi-classification information system," while conducting what SoSITE describes to be, "rapid integration of mission systems into existing and new architectures," while updating, supporting, and maintaining the JADC2 system through, "integrating incompatible DoD fielded systems and architectures together without the need to modify system source code." Defendants also utilize this program to test and field emerging technology and programs with existing and, "incompatible," DoD systems, equipment, and architectures. Exhibit R-2, RDT&E Budget Item Justification: PB 2024, *Department of Defense Fiscal Year (FY) 2024 Budget Estimates Air Force Justification Book Volume IV Research, Development, Test & Evaluation*, USAF (2023).

20. The Department of Defense Department of the USAF 350th Spectrum Warfare Wing states they,

> activated 25 June 2021 to support the consolidation and modernization of the Department of the Air Force electromagnetic spectrum enterprise and is responsible for providing operational, technical, and maintenance electronic warfare expertise for the CAF and for systems engineering, testing, evaluation, tactics development, employment, capability, and technology assessment.

350th Spectrum Warfare Wing, USAF, https://www.350sww.af.mil/About-Us/Our-Mission/.

21. The Department of Defense Department of the Air Force's
    350th Spectrum Warfare Wing states they consist,

    > of two Groups: 350th Spectrum Warfare Group and 850th
    > Spectrum Warfare Group. The 350th Spectrum Warfare Group
    > has the equivalent of five squadrons: 16th Electronic Warfare
    > Squadron, 36th Electronic Warfare Squadron, 68th Electronic
    > Warfare Squadron, 513th Electronic Warfare Squadron, and F-35
    > Partner Support Complex. The 850th Spectrum Warfare Group
    > has three squadrons: 39th Electronic Warfare Squadron, 87th
    > Electronic Warfare Squadron, and 453d Electronic Warfare
    > Squadron.

    350th Spectrum Warfare Wing, USAF,
    https://www.350sww.af.mil/About-Us/Our-Mission/.

22. The Department of Defense Department of the USAF 16th
    Electromagnetic Warfare Squadron officially is stated, "to
    defend(s) the space domain with space electromagnetic warfare
    systems for our Nation, the Joint Force, and Allies. The
    squadron is assigned to Space Delta 3, located at Peterson Space
    Force Base, Colo." The USAF 16th Electromagnetic Warfare
    Squadron officially, "protects critical satellite communication
    links to achieve a near-global capability to detect, characterize,
    geolocate and report sources of electromagnetic interference
    (EMI) on U.S. military and commercial satellites," and,
    "provides combat-ready crews to deploy and employ defensive
    space control capabilities for theater combatant commanders."
    *16th Electromagnetic Warfare Squadron*, USAF,
    https://www.spaceforce.mil/About-Us/Fact-Sheets/Fact-
    Sheet-Display/Article/3741210/16th-electromagnetic-warfare-

squadron/#:~:text=The%2016th%20EWS%20is%20the,U.S.%20 military%20and%20commercial%20satellites.

23.  The Department of Defense Department of the USAF 4th Electromagnetic Warfare Squadron officially, "trains, equips and mobilizes to employ space electromagnetic warfare capabilities in order to support full spectrum national security objectives. The squadron is assigned to Space Delta 3, located at Peterson Space Force Base, Colo."  Space Delta 3, USAF, https://www.spaceforce.mil/About-Us/Fact-Sheets/Fact-Sheet-Display/Article/3741156/space-delta-3/#:~:text=4th%20Electromagnetic%20Warfare%20Squadron% 3A%20Trains,full%20spectrum%20national%20security%20obje ctives.

24.  The Department of Defense Department of the USSF Space Delta 3 officially, "trains and presents operational combat-ready space electromagnetic warfare forces in support of assigned missions." According to Peterson and Schriever Space Force Base, the USSF Space Delta 3 is the, "Premier Electromagnetic Warfare organization capable of integration and synchronization of joint fires across all domains." Space Delta 3, USAF, https://www.spaceforce.mil/About-Us/Fact-Sheets/Fact-Sheet-Display/Article/3741156/space-delta-3/.

25.  The 544th Intelligence, Surveillance and Reconnaissance Group (544th ISRG) officially, "delivers global, space-related information to national agencies and warfighting commands, provides policy guidance and functional assistance to assigned organizations, and develops mission-based facilities and communication." Blevins, Haley, *Newly activated 544th ISRG*

*welcomes units during ceremony*, USAF,
https://www.16af.af.mil/Newsroom/Article/3173277/newly-
activated-544th-isrg-welcomes-units-during-
ceremony/#:~:text=Previously%20located%20at%20Peterson%
20Space,mission%2Dbased%20facilities%20and%20communica
tion.

26.     The 544th Intelligence, Surveillance and Reconnaissance Group
        (544th ISRG) Detachment 5 is a, "joint-force," clandestine branch
        of the 544th ISRG. This is recognized to be located at the NRO in
        Chantilly, VA, as stated in the USAF's, "Improving Outcomes:
        Intelligence, Surveillance, and Reconnaissance Assessment."
        Haugh, Leonard, *Improving Outcomes: Intelligence, Surveillance,
        and Reconnaissance Assessment*, Air & Space Power Journal 15
        (2017).

27.     Defendant Department of Defense's National Air and Space
        Intelligence Center (NASIC) officially is the, "Department of
        Defense's primary source for foreign air and space threat
        analysis." The NASIC publicly states they are the, "Air Force's
        service intelligence center, the nation's air and space
        intelligence center, and an operational wing in the Air Force
        ISR enterprise." According to the DoD: Department of the
        USAF, the, "NASIC's mission is to discover and characterize
        air, space, missile, and cyber threats to enable full-spectrum
        multi-domain operations, drive weapon system acquisition,
        and inform national defense policy." NASIC, USAF (2019),
        https://www.nasic.af.mil/About-Us/.

28.     Defendant Department of Defense's United States Air Force
        Space Force is partnered with Defendant Department of

Defense NRO's Space Delta 20, and USSF Space Delta 21 (amongst other groups). The Aerospace Data-Facility Colorado officially operates jointly with Defendant NSA's Colorado Cryptographic Center, as, "these two agencies have created common multi-INT fusion information (MFI)." According to the Buckley Air Force Base, the, "multi-mission ground station," is, "responsible for supporting worldwide defense operations and multi-agency collection, analysis, reporting, and dissemination of intelligence information." As this partnership between Defendant NRO's Space Delta groups provide support for Defendant Department of the USAF USSF, the relationship between the USSF and the NRO's Space Delta 20 also indicates a joint-agency effort with the NSA due to the NRO/NSA's operational capacity as stated by National Security Council Intelligence Directive No. 6. There also appears to be an overlap between the pertinent DoD USAF and NRO staff, which, when discussing, "joint-agency coalitions," and, "multi-INT," indicates an overlap and interconnectedness between not only the NRO, and NSA operations as stated in National Security Council Intelligence Directive No. 6, but also with the NRO, NSA, and DoD USAF USSF's operations. This is indicated simply by examining Col. Ronald Hopkins' positions as both Director of NSA Colorado, and as Commander of the Department of Defense Department of the United States Air Force's 544th Intelligence, Surveillance and Reconnaissance Group (544th ISRG). While the 544th ISRG Detachment 5 is solely operated by Defendant NRO, there is a significant overlap within the officially acknowledged relationship between

Defendant NSA and Defendant NRO as they develop utilizing, "joint-agency teaming," which is evident from the examination of Executive Order 14086 and also indicates, "joint-agency teaming," between these agencies, and Defendant Department of Defense Department of the United States Air Force's ISRG Squadrons.

29. Defendant NSA's and Defendant CIA's joint agency, "Special Collection Service," (SCS) or F6, is a clandestine group operating as a meld between SIGINT and HUMINT, as their efforts support their, "Strategic Partnerships." This includes but is not limited to partnerships with the: DEA, DIA, NRO, HUMINT, SSO, FBI, State, Secret Service, Law Enforcement, Homeland Security, Tailored Access, COVCOM, Military, and CLANSIG. This "joint-agency coalition," between the CIA and the NSA is formally acknowledged and described in, "National Security Agency, Special Collection Service, Presentation of the Pacific SIGDEV Conference, March 2011," which was released to the National Security Archives in 2015 via a FOIA request. In the, "Presentation of the Pacific SIGDEV Conference," the NSA formally acknowledges their, "Unique platform for conducting and enabling IC operations," operates utilizing, "holistic approaches," where, "SIGINT prowess provides cyber advantage," while, "capitalizing on the element of surprise," and is stated to yield, "Home field advantage in adversary's space." The NSA states the SCS utilizes, "Signal access for collection, exfil, and infil (via) Microwave, WiFi, WiMAX, GSM, CDMA, Satellite, etc." Through, "Living in the environment, the SCS gains the SCS, "Cyber Advantage," with "Insights on

infrastructure and configurations," and, "Discovery of targets, signatures, and behavior." The group also utilizes, "Tailored intelligence products," as these, "Diverse products (are) driven by national objectives and local needs through formal reporting, target packages, analytic insights, situational awareness, (and) threat warning." Through, "Fully leveraging 30-years of experience within the NSA and CIA enterprises and using existing authorities," the NSA states the SCS's, "Strategic Partnerships," furthers their "SCS SIGINT Mission," through their approach to, "Technology," "People and Business Practices," and, their "Platform for Transformational Activities," as this pertains to Data, "Collection," "Processing," "Analysis," and, "Dissemination," when addressing, "Hard Targets." Through this platform, "joint-agency teaming," enables cohesive operations as their strategy of, "SIGINT Enabling HUMINT" with "HUMINT Enabling SIGINT," is deployed through multiple teams and agencies. *National Security Agency, Special Collection Service, Presentation of the Pacific SIGDEV Conference*, The CIA and Signals Intelligence (2015), https://nsarchive.gwu.edu/document/28399-document-41-national-security-agency-special-collection-service-presentation-pacific.

30. Though Defendant CIA states its, "enhanced interrogation techniques," and what could also be categorized as, "coercive interrogation techniques," are both "Effective," and, "necessary to save lives," the Senate Select Committee on Intelligence has stated, "The CIA's use of its enhanced interrogation techniques was not an effective means of acquiring intelligence or gaining

cooperation from detainees," "CIA's use of enhanced interrogation techniques was not an effective means of acquiring intelligence or gaining cooperation from detainees," and, "The CIA's justification for the use of its enhanced interrogation techniques rested on inaccurate claims of their effectiveness." Study of the CIA's Detention and Interrogation Program ("SSCI Report").

31. Defendant DIA officially operates as the Department of Defense's, "all source intelligence agency," and principally operates as a CSA (combat support agency). While the NRO, "has exclusive responsibility for the management, operation, and security of the collection projects of the National Reconnaissance Program (NRP)…DIA … [is] responsible for determining who should be informed, and what information should be given to enable adequate preparation for exploitation of all products of the NRP, and for obtaining NRO approval and information release in each such instance." Memorandum for the Chief, Special Activities Office, Defense Intelligence Agency. The DIA states they, "provide military intelligence to warfighters, defense policymakers and force planners in the Department of Defense and the Intelligence Community to support U.S. military planning, operations and weapon systems acquisition. The DIA, "plan[s], manage[s], and execute[s] intelligence operations during peacetime, crisis and war." The DIA conducts the majority of the MASINT operations for the US Government, although they support multi-INT operations. The *INCA release of the MASINT Handbook For The Warfighter*, introduces MASINT Discipline Taxonomy which includes, but

is not limited to, "Electro-optical, Radar, Radio-frequency, Geophysical, and Materials," intelligence. *The INCA release of the MASINT Handbook For The Warfighter* introduces, "Electro-Optical Intelligence," as the, "collection, processing, exploitation, and analysis, of emitted or reflected energy across the optical portion (ultraviolet, visible, near infrared, and infrared) of the electromagnetic spectrum." The *INCA release of the MASINT Handbook For The Warfighter* introduces, "Radar Intelligence," as, "the collection, processing, exploitation, and analysis of radar energy reflected from a target or objective." The *MASINT Handbook For The Warfighter* states Radar Intelligence, "Instruments for active target illumination may include monostatic or bistatic, phased array, synthetic aperture radar (SAR), and over-the-horizon radar systems." The *INCA release of the MASINT Handbook For The Warfighter* introduces,

> unintentional Radiation Intelligence (RINT)," as, "the integration and specialized application of multiple MASINT collection, processing, and exploitation subdisciplines and techniques against unintentional radiation sources that are incidental to the design propagation and operating characteristics of military and civil propulsion units, power sources, weapons systems, electronic systems, machinery, equipment, or instruments.

The *INCA release of the MASINT Handbook For The Warfighter* states these, "techniques may be valuable in detecting, tracking, and monitoring a variety of activities of interest."
*MASINT Handbook For The Warfighter*, Inca Project Office (1994), https://archive.org/details/MASINTHandbookForTheWarfighter/mode/2up.

32. According to Defendant Department of Defense's
Electromagnetic Spectrum Superiority Strategy of 2020,

> The EMS, as the range of all types of electromagnetic radiation, is
> a fundamental component of the natural environment, and the
> EMOE (Modern Electromagnetic Operational Environment) is a
> space in which military functions are performed. The EMOE is a
> maneuver space, a battlespace, a place where competition and
> warfare, as well as commerce and other non-military activities,
> are conducted.

33. Defendant Department of Defense's Electromagnetic Spectrum
Superiority Strategy of 2020 states their, "Future EMS
capabilities must be able to perform, operate, and adapt in
complex EMOEs," and that they, "must maintain
interoperability with other systems and be capable of rapid
software and hardware upgrades to remain relevant against the
evolving near-peer threat," and that the Department of Defense
will operate utilizing their Electromagnetic Spectrum
Superiority Strategy of 2020 with, "a modular open systems
approach (MOSA)."

34. Defendant Department of Defense's Electromagnetic Spectrum
Superiority Strategy of 2020 states, "It will utilize the flexibility
provided by the Adaptive Acquisition Framework to accelerate
delivery of superior EMS capabilities to the warfighter,
including rapid prototyping and rapid fielding pathways."

35. Defendant Department of Defense's Electromagnetic Spectrum
Superiority Strategy of 2020 states it, "plans to target their [the
target's or enemy's] vulnerabilities with advanced
electromagnetic attack (EA) capabilities designed to keep the

enemy in a defensive posture and offset adversary capacity overmatch."

36. According to Defendant Department of Defense's Electromagnetic Spectrum Superiority Strategy of 2020, "Developing disruptive EW capabilities and attributes requires the most advanced technology the Department can bring to bear and must incorporate autonomous, cognitive, and asymmetric capabilities by harnessing cutting edge technologies such as AI and photonics."

37. Defendant Department of Defense's Electromagnetic Spectrum Superiority Strategy of 2020 states, "Advanced capabilities in directed energy, RF-enabled cyber, and multifunctional EMS systems all networked and operating at machine speed are required to provide future commanders with scalable options to achieve EMS superiority and military overmatch," and the Department of Defense's Electromagnetic Spectrum Superiority Strategy states, "These vital corollary systems will unravel the chaos of a congested and contested EMOE and provide near-real-time situational awareness for EMBM as well as real-time targeting information to attack adversary forces as they use the EMS," which, with, "Networked, adaptive, and distributed, both traditional and non-traditional sensors will provide the integrated data, enabled by machine learning and assured EMS distribution to the warfighter, required to implement disruptive EW and ensure joint lethality."

38. Defendant Department of Defense: Department of the United States Air Force's *Electronic Warfare Fundamentals* describes a parabolic antenna as,

> One of the most widely used radar antennas is the parabolic reflector. The parabola-shaped antenna is illuminated by a source of radar energy, from the transmitter, called the feed. The feed is placed at the focus of the parabola, and the radar energy is directed at the reflector surface. Because a point source of energy, located at the focus, is converted into a wavefront of uniform phase, the parabola is well suited for radar antenna applications. By changing the size and shape of the parabolic reflecting surface, a variety of radar beam shapes can be transmitted.

*Electronic Warfare and Radar Systems Engineering Handbook,* Avionics Department (2013), https://apps.dtic.mil/sti/tr/pdf/ADA617071.pdf.

39.  Defendant Department of Defense: Department of the United States Air Force's *Electronic Warfare Fundamentals* defines a MASER, "Microwave amplification by stimulated emission or radiation," as, "A lownoise, radio-frequency amplifier. The emission of energy stored in a molecular or atomic system by a microwave power supply is stimulated by the input signal." *Electronic Warfare and Radar Systems Engineering Handbook,* Avionics Department (2013), https://apps.dtic.mil/sti/tr/pdf/ADA617071.pdf.

40.  ADA490279, the Department of Defense's Deterrence Operations Joint Operating Concept v. 2.0, 2006 introduces, "deterrence operations," as what, "convince[s] adversaries not to take actions that threaten US vital interests by means of decisive influence over their decision-making." This is achieved through, "credibly threatening to deny benefits and/or impose

costs, while encouraging restraint by convincing the actor that restraint will result in an acceptable outcome." This Defense's Deterrence Operations Joint Operating Concept's (DO JOC), "central idea," is, "to decisively influence the adversary's decision-making calculus in order to prevent hostile actions against US vital interests." The DO JOC is, "implemented at the operational level by," "Tailoring Deterrence Operations to Specific Adversaries and Contexts, Dynamic Deterrence Assessment, Planning and Operations, Deterring Multiple Decision-Makers at Multiple Levels, [and] Characterizing, Reducing, and Managing Uncertainty." The DO JOC comprises of the "Direct [military] means," of, "Force Projection, Active and Passive Defenses, Global Strike (nuclear, conventional, and non-kinetic), [and] Strategic Communication." The DO JOC's, "Enabling means include... Global Situational Awareness (ISR), Command and Control (C2), Forward Presence, [and] Security Cooperation and Military Integration and Interoperability, Deterrence Assessment, Metrics, and Experimentation." *Deterrence Operations Joint Operating Concept*, United States Strategic Command (2006), https://apps.dtic.mil/sti/pdfs/ADA490279.pdf.

41. Defendant Department of Defense: Department of the United States Air Force's *Electronic Warfare Fundamentals* describes a phased array antenna as a,

> product of the application of computer and digital technologies
> to the field of radar design. A phased array antenna is a complex
> arrangement of many individual transmitting and receiving
> elements in a particular pattern. A phased array antenna can, in

> effect, radiate more than one beam from the antenna by using a computer to rapidly and independently control groups of these individual elements. Multiple beams and computer processing of radar returns give the phased array radar the ability to track-while-scanning and engage multiple targets simultaneously.

*Electronic Warfare and Radar Systems Engineering Handbook,* Avionics Department (2013), https://apps.dtic.mil/sti/tr/pdf/ADA617071.pdf.

42. Defendant Department of Defense: Department of the United States Air Force's *Electronic Warfare Fundamentals* describes, "LOBE-ON-RECEIVE-ONLY (LORO)," as, "a mode of radar operation developed as an EP feature for a track-while-scan radar. LORO can be employed by any radar that has the capability to passively track a target. In a LORO mode, the radar transmits a continuous signal from a set of illuminating antennas," where this, "continuous signal hits the target, and the return echo is received by a different set of receive antennas." During the deployment of the LORO method, "receive antennas are passive and generate azimuth and elevation tracking signals by electronically scanning the reflected signal." During the deployment of the LORO method,

> The tracking signals are sent to the antenna servos to keep the illuminating antennas pointed at the target and centered in the receive antenna tracking area. The range tracking circuit uses the time delay between the transmission and reception of the illuminating antenna signals. A split-gate tracker is used to provide range tracking.

- 109 -

While utilizing the LORO method, Defendant Department of Defense: Department of the Air Force gains the capability to utilize moving target integration and tomography of moving targets. *Electronic Warfare and Radar Systems Engineering Handbook*, Avionics Department (2013), https://apps.dtic.mil/sti/tr/pdf/ADA617071.pdf.

43. In "Psychological Operations An Introduction," Col Frank L. Goldstein, USAF and Col Daniel W. Jacobowitz, USAF, Retired, describe, "Psychological operations," as, "an important dimension of overall military operations," where, "They may be used by commanders to influence the attitudes and behavior of foreign groups in a manner favorable to the achievement of US national objectives." They state the, "the principal purpose of DoD PSYOP is to persuade foreign audiences to change or enhance attitudes or behaviors in a manner favorable to one or more national security objectives." Col. Goldstein and Col Jacobowitz state current PSYOP planning,

> identifies possible target audiences. Once the target audience is identified, such target characteristics as vulnerabilities, susceptibilities, conditions, and effectiveness are analyzed. Vulnerabilities are the four psychological factors that affect the target audience: perception, motivation, stress, and attitude.

Findley, Goldstein, *Psychological operations: Principles and case studies*. Air University Press (1996).

44. In, "Intelligence and Psychological Operations," by Col Joseph S. Gordon, USAR, PSYOP's, "Target Analysis," is described to,

> determine the attitudes of key audiences. Basic research provides intelligence on long-standing attitudes toward political, military,

> economic, and social subjects. This information is refined as much as possible to delineate the views of various age cohorts, social strata, and occupational groups.

Col Joseph S. Gordon introduces PSYOP issues, and states, "Cohesive issues exploited could help strengthen or more closely unite the total society or particular target group," and, "Divisive issues exploited could contribute to the separation of a group from the greater society or to the disorganization of a people." Col Joseph S. Gordon states an integral capability of PSYOP is, "to discredit, to destabilize, to denounce and suppress the possibility of opposition." Findley, Goldstein, *Psychological operations: Principles and case studies.* Air University Press (1996).

45. Executive Order 13491 standardizes the interrogation methods and treatment of detainees, individuals in custody, individuals under effective control, "of an officer, employee, or other agent of the United States Government or detained within a facility owned, operated, or controlled by a department or agency of the United States," to the methods described in US Army FM 2-22.3 (FM 34-52). US Army FM 2-22.3 (FM 34-52) 5-75 describes the limitations of intelligence personnel's interrogations, "stating prohibited actions include, but are not limited to — Applying beatings, electric shock, burns, or other forms of physical pain." US Army FM 2-22.3 (FM 34-52) 5-95 introduces, "two general categories of interrogation operations: field interrogation operations and interrogation facility operations."

46. The,

> military intelligence uses ISR from the entire intelligence community, not just the military services. The services depend primarily on three intelligence agencies in the Defense Department itself — the Defense Intelligence Agency (DIA), National Security Agency (NSA), and the National Imagery and Mapping Agency (NIMA). The National Reconnaissance Office (NRO), while a DoD agency, designs, launches, and flies satellites for the other agencies, and is not a primary producer of intelligence products.

Congressional Research Service, CRS 10924 Military Transformation, Intelligence, Surveillance and Reconnaissance.

47.     Defendant CIA's SIGINT activity is defined and limited by the Presidential Policy Directive 28. The CIA is permitted to collect SIGINT if, "authorized to do so by statute or Executive Order, proclamation, or other Presidential directive, and such collection shall be undertaken in accordance with the Constitution and applicable statutes." Presidential Policy Directive 28. The CIA's SIGINT activity is limited, as they, "shall use SIGINT collected in bulk only for the purposes of detecting or countering: espionage and other threats and activities directed by foreign powers or their intelligence services against the United States and its interests; threats to the United States and its interests from terrorism; threats to the United States and its interests from the development, possession, proliferation, or use of weapons of mass destruction; cybersecurity threats; threats to U.S. or allied Armed Forces or other U.S. or allied personnel; transnational criminal threats, including illicit finance and sanctions evasion

related to the other purposes identified in the section on 'Use of SIGINT Collection in Bulk'; and any threat to the national security determined to be a permissible use of SIGINT collected in bulk in the review process established by Section 2 of Presidential Policy Directive 28, or for any other lawful purpose, when approved by the President." Presidential Policy Directive 28. Defendant CIA is limited as they, "shall not use SIGINT collected in bulk for the purpose of: suppressing or burdening criticism or dissent; etc." Presidential Policy Directive 28.

48.   In Under Secretary of Defense Porter J. Goss's memorandum, "Cooperative Way Forward On MASINT Management," both the CIA's involvement in current MASINT clandestine activities are formally acknowledged, and their clandestine activities as these pertain to MASINT are introduced to be different from that of the DIA. The CIA gains access to SIGINT as they direct the NRO to record RF data, which is then processed by the NSA into signals intelligence. National Security Council Intelligence Directive No. 6. Section 5a. The CIA's Directorate of Science and Technology (DS&T) staff researches at the NRO while, "apply(ing)…technical expertise to advancing research projects."

49.   Defendant CIA is responsible for the US Intelligence Community's clandestine detention and interrogation program, as introduced and explicated in the, "Report of the Senate Select Committee On Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program."

50.   It is found that, "Two key offices for developing technology, the Advanced Systems & Concepts Office and the Defense Advanced Research Project Agency (DARPA), have strong track records in ISR development." Congressional Research Service, CRS 10924 Military Transformation Intelligence, Surveillance and Reconnaissance.

51.   Defendant Defense Intelligence Agency, "has played a central role in gathering, processing, and producing intelligence used to defend the United States from foreign aggression." Intelligence: A History of the Defense Intelligence Agency.

52.   Defendant Defense Intelligence Agency's release of the US Army Medical Intelligence and Information Agency Office of the Surgeon General's, "Biological Effects of Electromagnetic Radiation (Radiowave and Microwaves) – Eurasian Communist Countries," states the, "Biological Significance of Radiowaves and Microwaves," effects to a human's, "blood, cardiovascular system, cells, central nervous system, digestive system, glands, metabolism, reproduction, visual systems, and internal sound perception." The, "Biological Significance of Radiowaves and Microwaves," states, "Effects of electromagnetic irradiation on the blood include biochemical variations, effects on erythrocytes, changes in coagulation, and alterations in the blood forming system." The, "Biological Significance of Radiowaves and Microwaves," also states the, "Effects (of electromagnetic radiation) on hemodynamics include blood pressure variations and cardiac arrhythmias… slowdown of intraventricular and intra-atrial conduction, diffuse cardiac muscular damages, and ventricular extrasystole…Many

- 114 -

variations noted on the cardiovascular system result from central nervous system effects." With respect to cardiovascular health, the "Biological Significance of Radiowaves and Microwaves," concludes, "microwaves act as a non-specific factor which, under certain conditions, interferes with adaptation to unfavorable influences. Exposure therefore promotes an earlier onset to cardiovascular disease in susceptible humans." The "Biological Significance of Radiowaves and Microwaves," states that electromagnetic radiation effects occur at the cellular level which requires further study. As this pertains to the central nervous system (CNS), the "Biological Significance of Radiowaves and Microwaves," states,

> Subjects exposed to microwave radiation exhibited a variety of neurasthenic disorders against a background of angiodystonia (abnormal changes in tonicity of the blood vessels). The most common subjective complaints were headache, fatigue, perspiring, dizziness, menstrual disorders, irritability, agitation, tension, drowsiness, sleeplessness, depression, anxiety, forgetfulness, and lack of concentration.

Also concerning the CNS, "Biological Significance of Radiowaves and Microwaves," states, "Changes in EC (excitation conduction) were characterized by rapid increases as absorption of microwave energy increased, followed by a fairly sharp drop upon switching off the microwave irradiation and normalization within three minutes," and, "Changes in the BA (biopotential amplitude) during microwave irradiation were also characterized by a much faster increase, followed by a

sharp dose to below the original level after irradiation and essential recovery in three minutes," which, "indicate(s) that microwaves may have a specific effect on EC and BA, causing sharp and irreversible changes in these functional parameters of nerve pulse." Concerning the Digestive System, the "Biological Significance of Radiowaves and Microwaves," states, "exposures of subjects working for long periods of time in the presence of low intensity centimeter and decimeter waves resulted in numerous disorders...dyspeptic disorders, edema of the gums, bleedings gums, alteration of the gastric acidity, and a reduction of the tonus and evacuator functions of the stomach," in addition to a plethora of other biological phenomenon. As this pertains to Glands, the "Biological Significance of Radiowaves and Microwaves," concludes "The general conclusion that can be drawn from various (both animal and human) studies of the anterior pituitary and adrenal cortex is that exposure to radiowaves and microwaves of thermal intensities results in suppression of the hormone producing function but exposure to nonthermal intensities tends to enhance production." As this pertains to a human's metabolism, the "Biological Significance of Radiowaves and Microwaves," states, "Electromagnetic radiation exposure has been found to produce disturbances in carbohydrate energy and nitrogen metabolism in the brain, liver, and muscles," "It appears that under electromagnetic exposure, macroergic compounds become deficient due to disjunction of the oxidative phosphorylation processes and deranged metabolism of carbohydrates," that, "exposure increased ATP and

creatinphosphate by causing disturbances of the oxidative changes of carbohydrates and divergence of conjugation of oxidation and phosphorylation process," and, "it was concluded that changes in carbohydrate energy and nitrogen metabolism preceded the inception of structural damages in the myocardium." As this pertains to human reproduction, the "Biological Significance of Radiowaves and Microwaves," states, "revealed changes in the estrus cycle," with, "progeny show(ing) reduced viability, poor development, and anomalies," while the, "reduced viability and abnormal development, reduced rate of development and nervous disorders," was also observed. Pertaining to visual systems, "Biological Significance of Radiowaves and Microwaves," states, "the role of microwaves in cataract formation and visual damage has been studied extensively in the past and is well understood."

Adams, Williams, *Biological effects of electromagnetic radiation (radiowaves and microwaves): Eurasian communist countries*, Defense Intelligence Agency (1976).

53.   According to the US Defense Technical Information Center (DTIC) mission statement, "[Their] mission is to preserve, curate, and share knowledge from DoD's annual multi-billion-dollar investment in science and technology, multiplying the value and accelerating capability to the warfighter."

54.   DTIC release AD0750271, the Naval Medical Research Institute Report No. 2 Project MF12.524.015-00043, the "Bibliography of Reported Biological Phenomena ('Effects') and Clinical Manifestations Attributed To Microwaves and Radio-

Frequency Radiation," states dangerous levels of microwave band and radiative emission exposure is associated with, "Depression, Lack of concentration, Hallucinations, Insomnia, Tremor of the hands…" and spurns, "Behavioral Changes," of, "Reflexive, Operant, Avoidance, and Discrimination Behavior(al)," cognitive central state behavioral responses, in addition to the, "Central Nervous System Effects," of, "Headaches, Insomnia, Restlessness…Cranial Nerve Disorders, Pyramidal Tract Lesions, Conditioned Reflex Disorders, Vagomimetic Action of the Heart; Sympaticomimetic Action, Seizures, Convulsions," Autonomic Nervous system effects, and pertinent peripheral nervous system effects such as, the, "effects on locomotor nerves," "Enzyme and Other Biochemical Changes," "Metabolic Disorders,", "Gastrointestinal disorders," "Endocrine Gland Changes," "Histological Changes," "Genetic and Chromosomal Changes," "Pearl Chain Effect," and various, "Miscellaneous Effects," such as, "Sparking between dental fillings," "(modification) … of taste in mouth," "loss of hair," "brittleness of hair," "Sensations of Buzzing Vibrations, Pulsations, and Tickling About the Head and Ears," "Copious Perspiration, Salivation, and Protrusion of the Tongue," "Changes in the Operation of the Implanted Cardiac Pacemakers," and, "Changes in Circadian Rhythms." AD0750271 examines the Department of Defense's documented priori, experimentation, and expertise as this pertains to the biological effects and, "clinical manifestations," of Microwave and Radio frequency radiation. Glaser, Zorach, *Bibliography of Reported Biological Phenomena ('Effects') and Clinical*

*Manifestations Attributed To Microwaves and Radio-Frequency Radiation*, Navy and Marine Core (1971), https://apps.dtic.mil/sti/citations/tr/AD0750271.

55. In Defense Technical Information Center (DTIC) release AD0629363, "Phased Array Radar Studies," by Lt. Colonel, Stanley J. Wisnlewski USAF, "is directed toward an investigation of components, techniques, and fundamental theoretical limitations of arrays, primarily for high-power radar applications." Lt. Colonel, Stanley J. Wisnlewski USAF introduces the USAF Lincoln Laboratory Office's experiments, expertise, advancements, and research and development efforts as these pertain to Phased Array Radar systems. Wisnlewski, *Phased Array Radar Studies*, Lincoln Laboratory (1965).

56. Defense Technical Information Center (DTIC) release, "An Airborne Rotman Lens Phased Array," introduces Goodyear Aerospace Corporation's experiment, "An airborne single axis phased array has been designed using a folded Rotman Lens as a cost and performance effective alternative to a phase shifter steered array." Ewen and Brunner state that through their R&D, that, "Tradeoffs were performed among various antenna types including mechanically steered reflectors and arrays and electronically scanned arrays (ESAs)." Ewen and Brunner specifically state that through, "realizing beam scanning without physically steering the antenna, the swept volume demands of the antenna were minimized and the available aperture was maximized," which lead the group to choose to use a lens over [instead of] microwave phase shifters. "An Airborne Rotman Lens Phased Array," exemplifies Defendant

Department of Defense Department of the United States Air
Force's expertise and familiarity with operating and
experimenting with Airborne Rotman Lens Phased Array
Systems. Brunner, Ewen, *An Airborne Rotman Lens Phased Array*,
Goodyear Aerospace Corporation,
https://apps.dtic.mil/sti/pdfs/ADP001095.pdf.

57. Defense Technical Information Center (DTIC) release of the Air
Force Institute of Technology's AD172914, "The Effect of
Ionizing Radiation on the Breakdown Voltage of Power
MOSFETs" introduces MOSFETs while stating, "First
developed in the early 1980s, VD MOSFETs (also called power
MOSFETs) have become widely used in the electronic Industry
due to their ability to switch large currents at high frequencies
(10-100 kHz) and because of their thermal ruggedness." Pugh
utilizes the analogy, "a MOSFET can be considered the
electrical counterpart of an electrically controlled gate valve,"
and states, "In the case of a MOSFET, the flow through the
valve corresponds to the electrical current which flows through
the MOSFET." Pugh also introduces evidence supporting his
findings that, "Ionizing radiation can cause substantial changes
in the breakdown voltage of power MOSFETs." As this
concerns the MOSFET, Pugh states, "If a sufficient positive
potential is applied to the gate of an N-channel MOSFET, an
Inversion layer is induced and conduction can occur," where
the threshold voltage (VTH), "At applied gate voltages below
VTH, (effectively) no current flows through the gate-body
region," and at, "potentials above VTH the n-channel is
induced and current can flow." Pugh introduces the,

"Avalanche Breakdown," of the MOSFET, mentioning the, "continual process of thermally Induced electron-hole pair generation and recombination going on throughout the silicon," while stating that as the, "thermally Induced free electron-hole pairs … created in the depletion region, the pair will move apart under the effect of the applied field," which Pugh defines as leakage current, and states this, "usually is insignificant." Pugh describes potential accelerated, "thermally generated carriers," stating, "If (a) potential applied across the junction is sufficiently high, however, the carriers are accelerated until they are energetic enough to break loose one of the strongly bound electrons from the silicon lattice in the junction." Pugh describes the, "Avalanche Breakdown," as, when, "the potential is high enough to accelerate the carriers to these energies between each collision," where, "the carriers that are broken loose will also gain that much energy and will break loose another carrier in their next collision," and when, "With a sufficiently large potential applied, this process continues until the FET no longer has any control over the current." Pugh states the Avalanche Breakdown occurs when, "there is no way to stop the flow of current through the device without decreasing the drain-source potential." AD172914 indicates the Air Force Institute of Technology's expertise and familiarity with MOSFET related topics as this pertains to the effects of potential acceleration on their operation and function. Pugh, *The Effect of Ionizing Radiation on the Breakdown Voltage of Power MOSFETs*, University of Washington (1986), https://apps.dtic.mil/sti/tr/pdf/ADA172914.pdf.

58.  Defense Technical Information Center (DTIC) release
     ADA228774, "Phased Array Imaging," both explicates
     intricacies of phased array imaging, and states, "Ken Johnston
     of NRL(Naval Research Laboratory) introduced ... the CLEAN
     algorithm," which, "demonstrated that it was possible to
     recover very acceptable, high resolution images starting with
     data from an array so sparse that for many of the spatial
     frequencies that were present in the recovered image, the value
     of the array's optical transfer function was equal to zero," and,
     "radio astronomers form apparently useful images from
     interferometric data using very sparse arrays and an algorithm
     called CLEAN." ADA228774 introduces Defendant Department
     of Defense's development process, invention, and the historical
     applications of phased array imaging. Fried, David Sherwood,
     Douglas, *Phased Array Imaging*, Optical Sciences Co. (1990),
     https://apps.dtic.mil/sti/citations/ADA228774.

59.  Defense Technical Information Center (DTIC) release of the
     Naval Postgraduate School's ADA567326, "Beaming Electricity
     via Relay Satellites in Support of Deployed Combat Forces,"
     introduces and educates discourse on, "the feasibility for a
     space-based system using wireless power transfer technology
     to relay power to a remote base from a location with a
     commercial grid for simplicity of analysis purposes," as, "the
     system shall be required to target a single location per
     spacecraft for power delivery at any given time inputs for this
     analysis were the orbital altitude, the power delivery
     requirement and a few assumptions." Essenpreis introduces the
     advantages and disadvantages of utilizing a Laser-based

Wireless Power Transfer Architecture, or RF Wireless Power Transfer Architecture as these are compared both with efficiency, and cost structure factored in. Essenpreis introduces RF Wireless Power Transfer and states, "The Department of Energy and the National Aeronautics and Space Administration revived experiments designed to develop the use of the Extremely High Frequency (EHF) radio portion of the electromagnetic spectrum for electricity transmission in the mid-1970s with some success." Essenpreis states the DOE and NASA's, "concept involved using a parabolic transmitting antenna focused at a distant receiving array," which was comprised of, "numerous half-wave dipole antennas, which terminated into rectifiers. These devices came to be known as rectennas (Brown, 1984)." Through presenting examples of inputs, conversion tables, outputs, results, and the cost per kW generated, Essenpreis demonstrates the capabilities of his example systems' architectures as well as the capabilities of a LEO RF Wireless Power Transfer or Microwave Power Transfer System. ADA567326 introduces Defendant Department of Defense's expertise as this pertains to Laser-Wireless Power Transfer and Microwave Power Transfer (RF Wireless Power Transfer) with remarks on its current and developing capabilities. Essenpreis, *Beaming Electricity via Relay Satellites in Support of Deployed Combat Forces*, Naval Postgraduate School (2012), https://apps.dtic.mil/sti/tr/pdf/ADA567326.pdf.

60. In Defense Technical Information Center (DTIC) release of the USAF's Rome Laboratory's ADA318123, "Intense Microwave Pulses IV. SPIE'S 1996 Conference on Millimeter and

Microwave Engineering," Shepdev, Glotova, Shvartsburg's, "Harmonic Generation In the Reflection of Microwave Radiation from Semiconductor Surface," states, "The interaction between the microwave radiation, reflected from the semiconductor surface, and the gas of free carriers results in emergence of radiation harmonics." Shepdev, Glotova, and Shvartsburg introduce the exactness with which microwave radiation reflection has the capability to generate radiation harmonics as this pertains to semiconductors. They also introduce the, "well-known Conwell-Weisskopf relation," which, "determines the relation between the relaxation time and the carrier's temperature," when examining the, "relaxation of the carrier's pulse," as this pertains to, "interaction with the ionized lattice impurities." ADA318123 introduces Defendant USAF's expertise and familiarity as this pertains to harmonics generation in the reflection of microwave radiation from semiconductor surfaces. Shepdev, Glotova, Shvartsburg, *Harmonic Generation In the Reflection of Microwave Radiation from Semiconductor Surface*, Intense Microwave Pulses IV. SPIE'S 1996 Conference on Millimeter and Microwave Engineering, Rome Laboratory, https://apps.dtic.mil/sti/citations/ADA318123.

61. Defense Technical Information Center (DTIC) release, Office of Naval Research's ADA244139, "Kinetics of Intersubband Optical Excitation and Photoinduced Electron Transfer in an Asymmetric Double Quantum Well," defines a quantum well as, "a semiconductor heterostructure (see, e.g., Ref. 1) whose potential confines electrons to a small region." In ADA244139,

Stockman, Muratov, Pandey, and George describe, "quantum beats," while stating, "the system is excited with a short pulse of light and, after the pulse is over, the population numbers and polarizations are changing in time, in some cases in an oscillating manner." They summarize the relationship of intersubband photoexcitation as, "a net result of the photoexcitation of the intersubband transition in the N well is a transfer of the electron from the N well to the W well in the direction of the potential increase (i.e. against the direction of the field force." They also state, "the energy needed for such a transfer is taken from the exciting radiation," and, "if the transition in the wide well is excited, the electron transfer would occur in the direction of the field force." ADA244139 introduces Defendant Department of Defense's expertise and familiarity with optical excitation of electrons in an asymmetric double quantum well, which the Plaintiff states occurred during Defendants' alleged violations. Muratov, Pandey, and George, *Kinetics of Intersubband Optical Excitation and Photoinduced Electron Transfer in an Asymmetric Double Quantum Well*, Office of Naval Research (1992), https://apps.dtic.mil/sti/tr/pdf/ADA244139.pdf.

62. Defense Technical Information Center (DTIC) release of the Naval Research Laboratory's ADA169635, "Phased Array Laser System (PALS)," "presents analyses and design approaches for a high brightness space-based HF phase-conjugate laser system answering current SDI (software designed infrastructure) needs." Schnurr introduces phase conjugation analysis as, "wavefront process by which a beam retraces its path through

- 125 -

aberrations and corrects its wavefront distortion by virtue of phase sign reversal over that of the forward beam." ADA169635 examines the intricacies and expertise Defendant Department of Defense introduces pertaining to the function, design, development, and operation of phased array laser systems. Schnurr, *Phased Array Laser System (PALS)*, National Research Laboratory (1986), https://archive.org/details/DTIC_ADA169635/page/n3/mode/2up.

63. Defense Technical Information Center (DTIC) release of the Air Force Research Laboratory's ADA430879, "Physics of Non-Adiabatic Transport and Field-Domain Effect in Quantum-Well Infrared Photodetectors," introduce, "Numerical calculations," which, "indicate that field-domain effects [that] are only important at high temperatures or high voltages when both injection and sequential-tunneling currents are significant." Huang and Cardimona state the, "non-adiabatic effect... refers to the fact that a transient current not only depends on the magnitude of an electric field, but also depends on its time derivative." Huang and Cardimona, conclude, "In the presence of incident photons, the conduction current flowing through the MQW sample will be the sum of sequential-tunneling and photoexcited currents," that the, "field-domain effects are only important at high temperatures or high voltages, which implies the existence of significant injection and sequential-tunneling currents in the system," and, "we predict that the field-domain effects which are significant at high temperatures or high photon fluxes will strongly affect both tunneling- and

photocurrents." ADA430879 describes Defendants' familiarity with the complexity of the non-adiabatic effect as this pertains to, "an equilibrium state variation with time under an ac voltage." Cardimona, Huang, *Physics of Non-Adiabatic Transport and Field-Domain Effect in Quantum-Well Infrared Photodetectors*, Air Force Research Laboratory, Infrared Physics & Technology 44 (2003) 487–50, https://apps.dtic.mil/sti/tr/pdf/ADA430879.pdf.

64. Defense Technical Information Center (DTIC) release of DARPA's ADA473953, "Strong Optical Injection Locking of Edge-Emitting Lasers and Its Applications," introduces. "Semiconductor lasers under optical injection locking," and states they, "exhibit superior performance over free-running lasers and provide useful applications not achievable through the free-running lasers." Sung states, "Locking phenomenon can occur between oscillators," and the, "original oscillation frequency of a free-running oscillator can be locked to the frequency of an injecting oscillator with a constant phase value." Sung introduces the, "Synchronization of lasers," and states, "It can be attained either in the electric domain by phase-locked loops (PLL) or in the optical domain by optical injection locking." Sung states, "directly modulated laser… applications have been limited to low frequency systems (-10 Gb/s or 10 GHz) due to relaxation oscillation and chirp." He states that, "RF signals can be conveniently performed in the optical domain using coherent optical receivers if one can synchronize the RF-modulated optical carrier with an optical frequency comb (OFC) local oscillator." Sung states that through,

"synchroniz(ing) the RF-modulated optical carrier with an optical frequency comb (OFC) local oscillator," that, "The channelization of broadband (~ 100 GHz) RF signals can be conveniently performed in the optical domain using coherent optical receivers." Sung states that, "By injecting light from a CW master laser or a mode-locked laser, phase coherence is established between the master and the injected mode." Sung also mentions that, "Under strong injection locking, we have found that the directly-modulated slave laser exhibits asymmetric modulation sidebands." Sung concludes that, "In this dissertation, the physical properties, performances, and applications of strong injection-locked distributed feedback (DFB) lasers with various injection locking configurations have been presented." ADA473953 introduces and examines Defendants' expertise as this concerns the intricacies of optical injection locking. Hyuk-Kee, Sung, Strong Optical Injection Locking of Edge-Emitting Lasers and Its Applications, California University Berkley Department of Electrical Engineering and Computer Science, https://apps.dtic.mil/sti/citations/ADA473953.

65. Defense Technical Information Center (DTIC) Naval Research Laboratory release ADA608768, "Applications of Graphene to Photonics," introduces graphene, stating the, "unique physical property of graphene is that it exhibits fractional quantum Hall effect due to the collective behavior of its carriers." Currie states, "graphene's demonstration as a THz transistor shows potential in high-speed electronics/photonics," and that, "Applications in a variety of spectral regions will gain from

graphene's broad spectral absorption." Currie remarks, "graphene has potential for far-infrared or submillimeter-wave astronomy, with the possibility of photon counting at frequencies as low as 800 MHz, which, "enable(es) exploration of quantum experiments with microwave photons." While, "Modulation of light is needed in many photonic applications," Currie states, "Materials can be used for electro-optic modulation of light if some characteristic of the light (amplitude, polarization, etc.) can be modified by an applied electric field or injected current." Currie introduces electro-optic modulation and states it, "is commonly achieved," through an, "

> electro-optic material (electric-field terms of a material's nonlinear susceptibility), ... an electro-absorption material (absorption characteristics are electrically modified) ... electrically induced modulation of an optical material's refractive index (e.g., electric field or current injection modifies carrier densify producing a carrier-refraction effect), ... [or] electrically induced thermal variations which modify an optical material's properties."

ADA608768 introduces Defendant Department of Defense's research and expertise with regards to the various qualities and properties of graphene as this pertains to photonics. Currie, *Applications of Graphene to Photonics*, Naval Research Laboratory (2014), https://apps.dtic.mil/sti/pdfs/ADA608768.pdf.

66. Defense Technical Information Center (DTIC) release of the USAF's ADA027195, "Digital Photon Correlation Data Processing Techniques," introduces photon counting

techniques, stating these, "offer improved system sensitivity by allowing velocity measurements to be made even when there are insufficient signal photons available to define the classical scattering signal." Mayo Jr. states, "Theoretical Poisson models have been formulated for dual-scatter LV (laser velocimeter) signals with sufficient generality to include all signal regimes from classical signals with Gaussian noise down to photon-resolved signals which require photon counting techniques." Mayo Jr. states, "Analysis of conditional signal models has provided instantaneous signal-to-noise ratio and other statistical parameter equations not previously available in the LDV (Laser Doppler Velocimetery) literature." Mayo Jr. provides, "A detailed analysis, including explicit mention of approximations required, of the expected value of direct photon correlation of LV signals from turbulent flow is provided." Mayo Jr. concludes, "Experimental measurements have been performed which verify the operation of the photon processor with 100 MHz input events and 40 MHz system clock operating speed," and culminates his project stating, "A sequential photon correlation of a low-level sinusoidally modulated optical source has been made with 25 nsec time resolution." ADA027195 demonstrates Defendant USAF's experience with the development of several photon correlation data processing methods and techniques, and discusses the optimization of several digital methods which do so. Mayo Jr., *Digital Photon Correlation Data Processing Techniques*, USAF Systems Command (1976), https://apps.dtic.mil/sti/pdfs/ADA027195.pdf.

67.    Defense Technical Information Center (DTIC) release of the US
       Army Research Office's AD1001385, "Breaking the Neural
       Code," Sable, Peterka, Yuste, and Paninaski utilize, "in vivo
       two-photon calcium imaging to record the activity of neuronal
       populations in primary visual cortex of awake mice in the
       presence and absence of visual stimulation," and use,
       "Multidimensional analysis of the network activity," which
       allowed (them) to identify neuronal ensembles defined as
       groups of cells firing in synchrony." Sable, Peterka, Yuste, and
       Paninaski, "demonstrate the general applicability of our
       method by applying it to in vitro and in vivo multi-neuronal
       imaging data, whole brain light-sheet imaging data, and
       dendritic imaging data," and, "developed a modular approach
       for analyzing calcium imaging recordings of large neuronal
       ensembles," with, "A flexible and efficient model for calcium
       deconvolution." The group uses, "Simultaneous identification
       of the locations of the neurons, demix spatially overlapping
       components, and denoise and deconvolve the spiking activity
       from the slow dynamics of the calcium indicator," to accurately
       document and trace neuronal activity. AD1001385 introduces
       Defendant US DoD's expertise and familiarity as this pertains
       to two-photon calcium imaging, and their methods of analyses
       pertaining to this neuronal imaging technique. Sable, Julia,
       Peterka, Darcy, Yuste, Rafael, Paninaski, Liam, *Breaking the
       Neural Code*, Columbia University (2015),
       https://apps.dtic.mil/sti/pdfs/AD1001385.pdf.

68.    Defense Technical Information Center (DTIC) release
       ADA016664, "Theoretical Studies of High-Power Ultraviolet

and Infrared Materials," introduces the, "lucky-reversing-electron process," the, "Holstein process plus vertical inter-conduction-band transitions," "Holstein photon-electron-phonon process," "ferromagnetic subsidiary-resonance absorption," and states, "Kramers-Kronig relations connect the real and imaginary parts of the dielectric constant and are used to relate the nonlinear index to the two-photon absorption coefficient." ADA016664 introduces Defendants' familiarity with two-photon absorption and ferromagnetic subsidiary-resonance absorption. Sparks, Marshall, Duthler, Carl, *Theoretical Studies of High-Power Ultraviolet and Infrared Materials*, Xonics (1974), Advanced Research Projects Agency, https://apps.dtic.mil/sti/pdfs/AD0784327.pdf.

69. Defense Technical Information Center (DTIC) release of Defense Intelligence Agency's ADA126620, "Bibliography of Soviet Laser Developments Number 57, January-February 1982," includes Vlasov and Zhvavyi's, "Role of two-photon absorption in optical avalanche breakdown." In, "Role of two-photon absorption in optical avalanche breakdown," Vlasov and Zhvavyi examine the two photon and single photon interaction as this affects the breakdown threshold, phonon-electron interactions, introduce the kinetic equations for electrons in the conduction zone, utilize a distribution function, integrate energy balance equations, and calculate the flux density threshold of the radiation. They examine and study the electron-phonon interaction as this pertains to temperature dependence of optical breakdown threshold intensity and the, "kinetics of avalanche optical breakdown taking into account

both single-phonon and two-photon energies." Through careful study, Vlasov and Zhvavyi state, "we carry out an estimate of the contribution of two-photon processes to optical avalanche breakdown and we consider their influence on the functional dependences of the breakdown threshold." ADA126620 lists the various Soviet-era laser developments in an itemized form, indicating Defendant DIA's familiarity with, study of their scientists' publications, and familiarity with two-photon absorption as this pertains to avalanche breakdown. Vlasov, Zhvavyi, *Role of two-photon absorption in optical avalanche breakdown, Bibliography of Soviet Laser Developments Number 57, January-February 1982*, DIA (1982), https://apps.dtic.mil/sti/citations/tr/ADA126620.

70. Defense Technical Information Center (DTIC) release of Naval Research Laboratory's ADA186236, "Higher Harmonic Generation in the Induced Resonance Electron Cyclotron Maser," introduces, "the operation of the induced resonance electron cyclotron (IREC) maser at Doppler upshifted cyclotron harmonics." Riyopoulos, Tangs, Sprangle, and Levush state, "Electrons gyrating in resonance with the radiation field experience a bunching in the relative wave particle phase through the dependence of the cyclotron frequency on the relativistic mass." They state, "High amplification of the radiation field, known as masing action, results for radiation frequencies slightly above the electron cyclotron frequency." ADA186236 examines Defendants' expertise of the induced resonance electron cyclotron (IREC) maser, including its current applications and capabilities. Riyopoulos, Tangs,

Sprangle, and Levush, Higher *Harmonic Generation in the Induced Resonance Electron Cyclotron Maser*, Naval Research Laboratory (1987), https://apps.dtic.mil/sti/pdfs/ADA186236.pdf.

71. In, "Analysis and Design of Sub-Harmonically Injection Locked Oscillators," Neogy and Roychowdhury introduce, "Injection locking (IL)," as, "a nonlinear phenomenon in which a self-sustaining oscillator's phase becomes precisely locked (i.e., entrained or synchronized) to that of an externally applied signal." This document indicates the capability to utilize an externally applied signal and injection locking to generate sub-Harmonic injection locked oscillators. Neogy, Roychowdhury, *Analysis and Design of Sub-Harmonically Injection Locked Oscillators*, IEEE, 2012 Design, Automation & Test in Europe Conference & Exhibition (DATE), https://ieeexplore.ieee.org/document/6176677.

72. In 2021, The Wall Street Journal reported SpaceX having been awarded a $1.8 billion classified Starshield contract with an unlisted US governmental agency.

73. While the US government maintained secrecy pertaining to their involvement with and utilization of SpaceX's technology and resources until 2023, on September 27th, 2023, during a Bloomberg exclusive release, US Air Force Spokeswoman Ann Stefanek introduced, "SpaceX's one-year contract for Starshield was awarded Sept. 1 (2023)," which, "provides for Starshield end-to-end service via the Starlink constellation, user terminals, ancillary equipment, network management and other related services." This discloses the USSF's operation of Starlink's

"ancillary equipment," 15 CFR 301.2(j), during late 2023 and early 2024, regardless of SpaceX contracts funded and held by undisclosed US Governmental organizations pertaining to SIGINT during 2021 and earlier. Bloomberg also stated, '"The Starshield contract 'is for a service' but 'how SpaceX or any other company provides 'that service is up to them,' Lieutenant Colonel Omar Villarreal, a Space Force spokesman, said in an email, 'I am unable to get into specifics, but requirements were received from the Army, Navy, Air Force, Coast Guard and other outside agencies and combined."'

74.    On March 16, 2024, Reuter's Mr. Joey Roulette and Ms. Marisa Taylor reported, "SpaceX is building a network of hundreds of spy satellites under a classified contract with a U.S. intelligence agency…The network is being built by SpaceX's Starshield business unit under a $1.8 billion contract signed in 2021 with the National Reconnaissance Office (NRO), an intelligence agency that manages spy satellites, the sources said."  This was the first public release pertaining to Defendant US NRO's involvement with SpaceX's Starshield system.

75.    In Landolt-Bornstein's Medical Radiological Physics Volume 7, Kramer, Vatnitsky, and Selbach's, "Dosimetry for teletherapy," Kramer introduces, "reference dosimetry," as "the determination of the absorbed dose [radiation] to water under clinical reference conditions," and exhibits the model equation for the radiation absorption dose to water as determined in photon and electron beams. Kramer states, "In view of radiation transport, air saturated with water at approximately room temperature differs in three ways from dry air at about

the same temperature: its density is about 1%...mass collision stopping power is about 0.2% larger." Kramer's series of calculations exemplifies the capability to determine the specific radiation absorption level factoring in radiation transport through air saturated with water, which is pertinent to Plaintiff's claims. Kramer, Vatnitsky, Selbach, *Medical Radiological Physics Volume 7*, Landolt-Börnstein (2012).

76. In, "Whole-of-Government Teaming Through Collaborative Construction: NRO/NSA Synergy," DeWitt and Dillinger introduce the "joint agency ownership of multi-intelligence (multi-INT) fusion tools." Regardless of Defendant NSA's capability to affirm or deny their involvement, while acting in their official capacity defined in the National Security Council's Intelligence Directive No. 6, as a combat supporting agency, and a, "multi-INT," "joint agency," Defendant is directly involved in the RF data collection throughout any portion of the National Surveillance Program. DeWitt, Dillinger, *Whole-of-Government Teaming Through Collaborative Construction: NRO/NSA Synergy*, Inter-Agency Journal 6-3 (2015), https://thesimonscenter.org/featured-articles/featured-article-nronsa-synergy/.

77. When studying Zhi, Wang, and Hu's, "Recent advances in the effects of microwave radiation on brains," they found drastic consequences for organisms effected, "exposed rats to microwaves (500 pps, pulse width = 2 µs, and average whole body-specific absorption rate (SAR) = 0.6 W/kg) for an exposure duration of 45 min, and a significant decline was observed in the rats' performance, indicating that microwave

radiation influenced their working memory." Plaintiff states the use of microwave radiation drastically decreased his academic performance, and contributed to neurodegeneration due to surface optical rectification and several other complex phenomenon explicating the interaction between RF and EMF and Plaintiff's KLS Martin titanium metal implants. Hu, Wang, Zhi, *Recent advances in the effects of microwave radiation on brains*, Military Medical Research Volume 4-29 (2017), https://mmrjournal.biomedcentral.com/articles/10.1186/s407 79-017-0139-0.

78.   The International Commission on Non-Ionizing Radiation Protection (ICNIRP) introduces the, "specific energy absorption rate," (SAR) "where EMFs penetrate deep into tissue." The ICNRIP introduces and elaborates upon, "operational adverse health effect thresholds," while also utilizing precision measurements and calculations to determine radiation absorption into various portions of a human body at different body mass indexes.

79.   As mentioned in "Behavioral Inhibition System function as the mediator in the pathway from electrodermal fear conditioning to antisocial behavior: Integrating the Reinforcement Sensitivity Theory," Dr. Chen concludes, "Electrodermal fear conditioning was found to be associated with antisocial behavior in this study," this series of electrodermal fear conditioning events has altered Plaintiff's sociability and Plaintiff's mental and psychological health, which has resulted in hospitalization, mental health damages, and it is plausible this also contributed to the mental health unwellness of Plaintiff's surrounding

community. Chen, *Behavioral Inhibition System function as the mediator in the pathway from electrodermal fear conditioning to antisocial behavior: Integrating the Reinforcement Sensitivity Theory*, Department of Criminal Justice and Criminology, Georgia State University, https://www.sciencedirect.com/science/article/abs/pii/S019 1886920303688.

80.    Though excess microwave radiation exposure and electromagnetic radiation exposure is found to be associated with various short-term detrimental biological effects, the long-term effects of these forms of radiation have also been associated with cancer, neurodegeneration, and significant metabolic disruption.  In, Noto, Iwazaki, Nagao, Sumiyama, Redpath, Stanbridge, and Kitagawa's "Altered N-Glycosylation of Glucose Transporter-1 Associated with Radiation-Induced Tumorigenesis of Human Cell Hybrids," findings suggested that radiation, "altered glycosylation of GLUT1 (transporter gene) at the cell surface [which] may play a role in tumor growth and maintenance by increasing the availability of glucose as a local environmental nutrient." Noto, Iwazaki, Nagao, Sumiyama, Redpath, Stanbridge, and Kitagawa, *Altered N-Glycosylation of Glucose Transporter-1 Associated with Radiation-Induced Tumorigenesis of Human Cell Hybrids*, Biochemical and Biophysical Research Communications Volume 240, Issue 2, 17 (1997).

81.    In, "Differential Pro-Inflammatory Responses of Astrocytes and Microglia Involve STAT3 Activation in Response to 1800 MHz Radiofrequency Fields," Lu, He, Zhang, Xu, Zhang, He, Chen,

Liu, Pi, Yu, and Zhao conclude, "RF exposure differentially induced gene expressions of pro-inflammatory cytokines in microglia and astrocytes." They found, "RF exposure differentially induced expression of iNOS and COX2, and production of NO and PGE2 in microglia and astrocytes." He, Lu, Zhang, *Differential Pro-Inflammatory Responses of Astrocytes and Microglia Involve STAT3 Activation in Response to 1800 MHz Radiofrequency Fields*, PLoS One 9, 10 (2014), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0108318.

82. In *Role of Nutrients in Neurological Disorders*, Rajagopal, Ramachandran, Sundararaman, and Venkata found, "The event of demyelination and axonal damage could be initiated by the activation of microglia, which release nitric oxide (one of the free radicals, produce nitrosative stress) and show enhanced production of glutamate (a major excitatory neurotransmitter), leading to injury of nerve fibers by prompting the accumulation of intracellular $Na^+$ and/or $Ca^{2+}$ concentration." Berer and Krishnamoorthy (2014). They also found, "The pathophysiology of AD is primarily associated with the extracellular deposition of amyloid beta (Aβ) plaques and intracellular accumulation of tau neurofibrillary tangles (NFT)," and "Aβ deplete the intracellular $Ca^{2+}$ storage in endoplasmic reticulum (ER), where $Ca^{2+}$ storage occurs generally, resulting in cytosolic $Ca^{2+}$ overload." The possible injuries associated with microglia activation are pertinent to Plaintiff's claims. Rajagopal, Ramachandran, Sundararaman, Venkata, *Role of*

*Nutrients in Neurological Disorders*, Springer (2022), https://link.springer.com/book/10.1007/978-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-5.

83. In Böhme's Charge Injection, "Charge Trapping and Charge Transfer in Quantum-Dot Solids," linear absorption is introduced and described by the Lambert-Beer law, as calculating, "transmitted and incident light intensity," through multiplying a factor of both the negative, "absorption cross section per Quantum Dot," and the Quantum Dot density per unit volume. Böhme introduces, "the absorption change in Transient Absorption measurements," which is expressed as, "the multiplication of the cross section of a single excitation," and, "the density of excitations per unit area," as this is then divided by the logarithm 10 constant. Böhme describes, "electrochemical charge injection," and states, the, "concomitant change in optical absorption of the film allows quantification of the number of charges in quantum confined levels and thereby their energy." This is pertinent to Plaintiff's claims pertaining to the capability to optically induce quantum dot charge transfer. Boehme, *Charge Injection, Charge Trapping and Charge Transfer in Quantum-Dot Solids*, Department Chemical Engineering (AS) (TU Delft), https://repository.tudelft.nl/record/uuid:387ff649-1aa3-44a5-a22b-0e33fe39446b.

84. While previous sources have stated the bright light emissions from the Starlink/Starshield system are interference, as Mr. Frederick Sr. states in the Handbook of Radio Frequency Interference V3, " resulting from reflections from the satellite…from sources within radio line-of-sight of the

- 140 -

satellite…the solid angle in which interference sources may exist at a given time is described by a cone with its apex at the satellite having an apex angle of approximately 76 degrees," or that, "Electromagnetic radiations .. are possible sources of radio frequency interference," with Elon Musk claiming, that the visible light emissions from the Starlink satellites are due to, "Solar panel angle," on his twitter page, Plaintiff alleges these emissions are bright light emissions correlated to both parabolic antenna emissions from, as the USAF's *Fundamentals of Electronic Warfare* defines the antennas', "parabolic reflecting surface," with visible emissions from the parabolic antenna's reflectors, as these act as the substrate for the satellite's, or satellite's, "ancillary equipment's," "Self-multiplexing antennas," and phased array antenna emissions as these are observed and their emissions are recorded. These both are documented with calibrated field meters, microwave analyzers, and other various professional recording instruments which are subject to inspection during the defense's discovery period. As Patent No. US20190252800A1 states, "it is often impractical to physically reorient the antenna with respect to the target or source of the signal," the Space Exploration Technologies Corporation states, "To overcome some of the above shortcomings of the antenna, a phased array antenna can be formed from a set of antenna elements to simulate a large directional antenna," which when combining parabolic antenna elements with the other components of the phased array antenna to form a large directional antenna, generates visible light emissions from this bi-directional antenna, as their

- 141 -

parabolic antennas' reflectors (subreflector-to-main reflectors) emit bright light emissions directionally as these are oriented and directed towards their target. Frederick, *Handbook on Radio Frequency Interference, Volume 3: Methods of Electromagnetic Interference-Free Design and Interference Suppression*, Frederick Research Corporation.

85.  In his youth, Plaintiff experienced high levels of trauma and was the victim of a previously tried and sealed juvenile violent crime in the state of Florida, which resulted in permanent metal implants embedded in his mandible bone.

86.  Plaintiff submits the evidence including the utilization of a factory calibrated Keysight N9917a, a Microwave Analyzer which conforms to IEC/EN 61326–1, an Aaronia AG Omni-Log Pro H antenna, an antenna holding a current and recent factory calibration, and documents his evidence with untampered-with audio and video recordings while complying with the Federal Rules for Evidence. Plaintiff communicated with the Aaronia AG team and the collected data includes the Aaronia AG Omni-Log Pro H's antenna factor.

**Specific Allegations By The Plaintiff**

1.  Plaintiff claims to have been subjected to harmonic generation in the reflection of microwave radiation in semiconductor surfaces and optical charge injection nearly twenty-four hours a day, seven days a week, with an established timeline of continuous violations ranging from the January 21, 2021 to 2024 (present), although Plaintiff states these violations occurred as early as 2018. During the years prior to 2021, Plaintiff lacked the resources, wherewithal, and the knowledge to prove

occurrence, and this resulted in more than one hospitalization. During early 2021 to 2024, Plaintiff was exposed to high levels of microwave band activity, and unethical and unacceptable levels of both electromagnetic interference and radio frequency interference, while this accompanied what was believed to have been dangerous levels of surface optical rectification as his KLS Martin Titanium implants were irradiated. During this time period, Plaintiff was only capable of professionally recording RF interference, and the presence of Starshield's bright-light emissions overhead.

2.  During early 2018 and mid-late 2019, preceding the COVID-19 pandemic and during the epidemic, August to December 2021, March to June 2022, October 2022, March to December 2023, and from January to March 2024, Plaintiff states he was subjected to Defendant CIA's enhanced interrogation techniques as these were deployed optically via Defendant Department of Defense Department of the United States Air Force's and Defendant National Reconnaissance Office's Starshield's use of Starlink resources and, "ancillary equipment," while utilizing the alleged-to-have-been recently integrated system with the direction of Defendant CIA's Directorate of Science and Technology, Defendant DARPA's N3, NEAT, and RFMLS system's code in conjunction with Defendant DIA's RINT capabilities through the development of radar intelligence, unintentional radiation intelligence, and Defendant NSA's SIGINT capabilities as they produce signals intelligence, from unevaluated or unminimized RF data collected by Defendant NRO utilizing Defendant Department

of the US Air Force's LORO method to deploy the Starshield system's Starlink resource's, "ancillary equipment," and the deployment of DARPA's N3, NEAT, and RFMLS program via the JADC2 platform as SoSITE's STITCHES enabled, "rapid integration," of multiple different architectures seamlessly. Plaintiff's allegations indicate this occurred with the actions requiring data collected, which must have been collected and processed into measurement and signature intelligence and signals intelligence, to have been capable of integrating the N3, NEAT, and RFMLS into the JADC2 platform, and to have been utilized and processed past simple, "RF data," collected by Defendant NRO. This inculcates the involvement of the NSA's processing as this pertains to deploying these systems via subharmonic injection-locking phased locked loop synchronization, optical pumping, optical charge injection, passive intermodulation distortion, and harmonic generation in the reflection of microwave radiation in semiconductor surfaces, while generating EMI and passive intermodulation distortion. Thus, Defendant DARPA implemented their, N3, RFMLS, and NEAT programs into the JADC2, which directly describes what Plaintiff states to have been, "tested," on him, or to have been used without his consent. Plaintiff also states the concepts of Self-Multiplexing, optical charge injection, harmonic generation in the reflection of microwave radiation from semiconductor surfaces, optical pumping, plane wave scattering, passive intermodulation distortion, Thomson-resonant scattering as oscillatory energy, angular integration, and the dissipative phenomenon are involved while factoring

in the local field potentials, evoked potentials, the drude parameter, and molecular acoustics, as oscillator phased-locked synchronization, transient, electron energy loss/reflection absorption spectroscopy, the magnetically-induced-intersystem-crossing mechanism, leakage current energy harvesting, Transient Receptor Potential cation channels, blood oxygenation level dependent (BOLD) responses, two photon $Ca^{2+}$ imaging, and multifractal detrended fluctuation analysis. These are alleged to have been utilized as indicated by the heightened RF, EMI, EMF, and biological indicators and RF-interference in addition to Plaintiff's statements pertaining to the occurrence. Plaintiff cites the discrepancy between his education level and the education level necessary to understand and educate discourse as this pertains to these topics. While the Department of Defense officially acknowledges implementation of DARPA's SoSITE's STITCHES, as this, "rapidly integrates," various systems' or architectures' code via generating updatable, "interoperability code," for seamless multi-architecture, multi-interface, and multi-system deployments, Plaintiff believes Defendants' utilized this, the Starshield System, and the LORO method to deploy and implement the RFMLS system, which enables near-instantaneous updates to their, "warfighter," occurring in a frequency far faster than a human being moves. Plaintiff states this implementation of Defendant DARPA's RFMLS program factors in the drude parameter and the molecular acoustics of the surrounding environment due to physically observable and documented factors, and due to what he claims he physically

felt and documented interacting with his surrounding environment. Plaintiff states this also contributed to the implementation of optically deployed EIT's as these caused him significant amounts of distress, which he also believes contributed to his hospitalization. Plaintiff states there is a significant disparity between the education level necessary to discern events exactly as they transpired, and with the education level of the undergraduate degree he graduated with.

3. The Presidential Policy Directive 28 states the IC may not utilize, "SIGINT collected in bulk for the purpose of: suppressing or burdening criticism or dissent; disadvantaging persons based upon their ethnicity, race, gender, sexual orientation, or religion; affording a competitive advantage to U.S. companies and U.S. business sectors commercially; or achieving any other purpose than those identified above." Plaintiff states there is an indication of the use of the Starlink's, "ancillary equipment," on Starlink 1061, 1215, 1331, 1173, 1148, and 1163 (amongst others) through the Starshield system from September 2021 to March 2023 (which continuously occurred), over an area which does not subscribe to Starlink's services. Plaintiff states there also is an indication of the use of, "phased array imaging," while utilizing the LORO method as Starshield deploys what the US Air Force has openly disclosed and acknowledged as Starlink's, "ancillary equipment." As this is utilized in either Bulk Data Collection by Defendant NRO, SIGINT by Defendant NSA, general equipment testing by the DoD USAF USSF Branch, MASINT by Defendant DIA,

HUMINT by Defendant CIA and DIA, IMINT by Defendant DIA, or TECHINT by Defendant NSA, this comprises a gross Constitutional violation and deprived Plaintiff of rights. Should this be considered either general equipment testing in violation of the requirements of intelligence members as they test electronic surveillance equipment, or, electronic surveillance simply utilized without clear probable cause, regardless of the equipment's recording, storage, or processing of data, this equipment's operation is utilized in violation of the statutory allowances for testing or surveillance of this kind over the US homeland, or on a US person. With insight into abnormal and high levels of EMI Line noise, when comparing these to base-line readings, in conjunction with this occurrence, Plaintiff claims Defendants utilized this method of illegal surveillance while utilizing intersubband photoexcitation and optically pumping, or utilizing optical charge injection, through Plaintiff's power supply purposefully for RINT purposes while generating line harmonics, electrochromism, pulsed electromagnetic wavefields, generating quantum beats, pump-field scattering, second harmonic generation scattering, and Raman spectroscopy, reflection-absorption spectroscopy, and/or transient spectroscopy. Plaintiff states this enabled the utilization of the testing and deployment of Defendant DARPA's N3, NEAT, and RFMLS programs as these have been integrated into the JADC2 platform via DARPA's SoSITE's STITCHES by Apogee Research.

4. Due to the emissions Plaintiff recorded of the bright light emissions from the Starlink array's, "ancillary equipment,"

during August 1, 2021, which are documented electromagnetic
wave (light) emissions from the Starshield System's Rotman
lens substrate integrated waveguide leaky wave antenna
parabolic antenna subreflector to main reflector emissions and
Cassegrain system generated bi-directional self-multiplexing
phased array antenna's emissions, the Starshield system, or its
precursors, were determined to be tested by the NRO, NSA,
and CIA Directorate for Science and Technology as these were
utilized for IMINT, MASINT, RINT, HUMINT, and SIGINT
purposes. Plaintiff states these were used either in bulk data
collection, intelligence personnel training, or electronic
surveillance generally, although he states these were utilized
for more than a year in duration and were used around the
clock, prior to the signing of the US Department of the Air
Forces USSF Starshield contract. Plaintiff states the early
Starshield system tests similarly deployed Starlink resources,
"ancillary equipment," as these conducted illegal surveillance,
non-consensual human experimentation on Plaintiff's
permanent metal implants, on Plaintiff's transient receptor
potential cation channel currents, and Plaintiff's trigeminal
nerve, facial nerve, Cavernous Nerves, Vagus nerve,
Supraorbital Nerve, Corneal Nerves, short Ciliary Nerves,
TRPV I, TRPV II, TRPV IV, TRPV VI, microglia, myocytes,
goblet cell, pyramidal cell, Betz cell, TMEM16A, axons,
dendrites, motor neurons, somatosensory neurons,
interneurons, afferent neurons, efferent neurons, unipolar
neurons, C1-C2 innervation, T11-L2, S2-S3, and S4 innervation.
Plaintiff states that during this time, that the Starshield systems

- 148 -

use in SIGINT, MASINT, RINT, IMINT, and HUMINT
deployed optically, "Enhanced Interrogation Techniques."
These optically deployed EITs subjected Plaintiff to sleep
deprivation, high levels of transcranial electric stimuli,
transcranial magnetic stimuli, magnetoelectric stimuli,
ultrasonic acoustic heterodyne transmissions (with the data to
state occurrence) to the Coronal Section of his Temporal Bone,
and bone conduction. These optically deployed EITs (OEITs)
were utilized to generate Pavlovian aversion conditioning,
Electrodermal fear and aggression conditioning, and publicly,
what Plaintiff equates to a similar series of events to that of
Tang, Ko, and Ding's, "Pavlovian fear memory induced by
activation in the anterior cingulate cortex," where, "mice learn
to escape the noxious area," which generate, "avoidance
responses using the modified noxious hot-plate escape test."
Plaintiff states the emissions of harmonic generation in the
reflection of microwave radiation from semiconductor surfaces,
subharmonic injection locking, and harmonic injection locking
were weaponized while the LORO method enabled Defendants
NRO, NSA, and the CIA to gather and process data pertaining
to this equipment's tests and deployment of DARPA's newly
developed system's code prior to Defendant Department of the
US Air Force having integrated DARPA's SoSITE's STITCHES.
Plaintiff states this collectively generated Pavlovian-esque
aversions, and that Defendants intended on generating this
response to both suppress and burden opposition and dissent,
understanding the capabilities of the HSPICE, ANSYS, and
MATLAB's software when operating in conjunction with Mr.

Davies' RFMLS, a program developed with similar capabilities to Python's QCoDes data-acquisition framework when paired with programs similar to the aforementioned software's capabilities as this concerns RF data acquisition.

5. From September 2021 through June 2022, Plaintiff began to record alleged torture via what he then labeled an optical deployment of Dr. Jessen and Dr. Mitchell's Enhanced Interrogation Techniques. These were generated and deployed by the Starshield system's Starlink resources and, "ancillary equipment," via the tactics of Defendant DoD's Electromagnetic Superiority Strategy of 2020. These were deployed by the DIA as they derived MASINT and utilized their A.I. and Machine Learning Division's JADC2 integration of the RFMLS and N3 programs. This occurred prior to Defendant Department of the United States Air Force being explicitly involved in 2023 with operating SpaceX's Starshield system. Once detected, these emissions indicate the involvement of the NRO and NSA's SENTIENT program at the ADF-C, CIA's DS&T Office of Space Reconnaissance hosted at the NRO, and the NRO's Advanced Systems & Technology (AS&T) Directorate's (OSR), and NASIC's MASINT activity as these groups tested and integrated the Starshield system's Starlink resources, ancillary equipment, amongst other arrays as the JADC2 was implemented. Plaintiff states Defendant DIA and Defendant CIA's Directorate of Science and Technology's MASINT, TECHINT, HUMINT, SIGINT, IMINT, and RINT methods: intersubband excitation, subharmonic injection locking, passive intermodulation, second harmonic scattering,

reflection absorption spectroscopy, electron energy loss spectroscopy, transient spectroscopy, and harmonic generation in the reflection of microwave radiation from semiconductor surfaces, with electromagnetic interference having optically pumped Plaintiff's implant's weak ferromagnetism via resonant scattering and second harmonic scattering, factoring in not only oscillatory energy, but angular integration, the dissipative phenomenon, local field potential, evoked potential, the magnetically-induced-intersystem-crossing mechanism, magneto-mechano-electric-effect, and the Spin-Vibronic mechanism for intersystem crossing as this pertains to magneto-genetic responses, optical pumping of the weak ferromagnetic field interaction of the $Fe^{+3}$ clusters as present in the KLS Martin Titanium, and the general capabilities of DARPA's N3, NEAT, and RFMLS as deployed via the JADC2 platform and DARPA's SoSITE's STITCHES.

6. Following Defendant Department of Defense Department of the United Air Force's Space Force Branch's December 2023 contract with Starshield post-2023 involvement and integration of Defendant DARPA's SoSITE STITCHES N3, NEAT, and RFMLS indicates the involvement of the multi-INT coalition between Defendant CIA's DS&T, DARPA's operational liaisons, DARPA's MTO, and DARPA's BTO, Defendant DIA's J2T, placement in CENTCOM's J2 Artificial Intelligence and Machine Learning Division, Defendant DIA's Joint All Domain Command and Control (JADC2) and Data Integration Lead, DoD USAF 4th EWS and USSF Space Delta 3, DoD NRO 544th ISRG, Office of Intelligence Liaison to NASIC, and AS&T, and

NSA CCC and SENTIENT, and the NSA-CIA joint coalition group, the "Special Collections Service." The Space Delta 3 and 4th Electromagnetic Squadron are alleged to have been responsible for the EMS effects, while the 544th ISRG, NSA Colorado, and SCS are alleged to have also been privy and involved with this testing in addition to the DIA, as the alleged Starshield use, or, "tests," were jointly conducted by Defendants, with Defendant DIA, Defendant NRO, and Defendant CIA's, SIGINT, HUMINT, TECHINT, IMINT, and HUMINT operations. This occurred with Defendant CIA's guidance and direction being delivered to the warfighter as Defendant CIA's Enhanced Interrogation Techniques were remotely and optically deployed. These then became, "Optically Enhanced Interrogation Techniques." Utilizing PSYOPS tactics introduced and advanced by Defendants USAF, DIA, CIA, and US DoD generally, this, "joint-agency," effort culminated in what Plaintiff states illegally caused him significant amounts of pain, caused his family significant amounts of pain, tracked his movements and consumption patterns, modified his cognitive central state behavioral responses, cognitive cortical higher order associations, cortical associations, aggression level, attention span, muscle fatigue, appetite, and manipulated his diet, sleep cycle duration, circadian rhythms, balance, performance, development, and the other aforementioned effects in addition to requiring a significant time expenditure to explain occurrence while maintaining composure and psychological health.

7.  During the initial occurrence, between August and September
    2018, Plaintiff's academic performance declined, he experienced
    unexplainable sleep deprivation, he failed his curriculum, and
    was hospitalized. Plaintiff attributes this to microwave
    exposure, citing Zhi, Wang, and Hu's, "Recent advances in the
    effects of microwave radiation on brains," they found drastic
    consequences for organisms effected, "exposed rats to
    microwaves (500 pps, pulse width = 2 μs, and average whole
    body-specific absorption rate (SAR) = 0.6 W/kg) for an
    exposure duration of 45 min, and a significant decline was
    observed in the rats' performance, indicating that microwave
    radiation influenced their working memory." Similarly to Dr.
    Sweet's, "The Sociology of Gaslighting," introduction of
    gaslighting, "Barton and Whitehead are thought to have coined
    "gaslighting" in a 1969 Lancet paper that analyzed involuntary
    hospitalization as a form of abuse," Plaintiff believes he
    experienced neurodegeneration due to high levels of
    microwave radiation which was utilized not only as a PSYOP
    tactic, but also as gaslighting psychological manipulation. This
    was used within this relevant time as this enabled Defendants
    to undermine the credibility of Plaintiff, or victim. Zhi, Wei-Jia,
    Wang, and Hu, *Recent Advances in the Effects of Microwave*
    *Radiation on Brains - Military Medical Research*, BioMed Central
    (2017),
    https://mmrjournal.biomedcentral.com/articles/10.1186/s407
    79-017-0139-0.

8.  Initially, Plaintiff was unsure of the source of his extreme
    discomfort with his permanent metal implants embedded in his

- 153 -

mandible being irradiated due to the heightened EMI, RF interference, and due to various other recorded environmental factors, Plaintiff struggled both mentally and physically as he experienced what was then documented from August 2021 to March 2024.

9.  Plaintiff claims his residences' power supply was subjected to both harmonically injected phased locked loop synchronization via optical charge injection/optical pumping as this pertains to microwave reflection, pump-field scattering and Stokes beam (field) propagation, and sub-harmonically injected phased locked loop synchronization via optical charge injection. This varied depending on the physical location of where these violations were detected from August 2021 to 2023 (until present time) with evidence. Plaintiff experienced what has been proven to be unethical, extreme, and dangerous levels of EMI (mV p*p), unwarranted dBm at varying frequencies, and dangerous levels of EMF fields. While EMI generation contributes to Radio Frequency Generation and emission, the Frederick Research Corporation's Handbook of Radio Interference V3 states a, "receiver," is, "any type of electronic equipment in which radio interference may cause an undesirable response," and although, "possible interference sources are so numerous that a complete listing is almost impossible," the Frederick Research Corporation supplies the following list of possible interference sources: "Radio and Radar Equipment," "Rotating Machinery," "Mechanical Switches," "Transmission Lines and Connectors," "Electronic Devices," "Telephone and Telegraph Lines, Circuits, Switches,

and Dials," "Incandescent Lamps," "Fluorescent Lamps,"
"Mercury and Sodium Lamps," "Electronic Welders," "Engine
Ignition Systems," "Industrial, Scientific, and Medical
Equipment," "Household Appliances," "Business Machines,"
"Electric Power Controllers," "Precipitation Static," and, "Non-
electric Sources." Fried, David Sherwood, Douglas, *Phased
Array Imaging*, Optical Sciences Co. (1990),
https://apps.dtic.mil/sti/citations/ADA228774.

10.   Plaintiff states radiative emissions were/are noticeable every
time he enters or operates his vehicle, and has several witnesses
who can attest to this. Plaintiff services his vehicle regularly.
Plaintiff states his vehicle was serviced at a local mechanic shop
for a routine maintenance, where he documented an oil-filter
change, and that his vehicle passed inspection. Within two
weeks, during travel from Denver, Colorado, to Southwest
Ranches, Florida, from late January 2022, to February 2, 2023,
Plaintiff stated these emissions increased while observing the
EMF inside his vehicle, and states this was physically
noticeable and documentable. Plaintiff states this contributed to
engine malfunction and failure on his travel back to Florida.
Plaintiff alleges Defendants' RF emissions contributed to his
engine's malfunction, and to higher levels of EMF and magnetic
flux density emissions from his vehicle's electronic systems.

11.   Plaintiff states second harmonic and Thomson scattering was
noticeable, and noticeably caused both pain multiple
documented times, and generated physical irritation, or burns,
several documented times between February 2020 and
December 2023, although this continuously occurs. Plaintiff

alleges Defendant DARPA's RFMLS program was deployed via Defendant Starshield's use of Starlink's, "ancillary equipment." This was utilized to manipulate and control IoT while illegally surveilling and harming Plaintiff. Plaintiff states noticeable and proven RF presence altered his cognitive central state behavioral responses to environmental stimuli. Plaintiff states the optical-charge-injected and weaponized structure's, subjected to microwave reflection's, IoT, or EHIoT ("Electromagnetic Harvesting Internet of Things"), noticeably connected, or interacted with his permanent metal implants as he experienced high levels of transcranial electric stimuli, transcranial magnetic stimuli, magnetoelectric stimuli, ultrasonic acoustic heterodyne transmissions to the Coronal Section of his Temporal Bone, bone conduction, and various forms of scattering, while his metal implants were irradiated and experimented on through Starshield's use of Starlink's, "ancillary equipment." This deployed Defendant DARPA's N3 program's system's code as this modified Plaintiff's behavior, causing harm to his mental and psychological health, as well as threatening and harming the longevity of his organs, and overall lifespan.

12. While this occurred during September 2021 until December 2023, Plaintiff is reporting to have felt physical shocks, heightened radiation, and aversions both privately, and publicly, with a similar reaction to that of the canines in Pavlov's IX excerpt. These are stated to have occurred concurrently with what Plaintiff believes to be Defendant Department of Defense Department of the United States Air

Force's electromagnetic attack capability, Defendant NRO Advanced Systems & Technology's SENTIENT integrated into the JADC2, Defendant DIA's operation of DARPA's RFMLS, NEAT, and N3 via their SoSITE STITCHES JADC2 implementation, and Defendant CIA Directorate of Science and Technology's deployment of optically, "enhanced interrogation techniques," as they were deployed and utilized in conjunction with their electromagnetic warfare field disruption capabilities. Plaintiff alleges this occurred while he experienced optically and remotely conducted non-consensual human experimentation, regardless of the justification, and non-consensual conditioning experimentation as his implants were irradiated. Plaintiff believes this occurred while Defendant CIA's optically deployed EIT's, "OEIT's," were utilized to extract information, propagate, "Learned Helplessness," deploy Stasi psychological warfare tactics, and gather information on, "chronically implanted animals," as data on chronically implanted animals and humans is scarce. Due to Plaintiff recording this over several locations between August 2021 and December 2023, and continuously, Plaintiff states Defendant DARPA's involvement in this occurrence constitutes the label of human trafficking in addition to the labels of non-consensual human experimentation, coercion, sexual-assault, attempted murder, and cyberharassment via IoT. As Nitsche and Paulus state, "Excitability changes [are] induced in the human motor cortex by weak transcranial direct current stimulation," Starshield system's emissions were also the direct cause of murder attempts, behavioral modification, and overall,

retardation of physical performance and academic performance, as during driving, showering, weight lifting, etc. this could have resulted in serious injury or Plaintiff's death.

13. As in "Sociology of Gaslighting," Dr. Sweet describes, "gaslighting as a set of attempts to create a "surreal" (Ferraro 2006) social environment by making the other in an intimate relationship seem or feel "crazy," and "argue(s) that gaslighting tactics become consequential when abusers mobilize macro-level inequalities related to gender, sexuality, race, nationality, and class against an intimate other," she states that "that such tactics damage victims' sense of reality, autonomy, mobility, identity, and social supports," which supports Plaintiff's statements that Defendants' violations exploited their education level and access to resources while attacking Plaintiff when concerning Plaintiff and Defendants' relationship, between citizen and state, during the series of Defendants' alleged violations from August 2021 to December 2023. These violations are stated to have continuously occurred.

14. At the time of these early transgressions in 2018 and early 2019, Plaintiff was only a high school graduate attending the University of Denver, and the methods, tactics, and technology alleged to have been used by Defendants were done so while exploiting their significantly higher education level and access to resources. As Dr. Sweet states that, "Gaslighting is consequential when abusers mobilize gender-based stereotypes, intersecting inequalities, and institutional vulnerabilities against victims," Defendants' capability to shield themselves from a transgression's repercussions utilizing state

- 158 -

sovereign immunity, the State Secret's Privilege, and their typical *Glomar* response empowers them to commit egregious actions, Gaslight manipulating the victim while committing aforementioned alleged violations. Plaintiff states this occurred while Defendants' operated as Dr. Sweet states while, "using victims' lack of institutional credibility against them," gaslight manipulating Plaintiff while attacking his sense of reality through the use and weaponization of IoT, creating a, "surreal," environment, thus the lowly-educated victim would lack the resources, wherewithal, and knowledge to prove events as transpired. Sweet, *The sociology of gaslighting*, American Sociological Review, 84(5), 851–875 ((2019), https://doi.org/10.1177/0003122419874843.

15. Between August 2021, December 2023, and until the present date, Plaintiff introduces multiple instances where regular and noticeable connection to the permanent metal implants in his mandible as an EMI Line Monitor indicated abnormal EMI presence during both daytime, and nighttime over several addresses, where the power supply was directed from both on-site dedicated solar inverter systems, directly from FPL grid supply with correctly wired and grounded circuits, or from Xcel Energy. During the time of the bulk mass of the implant being irradiated, experimented on, and connected to, Plaintiff struggled mentally, due to what Plaintiff claims are the effects of high levels of microwave irradiation exposure. Following the 2021 bulk mass of the KLS Martin titanium implants' removal, Plaintiff's capability to annunciate the details of his experience increased drastically. With the majority of these removed,

Plaintiff regained the mental clarity required to pursue the research and data collection methods necessary to prove occurrence. Plaintiff has stated his TRPV4, TRPV6, and his Vagus, Facial, and Trigeminal nerves experienced unacceptable manipulation in addition to his KLS Martin titanium metal implants, which modified his cognitive central state behavior. Plaintiff states he simultaneously experienced an inundation of what can be observed to be both unnatural radiative emissions, and high volumes of high-level multi-channel RF activity. Plaintiff states that during this time his somatosensory and motor neuronal responses exhibited modification, which exhibited responses due to environmental stimuli, responses which should not have been experienced.

16. Plaintiff's documentation and recordings of radiative emissions from household appliances are documented to have surpassed an acceptable threshold, and have been documented as high as 189 microteslas on January 21, 2021, 21 microteslas November 1, 2023, 19.8 December 31, 2023, presently has recorded 20 uT-50uT emissions from his computers, and as high as 190uT from household appliances and other varying household RF interference sources. This occurred while an electromagnetic interference line noise monitor has indicated values surpassing a simple meter's capability to measure, with the maximum reading from the meter, 1999 mV p*p, also being documented pursuant to the Federal Rules for Evidence gathering while the Starshield's deployment of Starlink resources and, "ancillary equipment," is detected and well established to be operating over this space, during this time period.

17.  Between August 2021 and December 2023, with exact recording
     sessions occurring between the 1st to the 10th of each month,
     Plaintiff states harmonic generation in the reflection of
     microwave radiation from semiconductor surfaces manipulated
     and controlled optical charge injection as this modified the
     microtesla, lux, and surface plasmonic wave emissions from his
     Apple MacBook Air's display and chassis, his iPhone's display
     and chassis, other cellular and mobile devices' displays as these
     experienced high levels of microwave band irradiation,
     electromagnetic irradiation, and what is believed to be
     harmonic and Thomson scattering. These forces are believed to
     have also manipulated the quantum dot emission's from his
     devices' displays. Thus, these forces manipulated Plaintiff's
     Circadian Rhythms, while these devices were also required to
     be utilized during this time to research and work. Plaintiff
     states this noticeably affected his circadian rhythms and
     modified his cognitive central state behavioral responses.
     During this time, Plaintiff believes his TRPV4 and TRPV6
     experienced high levels of manipulation and experimentation.

18.  Through the utilization of harmonic generation in the reflection
     of microwave radiation from semiconductor surfaces, optical
     charge injection and optical pumping, Plaintiff states
     Defendants manipulated, controlled, and weaponized the
     MOSFETS, FETs generally, and transducers of his structure's
     various components, as this affected the IoT of the structure.
     This includes inducing avalanche breakdown of MOSFETs in
     the household's appliances, the Hz and MHz emissions of
     piezoelectric transducers in fire alarms and appliances, the

surface plasmonic wave emissions from the metal alloys present in the structure, the EMF, electron, and photon emissions from the structure's circuitry, and from within conduit (acting as a waveguide). Plaintiff's statements coincide with Defendants' statements pertaining to the methods they use to alter field effects while to generating, "field disruption," deploying their electromagnetic attack capability in order to do so. This includes but is not limited to: the radiofrequency interference from Plaintiff's structural elements and various RF interference sources, EMS and RF emissions from several environmental factors, RF emissions from biological organisms as controlled via optical stimulation of interneurons and delta gamma cortical entrainment, various scattering effects manipulated via harmonic generation in the reflection of microwave radiation from semiconductor surfaces, optical pumping, and optical charge injection.

19. The EMI presence, after demonstrating a system baseline and documenting what is visibly discerned to be a circuit experiencing harmonic generation in the reflection of microwave radiation from semiconductor surfaces, optical charge injection and optical pumping, and is also indicative of the presence of higher harmonic generation within the circuit. This is congruent with the statements of the utilization of harmonically injected phased locked loop synchronization via microwave reflection which, with radio frequency interference generation, capably emulates a psychoacoustic projector when paired with DARPA's RFMLS system, or with Ansys Slwave, Python's QCoDes, HSPICE, and MATLAB's deep learning

neural network trainers, and several optical methods and tuning mechanisms.

20. During exercise outdoors on April 9, 2022, September 9, 2022, and several times during mid-late 2023, Plaintiff experienced Pavlovian aversion conditioning and electrodermal fear conditioning attributed to microwave radiation which affected his positive coping mechanisms. Plaintiff believes the Starshield's microwave radiation payload was transmitted with the intention to disrupt his capabilities through precise dosimetry of radiation in air saturated with water in addition to the previously aforementioned methods, which significantly impacts his performance. In, "Behavioral Inhibition System function as the mediator in the pathway from electrodermal fear conditioning to antisocial behavior: Integrating the Reinforcement Sensitivity Theory," Dr. Chen concludes, "Electrodermal fear conditioning was found to be associated with antisocial behavior in this study," which supports Plaintiff's claim that Defendants' conduct has negatively impacted his psychological and mental health. Chen, *Behavioral inhibition system function as the mediator in the pathway from electrodermal fear conditioning to antisocial behavior: Integrating the reinforcement sensitivity theory*, Personality and Individual Differences (2020), https://www.sciencedirect.com/science/article/pii/S01918869 20303688.

21. Between mid-late 2021, late 2023, and currently, Plaintiff states high levels of harmonic and Thomson scattering, EMF, EMI, RF interference, electrodermal aggression conditioning,

electrodermal fear conditioning, and Pavlovian aversion conditioning, accompany any sexual activity he experienced, viewed, or witnessed, and that this modified his cognitive central state behavioral responses detrimentally.

22. Between 2021 and present, Plaintiff states high levels of harmonic and Thomson scattering, EMF, EMI, RF interference, electrodermal aggression conditioning, electrodermal fear conditioning, Pavlovian aversion conditioning, modified his consumption patterns, with EMI increasing and decreasing as he increased or decreased consumption of various chemicals or supplements. Through utilizing intersubband excitation and harmonic generation in the reflection of microwave radiation from semiconductor surfaces, Defendants are stated to modify EMI. Plaintiff states EMI decreasing and increasing emulated the cognitive central state behavioral response of, "momentary safety," which increased his likelihood of increasing the consumption of a substance as he developed cognitive cortical higher order associations to the cognitive central state behavioral response of, "momentary safety," as this was associated with the consumption of particular chemicals or supplements. As Plaintiff consumed particular chemicals, the EMI and radiofrequency interference would decrease for several minutes, and after this, the EMI would increase. Plaintiff states this regularly occurred after his consumption of various substances, such as caffeine, cannabis, sugar, alcohol, pharmaceuticals, and detrimentally modified his cognitive central state behavioral responses to these, amongst other substances. Thus, Plaintiff claims Defendants manipulated

cortical associations and consumption patterns as these were then a manipulation and instillment of negative coping patterns, revenue generating actions for Defendants, and, "defensive expenditures," for Plaintiff.

23.   Similarly, Plaintiff believes this also occurred during tattoo inking in 2021 and 2022, and laser removal sessions during 2023 and 2024, where EMI and RF interference reduction emulated the cognitive central state behavior of, "momentary safety," which increased his likelihood of increasing his expenditures related to tattoo inking. After becoming aware of the incident, whilst undergoing laser removal treatments, this occurred as he developed cognitive cortical higher order associations to pain being associated with the cognitive central state behavior of, "momentary safety." Briefly, following tattooing sessions, Plaintiff states EMI and radiofrequency interference would decrease for several minutes, up to thirty minutes, and after this, the EMI would increase significantly. Plaintiff states this regularly occurs after his tattoo sessions, laser removal sessions following, and that this detrimentally modified his cognitive central state behavioral responses through cortically associating pain with the cognitive central state behavior of, "momentary safety."

24.   Plaintiff states aforementioned and RF Interference generates both bone conduction, and multi-channel RF stimuli which is abrasive, and evokes a negative response.

25.   According to Tang, Ko, Ding, Qiu, Calejesan and Zhuo's, "Pavlovian fear memory induced by activation in the anterior cingulate cortex," "Pavlovian fear memory occurs when a

subject learns to associate a certain conditioned stimulus (CS) or cue with a noxious unconditioned stimulus (US)." Plaintiff states on multiple occurrences during early-late 2020, mid-late 2021 and during mid-2022, as the area Plaintiff was standing or the path with which he was located, was struck with what he now states was Starshield as integrated into the JADC2's EBMS's emissions, Plaintiff was given an aversion to the area, whether this was a park, a public venue, a restroom, or otherwise. Plaintiff states he was behaviorally experimented on to associate an adverse response with a place or setting, and to be forced to purge mucus or saliva, to spit, as Pavlov discovered canines do when studying a canine's gland secretion responses when exposed to radiation and electroshocks in Lecture IX of, "Conditioned Reflexes: An Investigation of the Physiological Activity of the Cerebral Cortex." Plaintiff states this hampered physical performance, illegally altering his physical development as AD0750271, Naval Medical Research Institute Report No. 2 Project MF12.524.015-00043, "Bibliography of Reported Biological Phenomena ('Effects') and Clinical Manifestations Attributed To Microwaves and Radio-Frequency Radiation," states that microwave radiation adds, "fatigue," as shown when test subjects were exposed to various doses of microwave radiation. Plaintiff's method to positively cope was attacked and conditioned to be cortically associated with noxious unconditioned stimulus. Plaintiff states his Pavlovian aversion is experienced due to the DoD's electromagnetic attack methods, USAF and US Army's PSYOP methods and

techniques, and CIA's PSYOP methods and techniques, and is conducted publicly through methods guided by the DO JOC. Tang, Ko, Ding, Qiu, Calejesan, A., Zhuo, *Pavlovian fear memory induced by activation in the anterior cingulate cortex*. Molecular Pain (2005), https://doi.org/10.1186/1744-8069-1-6.

26. Similar to the findings of Aliczki and Haller in the "Electric Shock as Model of Post-Traumatic Stress Disorder in Rodents," excerpt of, "The Comprehensive Guide To Post Traumatic Stress Disorders," where they found, "Strong (traumatic) electric shocks elicit long-term behavioral dysfunctions that are reminiscent of the symptoms of PTSD," Plaintiff states the occurrence of Pavlovian-esque aversion conditioning worsens his PTSD, depression, and anxiety, as he experienced aforementioned symptoms of being exposed to high levels of microwave irradiation and electromagnetic field irradiation, and as Plaintiff experience(s) data extraction, torture, optically enhanced interrogation techniques, and what has been defined as the Department of Defense's electromagnetic field disruption and electromagnetic attack capability. Aliczki, Haller, *Electric shock as model of post-traumatic stress disorder in rodents. Comprehensive Guide to Post-Traumatic Stress Disorder*, 1–16 (2015), https://doi.org/10.1007/978-3-319-08613-2_132-1.

27. Plaintiff states that with Starshield's, "ancillary equipment['s]," visible emissions overhead and microwave band analyzer activity in the Ku-Band, that Microwave Power Transfer occurred. This modified the power lines' harmonics, and the area's voltage levels between February 2021 and December 2023, and continuously occurs. Defendants formally recognize

the capabilities of harmonic generation in the reflection of microwave radiation from semiconductor surfaces, Microwave (RF) Power Transfer, and intersubband excitation of optical systems. Plaintiff states the EMI levels are recorded to have exceeded the normal or acceptable levels, and that these phenomena resulted in the propagation of undesirable and dangerous environmental conditions with the first recorded instance occurring in September 2021, while this is alleged to continuously occur. Plaintiff states the IoT was weaponized as this microwave power transfer, optical injection, and intersubband excitation of the power supply was conducted in an intended and calculated way, where voltage surpassed the threshold voltage of the MOSFETs in the residences' appliances, as they then were overloaded with EMI Line Noise, recorded in mV peak to peak, which indicates the occurrence of, "Avalanche Breakdown." Plaintiff states during 2021 to present, his household's appliances emitted abnormally high RF Interference due to this EMI both during the day, and at night, which he introduces and attributes blame to RINT and DARPA's RFMLS and N3 system's integration into SoSITE's STITCHES as then deployed by Starshield, for the exact phenomena he is reporting to have experienced. Plaintiff states he experienced photons, and EMF's leak from the optically pumped appliances, and that these have been explicitly weaponized. In addition to previous allegations, with what Plaintiff believes to be the LORO method observed physically from parabolic antenna emissions of the Self-multiplexing phased array antennas, Plaintiff alleges two photon $Ca^{+2}$

imaging is evident. Plaintiff states this also appeared to interact with his exposure to RF-interference mentioning binaural unmasking, bone conduction, and what Plaintiff states indicates to be the deployment of harmonic generation in the reflection of microwave radiation from semiconductor surfaces. He states that he believes LORO was utilized, visibly observing Starshield's emissions overhead, while also examining microwave analyzer data, and that this indicates the plausibility of occurrence as well as the possibility of this array utilizing MASER technology. Plaintiff alleges the Starshield system as integrated in the JADC2 platform utilizes [sub]harmonically injected phased locked loop synchronization via optical charge injection, intersubband excitation, and multifractal detrended fluctuation analysis, phase conjugation, Thomson-Resonant scattering while factoring in oscillatory energy, angular integration, and the dissipative phenomenon, dielectric electrically induced polarization, avalanche breakdown, evoked potentials, and two-photon absorption processes in infrared spectroscopy, or another optical or electro-optical method of $Ca^{+2}$ imaging and voltage imaging. Plaintiff states that when utilizing what he introduces is the recently integrated DARPA's RFMLS and factoring in paramagnetic resonance, electromechanical resonance, molecular acoustics, the Drude parameter, Drude-Born-Federov equations, etc. Plaintiff states that the RFMLS system, the N3 system and the NEAT system as these are integrated into the JADC2 platform via SoSITE's STITCHES, the Starshield system, optically deployed, "Enhanced Interrogation Techniques,"

through Bone conductions and RF interference between August 2021 and December 2021. He states this occurred between January and November 2022, August to December 2023, and continues to occur irregularly and sporadically, with professional audio and video recordings of these occurrences.

28. Plaintiff states he experienced sleep deprivation via EMI, EMF, and RF interference, dietary manipulation via microwave band irradiation, and that he experienced psychosexual terrorism over a lengthy duration as his cortical associations were, and have been experimented on detrimentally.

29. Plaintiff states, "bioelectric gastrointestinal neuromodulation," also altered his GI tract contractions. During multiple incidents between August 2021 to November of 2021, March 2023 to December 2023, and what continuously occurs, Plaintiff's gasotransmitters appeared to be controlled via bioelectric gastrointestinal neuromodulation which occurred similarly to Kim, Kim, Chun, Choi, Kim, Keum, Seo, Jeen, Lee, Um, and Kim's, "Minimally invasive gastric electrical stimulation using a newly developed wireless gastrostimulator," where, "electrical stimulation was applied as electric impulses, which mimicked the action potentials from the central nervous system, causing the muscles to contract," Plaintiff states mV p*p mimicked CNS action potentials acting as bioelectric gastrointestinal neuromodulation. Plaintiff states between September 2021, and November 2021, February 2022 and April 2022, and March and April 2023, and what continuously, sporadically and irregularly occurs, that his defecation events occurred in conjunction with high microwave band presence

(dBm) in the Ku Band, X band, L4 band, C band, high levels of EMI, and high levels of voltage microsurges. Plaintiff states this also caused glossopharyngeal nerve stimulation with high levels of salivary gland activation, resulting in copious amounts of saliva to be produced during bowel movements. During this time Plaintiff states his C1, C2, S2-S3, and S4 vertebrae were experimented on via scattering, and his TRPV4 and TRPV6 were manipulated while EMI levels were heightened, and his cognitive central state behavioral responses were experimented on. These GI tract contractions were documented occurring congruently with extreme EMI presence and fluctuation, unacceptable Microwave band presence, and Plaintiff states this is indication of his bioelectric gastrointestinal neuromodulation being modulated, remotely controlled, and is cruel and unusual. Plaintiff's gasotransmitters being exposed to high levels of EMI altered his GI tract contractions as the EMI fluctuations mimicked CNS action potentials, which, when paired with aforementioned illegal surveillance methods, falls under the categorization of technologically-enabled sexual assault, non-consensual human experimentation, and cruel and unusual punishment; introducing cognitive cortical higher order associations, and Neuroplasticity, and how these can be weaponized to alter cognitive central state behavioral responses over a significant duration. Plaintiff is concerned and unsure of the possibility of experiencing genetic mutations in transient receptor potential cation channel vanilloid receptors due to radiation exposure, and believes this occurrence contributes to his mental health unwellness generally, in addition to his

anxiety, depression, and PTSD. Kim, Kim, Chun, Choi, Kim, Keum, Seo, Jeen, Lee, Um, Kim, C. D., *Minimally invasive gastric electrical stimulation using a newly developed wireless gastrostimulator: A pilot animal study*, Journal of Neurogastroenterology and Motility 26(3), 410–416 (2020), https://doi.org/10.5056/jnm20063.

30. During the series of testing during August 2021 to December 2023, Plaintiff states this also interacted with his KLS Martin titanium metal implants via the magneto-mechano-electric mechanism, magnetically-induced-intersystem-crossing mechanism, and genetically magnetic manipulation through TRPV4 activation via ferromagnetic stimulation and optical pumping of Plaintiffs permanent metal implants, Plaintiff experienced manipulation and control over his neural system, namely his cerebellothalamocortical system, central nervous system, sacral nervous system, limbic system, idiotypic cortex functions, prefrontotemporopolar networks and gamma waves, cingulate cortex function, bed nucleus of the stria terminalis function, hypothalamus function, caudate function, nucleus accumbens function, amygdala function, electrically stimulating periaqueductal grey matter which altered vocalization characteristics, affecting the creation of cognitive cortical higher order associations, possibly influencing the creation of neurofibrillary tangles (Parkinson's seen elsewhere in his family), altering working memory function, and conducting electrodermal fear and aggression conditioning. During this same time period, Plaintiff states radiofrequency, electromagnetic radiation, and scattering-based unwarranted

stimulation of his Vagus, Trigeminal, Glossopharyngeal, and Facial nerve which contributed to distress and discomfort, and caused disorienting and behaviorally modifying effects. Plaintiff states this collectively contributed to dehumanization and disassociation.

31. Understanding the findings of Keller and Carman in, "Electromagnetic wave propagation in (bianisotropic) magnetoelectric materials," during 2021, 2022, and 2023, Plaintiff alleges EMI and Microwave Band presence indicates the N3 program's experimentation on his KLS Martin titanium plates as Dr. Patrick Connolly's system's code as deployed through Starshield's Starlink resources and, "ancillary equipment," interacted with these permanent metal implants as though they were a magnetoelectric antenna, "where changes in the electric polarization characteristic along the electric field direction affect phase velocity, and the same is true with respect to magnetic field direction and magnetizations," ultimately creating what Alivisatos, Andrews, Boyden, and others state as, "optical and electro-optical methods that can be used to sense neural cell activity such as $Ca^{2+}$, (7) voltage, (8-10) and … some neurotransmitters; (11) electrophysiological approaches that sense voltages and some electrochemically active neurotransmitters" in their, "Nanotools for Neuroscience and Brain Activity Mapping." Plaintiff states he experienced the weaponization of his metal implants via the use of optical pumping, optical charge injection, EMI interference, RF interference, and Microwave band presence, what was believed to have been indicative of optical pumping with the generation

of first and/or second order harmonics while he was exposed stimuli via radio frequency interference, microwave band spectrum activity, and bone conduction as he experienced optically enhanced interrogation techniques created and conducted by the Central Intelligence Agency, while being remotely tortured via Defendant Department of Defense Department of the Air Force's Starshield as they utilized, "LORO," Defendant Department of Defense Department of the Air Force's NASIC's MASINT analysis squadron, Defendant DIA's AI and ML Division, J2T, MASINT, and RINT, and Defendant DARPA's OVERSIGHT, Insight, N3, NEAT, and RFMLS system's code, with Defendant NSA's SIGINT data processing, Defendant NRO's RF data collection pertaining to MASINT and SIGINT and their SENTIENT program, Defendant CIA Directorate of Science and Technology's hosted at the NRO's guidance and operational procedure pertaining to HUMINT, SIGINT, MASINT, and IMINT, and after December 2023, Defendant NRO and Defendant NSA's SENTIENT while the NASIC and ADF-C supported the JADC2 platform as available to Defendant Department of Defense Department of the Air Force's USSF Space Delta 3, the 4th EWS, and their warfighter. Keller, Carman, G. P, *Electromagnetic wave propagation in (bianisotropic) magnetoelectric ...*, Journal of Intelligent Material Systems and Structures, https://journals.sagepub.com/doi/10.1177/1045389X12467518

32. During 2021, 2022, 2023 and what is stated to be continuous, this series of unwarranted EMS, RF, and Microwave Spectrum activity also appears to have altered what Plaintiff believe is

$Ca^{2+}$ ion activity, or at least certain Calcium metabolization activity, in not only the human beings, but also in the surrounding foliage and animals. This has been documented, and is physically seen in foliar density decreases, tree death, what appears to be foliage death, possibly guard cell death, and otherwise in immunodeficiencies of the surrounding area's foliage, vegetation, and trees; noting the negative correlation to foliar density growth amongst species, as Pazur, Rassadina, Dandler, and Zoller mention in, "Growth of etiolated barley plants in weak static and 50 Hz electromagnetic fields tuned to calcium ion cyclotron resonance," that, "the data indicate(s) an increased drought stress for the ICR exposed plants," when examining Ion Cyclotron Resonance(ICR) testing on Barley. When exposed to enhanced ICR during testing, Barley exhibited "enhanced oxidative damage to photosynthetic pigments, proteins and lipids." When these are tuned to $Ca^{2+}$ for an extended period of time, they will likely exhibit a decrease in foliar density, immunodeficiencies, and the other detrimental side effects of $Ca^{2+}$ ion deficiency if these are not amended to replenish the depleted nutrient. While this is seen amongst other species, and is accepted to be common knowledge when discussing the use of EMS, EMF, EMI, and RF when altering Ion Cyclotron Resonance frequency tuning, the side effects the ion cyclotron resonance has on overall ion current, bioelectromagnetism, and the electrophysiology of an organism is a somewhat new, and rarely-discussed topic, especially when examining the covert nature of the manipulation of surface electron cyclotron resonance and

- 175 -

surface electron cyclotron waves in plasmas via Transverse Electromagnetic Modes. Pazur, Alexander, Rassadina, Dandler, and Zoller, *Growth of Etiolated Barley Plants in Weak Static and 50 Hz Electromagnetic Fields Tuned to Calcium Ion Cyclotron Resonance - Biomagnetic Research and Technology*, BioMed Central (2006), https://biomagres.biomedcentral.com/articles/10.1186/1477-044X-4-1.

33. Plaintiff has shown founded concerns pertaining to whether the SpaceX team was privy to Defendants' data acquisition via Starshield, as their Starshield Network Operations Team members also maintain, "TS/SCI," clearance. There is an overlap of personnel between members on the Starshield, Starlink, and Neuralink teams, which could possibly have viewed and illegally used the Starshield system's data as DARPA's N3, NEAT, and RFMLS program is alleged to have been deployed and gathered data through the Starshield system and Starlink constellation via the JADC2 platform.

34. With a lack of published research on harnessing evoked potentials from as Ozen, Sirota, Belluscio, Anastassiou, Stark, Koch, and Buzsáki state, "chronically implanted animals," in, "Transcranial electric stimulation entrains cortical neuronal populations in rats," Defendant DARPA's N3 program as deployed by Defendants' Department of Defense Department of the United States Air Force is alleged to have utilized Starshield to gather data on Plaintiff's permanent metal implants, and is alleged to have been proven to have done so, from August 2021 until present. Ozen, Sirota, Belluscio,

- 176 -

Anastassiou, Stark, Koch, Buzsáki, *Transcranial electric stimulation entrains cortical neuronal populations in rats.* Journal of Neuroscience (2010), https://www.jneurosci.org/content/30/34/11476.

35.  This series of occurrences is believed to have been within a relevant time period of the beginning of the FDA trialing of Neuralink. Plaintiff believes there is relevance between the overlap in personnel between SpaceX's Starlink, SpaceX's Starshield, and Neuralink, and that these companies are capable of advancing while sharing data between themselves privately which was accessible via Starshield's terminals.

36.  Plaintiff states this occurred concurrently to EMF emissions from his Apple Laptop, graphene, indications of a chirp oscillator, what he believes could emulate a local optical frequency comb oscillator. Plaintiff believes this utilized the Van Eck Phreaking method, Van Hove Singularities of graphene, quantum tunnelling, and TCSPD (Time Correlated Single Photon Detection) to illegally surveil him and his digital activities while exposing him and his household to microwave radiation. Plaintiff believes this also contributed to two of his laptops' logic boards failing.

37.  While Plaintiff has not personally conducted experiments pertaining to his permanent KLS Martin titanium alloy implants, they are said to be comprised of TI-6AL-4V. As Zhang, Zhao, Cai, and Pan state in, "Effects of Magnetic Field on the Residual Stress and Structural Defects of Ti-6Al-4V," "the magnetism of high-purity titanium is almost pure paramagnetism with a mass susceptibility of $4.178 \times 10^{-8}$ m3

- 177 -

/kg, which suggests that the weak ferromagnetism of Ti-6Al-4V is due to the Fe composition," of apparent $Fe^{2+}$ ion clusters present. Plaintiff states his KLS Martin titanium implants were utilized to emulate a magnetoelectric antenna through manipulation and optical pumping of the weak ferromagnetic field interactions through the KLS Martin Titanium implants, utilizing the magnetically-induced-intersystem-crossing mechanism, light-induced excited spin state trapping, and through the Spin-Vibronic mechanism for intersystem crossing, while introducing the Lifshitz-Landau-Gilbert Slonczewski equation. Zhang, Zhao, Cai, Pan, *Effects of magnetic field on the residual stress and structural defects of ti-6al-4v*. MDPI (2020), https://www.mdpi.com/2075-4701/10/1/141.

38. Whether during 2021, 2022, or 2023, Plaintiff alleges to have experienced sensory deprivation while he was irradiated, and experienced what was discovered to be similar to Psychosurgery, with the bulk of the mass of the titanium plates still embedded in his mandible, while he struggled to prove occurrence, and was inundated with significant levels of sensory neuronal activity while being assailed with multi-channel RF stimuli (proven with a factory calibrated Channel scanner and antenna). Plaintiff states this occurrence exacerbated his MDD, anxiety, and trauma-induced-PTSD with a series of occurrences that he physically measured and documented, regardless of the academic or scientific priori documenting previous occurrences similar to his narrative with the same expertise or research level. This is stated to have slowed Plaintiff's cognition, hampered sociability, produced

dehumanizing and depersonalizing effects, contributed to the Gaslight Psychological Manipulation, modified Plaintiff's behavior, and is proven on a timeline to have caused irreparable damages.

39. Due to Plaintiff's allegation of IoT and EHIoT manipulation, more specifically, Defendants' use of the Starshield system to deploy harmonic generation in the reflection of microwave radiation from semiconductor surfaces, subharmonic injection locking, optical charge injection, optical pumping, and passive intermodulation distortion, Defendants are alleged to have violated Executive Order 13491 while Plaintiff experienced misconduct the FM 34-52 5-75 explicitly prohibits, as Plaintiff has been subjected to microwave band irradiation, dangerous levels of RF interference, electromagnetic interference, electromagnetic field emissions as these manipulated the surface optical rectification of Plaintiff's permanent metal implants, and as Plaintiff has experienced electrodermal aggression and fear conditioning, Pavlovian shock-aversion conditioning, and irritation due to radiation, or radiation burns.

40. Plaintiff states the Starshield system's emissions are documented as having accompanied him over various addresses, regardless of the technology used to prove this, and regardless of if this was at 17950 Southwest 68th Court, Southwest Ranches, Florida, 1920 South University Blvd Denver, CO, 137 S. Pennsylvania St. Denver, CO, or at another location.

41. Plaintiff states this occurrence contributed to his nearest next-door neighbor's, Dominick F. Barbera's, suicide in 2021, while

Plaintiff was attending university. While Plaintiff recorded environmental stimuli at other times, locally, during 2021, Plaintiff was unsure of the exact source of his unwarranted EMF, EMI, and RF Interference, until October to December 2023. While Plaintiff speculates this technology was in use at the address when he was not physically present, he can only definitively state what was documented while he was physically present; mentioning the multiple frequency channels which appeared to have been weaponized and are stated to have drastically altered Plaintiff's cognition while particular environmental stimuli altered his cognitive central state behavioral responses.

42. Similar to Kim, Kim, Chun, Choi, Kim, Keum, Seo, Jeen, Lee, Um, and Kim's, "Minimally invasive gastric electrical stimulation using a newly developed wireless gastrostimulator," where, "electrical stimulation was applied as electric impulses, which mimicked the action potentials from the central nervous system, causing the muscles to contract," Plaintiff states mV p*p levels, as they were optically pumped or injected via microwave reflection in a semiconductor, mimicked CNS action potentials emulating bioelectric gastrointestinal neuromodulation. Plaintiff states that this bioelectric gastrointestinal neuromodulation is modulated, remotely controlled, and is cruel and unusual as this contributes to gastrointestinal pain, flatulence, and at times, fecal incontinence. This aligned with the instances Plaintiff both physically observed what he states is Starshield's phased array system's emissions, operating similarly to DARPA's Blackjack

program, and recorded demonstrating unnaturally high EMI when utilizing FPL's grid supply.

43. Plaintiff is not a recruit, contractor, or operative of Defendants, or any group the USSF is authorized to utilize on aforementioned technology on, in any capacity.

44. During September 2021 to December 2023, the RF and EMS emissions of aforementioned system were weaponized regardless of Plaintiff's addressed location, in most rooms, restrooms, and bathrooms, and for unknown reason, specifically during, "defecation," where this caused a strong aversion, similar to Pavlov IX lecture's experimentation on canines, which caused saliva to be generated while defecating, and at other inconvenient, unusual, and cruel, times, as seen from professional A/V recordings of several events on a timeline, while Plaintiff simultaneously recorded data utilizing a calibrated Keysight N9917a microwave analyzer, which is routinely serviced.

45. This string of occurrences also can be seen from dashboard camera footage, with transformers' indicator lights flashing, indicating the use of external influence on power lines, causing short circuits, as Plaintiff, or his family, approaches and leaves 17950 Southwest 68th Court, Southwest Ranches, FL, which is seen on a timeline, during October 2021 and June 2022, when Plaintiff collected this data, although witnesses can attest to this continuously occurring. Plaintiff claims this occurred due to a phenomena explicated by Krishnan in, "Transformer simulation: Perform open and Short Circuit tests easily inside," and is a physically visible occurrence where optical pumping or

- 181 -

optical charge injection causes a transformer to short circuit, resulting in a bright light emission from a power line's transformer coil where the electricity arcs. When recording these factors when Plaintiff's family members arrived or left the residence without Plaintiff, there is a drop in EMI upon departing, as Plaintiff's family members left the vicinity. This was seen as a drop in the range of fluctuations of 1200-1400 mV peak to peak, to around 900 to 1000 mV from peak to peak, which illegally alters their cognitive central state behavioral responses, and is physically seen to coincide with a transformer's short circuit. This is documented having occurred from 2021 to 2023 (or present). Krishnan, *Transformer simulation: Perform open and Short Circuit tests easily inside SOLIDWORKS*, EMWorks Blog (2023), https://www.emworks.com/blog/transformers/transformer-simulation-perform-open-short-circuit-tests-easily-inside-solidworks.

46. Plaintiff states his Microwave Analyzer's readings from 2Hz to 18 GHz, and the RF Interference and EMI emissions as shown when Plaintiff's power lines experienced optical charge injection to over 1500 mV p*p from under 150 mV p*p via the Starlink's Ku-Band Interferometer Synthetic Aperture Radar space-based radar system's OEO Rotman lens' emissions on their phased array system, acting as an Induced Resonance Electron Cyclotron MASER, the RF Interference appeared to be weaponized via the quantum confined stark effect tuning mechanism, which in turn alters the emissions via the EMI source's paramagnetic resonance, ultimately creating what,

when paired with angular integration and oscillatory energy, was utilized to create an effect similarly to: Flanders of General Dynamics' Patent US3566347A, Stocklin's of Mentec AG's US4858612A, Henry and Kinsella of Cerberus Black LTD's US9872100B2, Clark's US3612211A, Norris and Putterman's Patent US11801394B1, Loree and O'Loughlin's Patent US20020123775A1, Malech of Dorne and Margolin's Patent US3951134A, and Tosaya and Silwa's Patent US7082395B2. This occurred in addition to aforementioned methods, tactics, and technology, and what could also be defined as the Frey effect, as seen when examining Plaintiff's evidence.

47.   Plaintiff's since deceased canine perished due to gastrointestinal complications pertaining to her stomach's gastrointestinal activity and gastrointestinal pressure build-up, which caused an internal rupture immediately resulting in her death on January 27, 2021. Plaintiff states he believes there is a parallel from what he experienced, to how the family's canine was, "experimented on," ultimately perishing due to the occurrence. This form of coercion occurred congruently with his later use of the freedom of speech and freedom of press, with increasing amounts of gastrointestinal activity influencing discomfort. Plaintiff has labeled this experience to be coercion and attempted murder due to the events which occurred within the November 29 and December 6, 2023 time period. He alleges this activity escalated as he increasingly publicly denounced the non-consensual human experimentation and illegal surveillance he claims the Starshield system was/is utilized to conduct. Plaintiff states this was a method of coercion, a

psychological manipulation tactic similar to what was described by Col Joseph S. Gordon, USAR in, "Intelligence and Psychological Operations," and this activity deprived him of constitutional freedoms.

48. During September 2021 to September 2022, Plaintiff states that with an increase in the specificity of his public disclosures, that his koi fish were harmed, with both their pelvic and dorsal fins being damaged in certain cases, where they appear shriveled and burned, not torn or bitten. Plaintiff states this is noticeable, and that these damages are evident from the emissions readings from his analyzers, metering devices, and recording equipment.

49. Plaintiff believes cochlear emissions were altered, as this overall effect on $Ca^{2+}$ emissions are well documented between August 2021, and December 2023, and align with the statements Bozovic and A. J. Hudspeth make in, "Hair-bundle movements elicited by transepithelial electrical stimulation of hair cells in the sacculus of the bullfrog," pertaining to, "Electrically Evoked Hair-Bundle Movements," and, "stereociliary $Ca^{2+}$ concentration," as , "electrical stimulation produces rapid, phase locked bundle movements driven by $Ca^{2+}$ dependent reclosure of transduction channels," and that, "oscillating hair bundles would drive basilar-membrane motion," proceeded with, "changes in the pressure between the scala media and scala tympani then be manifested as an otoacoustic emission." This, in congruence with abnormal EMI presence or Voltage Microsurge presence, indicates causation for the presence of abnormal RF-Interference generation, EMI generation, and

accounts for the experiences which other witnesses have the capability to attest to. As Geen states in, "Effects of Attack and Uncontrollable Noise on Aggression," that, "noise increases the aggressiveness of provoked subjects primarily by providing increased general arousal, part of which becomes labeled as anger," Plaintiff has stated the possibility of this occurrences' detrimental effects, and also states this escalated what is recognized to be Dr. John C. Lily's cognitive central state behavior musculoskeletal response of, "Net Punishing," and modified Plaintiff's overall volatility. Lilly, *Programming and Metaprogramming in the human Biocomputer: Theory and experiments*. Coincidence Control Publishing. (2014).

50. In Geen and McCown's, "Effects of Noise and Attack on Aggression and Physiological Arousal," the findings of several experiments, "conclude(d) that subjects who had previously been attacked were, because of that attack, disposed or, "primed" to aggress against their antagonist," when exposed to uncontrollable/controllable noise and electrodermal stimuli. When paired with several other aforementioned notions, mentioning the EMI source's paramagnetic resonance utilized in emulating a psychoacoustic projector, this propagates electronic warfare and psychological operations via Defendant Department of Defense's Electromagnetic Spectrum Superiority Strategy of 2020's Electromagnetic Attack capability and Field Disruption Capabilities. This is a blatant attempt to coerce, silence, manipulate, harm, and torture opposition while attempting to incite and direct conflict, and do so while gaslight-manipulating the target or victim through utilizing

methods only capably discerned and explicated by those with high levels of research and education. Plaintiff states this is a form of psychological warfare and electronic warfare, corresponding with very high levels of electrodermal aggression conditioning, extreme levels of radiation exposure occurring in congruence with the optical pumping of higher order harmonics present in local systems as their recently integrated STITCHES integration of the RFMLS system enabled near-simultaneous scan-to-exploit capabilities of the varying Radio-frequency interference sources as these, when experiencing optical charge injection which manipulated paramagnetic resonance emulating optical frequency comb oscillators. These can be simply directed via angular integration, the quantum confined Stark effect tuning mechanism, via directivity, or another similar method.  Geen, McCown, *Effects of noise and attack on aggression and physiological arousal*, Motiv Emot 8, 231–241 (1984), https://doi.org/10.1007/BF00991891.

51.   Plaintiff believes Defendants utilized the aforementioned methods, tactics, and technology in attempts to provoke, defined as Black's Law Dictionary states, "1. The act of inciting another to do something, esp. to commit a crime. 2. Something (such as words or actions) that affects a person's reason and self-control, esp. causing the person to commit a crime impulsively," Plaintiff while exacerbating conflict, utilizing these actions to coerce, intimidate, suppress and burden dissent and opposition. These actions were perpetrated to deter Plaintiff and others from utilizing both their freedom of speech,

and freedom of press as this pertains to Defendants' activities. Plaintiff believes should he not have expended upon both a significant expenditure of time and resources, that Defendants' actions from August 2021 to December 2023, as previously described, could have caused possibly lethal damages to Plaintiff's mental, psychological, and physical health, in addition to the general population's mental and physical health. *Provoke*, Blacks Law Dictionary.

52. During 2022, 2023, and 2024, while Plaintiff tested the WIFI emissions, air conditioners' emissions, refrigerators' emissions, solar inverters' emissions, battery backup systems' emissions, and cellular connection emissions' from within the household in addition to their equipment's (Comcast Xfinity, Carrier Air Conditioners, Amazon's Eero, and several other devices) emissions generally, Plaintiff documented what he believes to be the exploitation and weaponization of passive intermodulation distortion and subharmonic injection locked phased locked loop synchronization. The occurrence is documented with a Keysight N9917a microwave analyzer as the Spectrum emission mask measurement, adjacent-channel power measurement, and the interference analysis function of the Keysight's Signal Analyzer application's data, in addition to general correlation tables and descriptive statistics of the data. While Plaintiff states this is indicated through examination of data recorded by calibrated metering equipment, this could have only been via SIGINT, and could only be exploitable following the development of signals intelligence. This could only be weaponized through the Starshield system's utilization

of Starlink resources through joint agency teaming between Defendant Department of Defense Department of the Air Force USSF Branch, Defendant NRO, and Defendant NSA.

53. Plaintiff states the weaponization of passive intermodulation distortion occurred in conjunction with the use of MASINT and RINT via electron energy loss spectroscopy, reflection absorption spectroscopy, transient spectroscopy, and/or Zeeman Spectroscopy. The heightened EMI Line noise which is previously introduced, and Plaintiff documented over a significant timeline, is alleged to have contributed to skin irritation, physical burns, and signs of high levels of irradiation on Plaintiffs body. This can be observed following a series of events during 2022 and 2023.

54. Plaintiff states microwave radiation, Thomson scattering, and second harmonic scattering generated irritation and burns on his hands, one on each finger, as though this tracked his movements while typing once Plaintiff began utilizing a MIL-STD-461G compliant computer, due to what Plaintiff believes enabled Defendants' access to his activities.

55. While Plaintiff states there are clear indications the Starshield system's SIGINT, MASINT, and HUMINT capabilities have been, "tested," Plaintiff's experience as described with presented data which conforms to Rule 91(9) and Rule 92, indicates the following: the DoD Department of the USAF deployed the Starshield system via Starlink resources, "ancillary equipment," Defendant NRO utilized the Starshield system and their ground architecture through the SENTIENT program to gather RF data, Defendant NSA while operating as

a CSA, processed the RF data while creating signals intelligence which was necessary in order to utilize injection-locking, Defendant DIA utilized these same resources while also operating as a CSA utilizing second harmonic scattering, and Raman spectroscopy, electron energy loss spectroscopy, transient spectroscopy, or reflection absorption spectroscopy, to deploy Starshield while accomplishing MASINT objectives, Defendant DARPA deployed and tested their RFMLS, NEAT, and N3 as integrated into the JADC2 via SoSITE STITCHES, and Defendant CIA's guided, commanded, and directed operations as their EIT's and coercive interrogation techniques were remotely and optically deployed by these groups. They operated jointly while seizing control over the electromagnetic spectrum, manipulating environmental factors. They did so while acting within their officially acknowledged capacity and under the Color of Law.

56. Although Civil Action No. 1:18-cv-2709 states, "Public disclosure of either the capability to collect specific signals or the substance of the SIGINT information itself can easily alert foreign adversaries to the vulnerability of their signals – potentially eliminating critical sources of information," Defendant NSA officially acknowledges that the agency operates as a CSA (Combat Supporting Agency), with as DeWitt and Dillinger state in, "Whole-of-Government Teaming Through Collaborative Construction: NRO/NSA Synergy," "joint agency ownership of multi-intelligence (multi-INT) fusion tools that meld NRO capabilities and competencies to advance NSA's national and tactical missions to include

support to military operations." As DeWitt and Dillinger state that, '"By anchoring each agency in this vertically-integrated partnership through joint dependency on a common 'owned by neither' system, each agency moves into horizontal partnership productivities to collectively address 'wicked' problems." When addressing detected and recorded transgressions of one of these agencies as this pertains to SIGINT activity, this also indicates the culpability of the other due to, "cross-agency teaming, and resultant whole-of-government approach through joint construction of common capabilities," which, '"construct(s),' evolve(s), sustain(s), and leverage(s) a multi-INT fusion information system (which) has resulted in technical advancements applied to both agency missions."' This is especially pertinent to operations of the NASIC and 544th ISRG. The 544th ISRG comprises of units jointly command by Defendant USAF and Defendant NRO, at Defendant NRO's Space Delta 20 at the ADF-C. This is jointly operated with the NSA's CCC, with NASIC support via their liaison to the ADF-C. The 544th ISRG and NSA Colorado are also both commanded by Col. Ronald Hopkins.

57. Although Presidential Policy Directive 28, National Security Council Directive No. 8, Executive Order 12333, and Executive Order 14086 state the conditions and limitations with which Defendants may operate, the repurposing of, testing of, and deployment of Starlink's, "ancillary equipment," via SpaceX's Starshield system past the plausibly authorized testing duration or extent level, documentation of their activity past these thresholds places Defendants in direct violation of these

statutes in addition to Plaintiff's, a US person located within US territory, constitutional freedoms and civil liberties. Documentation of harmonic generation in the reflection of microwave radiation from semiconductor surfaces, radio frequency interference, microwave band irradiation, spike wave discharges, and Electromagnetic interference, in addition to Plaintiff's allegations of Defendants' deployment of optically, "enhanced interrogation tactics," places Defendants in direct violation of Executive Order 13491, surpassing the allowances set forth by FM 2-22.3 (FM 34-52) and violating FM 2-22.3(5-75) through applying intersubband excitation, photoexcitation, and harmonic generation in the reflection of microwave radiation from semiconductor surfaces. This is recorded, documented, and represented as Electromagnetic Interference Line Noise and radiofrequency interference. This is stated to manipulate sleep deprivation at an extended duration, and subject Plaintiff to microwave band irradiation, which can be equated to electric shocks delivered via Plaintiff's permanent KLS Martin titanium implants, and generally to Plaintiff's skin via electrodermal conditioning. The microwave irradiation is alleged to have contributed to carbohydrate metabolization manipulation and modification, once these emissions were demonstrated and recorded past legal thresholds when proven to be maliciously utilized on Plaintiff. In addition to violating these statutes, Constitutional doctrine, civil liberties, human rights, and Executive Orders, the National Security Council Intelligence Directive No. 8. limits the CIA, which, "shall have no police,

subpoena, law-enforcement powers, or internal-security functions."

58. Defendant Defense Advanced Research Projects Agency is culpable due to their SoSITE STITCHES integration of the OVERSIGHT, Insight, RFMLS, N3, and NEAT program' system's code into the JADC2 as this was tested and deployed via the Starshield system's Starlink resources and, "ancillary equipment." Defendants' joint SIGINT, TECHINT, HUMINT, MASINT, and IMINT effort was supported by DARPA's Operational Liaisons, Defendant NRO's Office of Intelligence Liaison to NASIC, NASIC's Liaison to the ADF-C, as well as Defendants' overall, "joint-agency coalition." Defendant violated Plaintiff's 1st, 4th, 5th, and 8th amendments, caused Plaintiff property and personal injury damages, and committed the violations of cruel and unusual punishment, torture, non-consensual human experimentation, and human trafficking.

59. Defendant Department of Defense Department of the Air Force is culpable due to the Space Delta 3 assigned 4th EWS, NASIC, and 544th ISRG's testing and deployment of the Starshield system's Starlink resources and, "ancillary equipment," via the LORO method while utilizing Defendants' Electromagnetic Spectrum Superiority Strategy of 2020, including electromagnetic attacks and field disruption attacks. Defendant violated Plaintiff's 1st, 4th, 5th, and 8th amendments, caused Plaintiff property and personal injury damages, and committed the violations of cruel and unusual punishment, torture, non-consensual human experimentation, and human trafficking.

60.   Defendant Defense Intelligence Agency is culpable due to their JADC2 integration team and Artificial Intelligence for their Defense Intelligence Enterprise's MASINT and RINT activity, operating as a CSA while testing and deploying the Starshield system's Starlink resources and, "ancillary equipment," via the SoSITE STITCHES integration of the RFMLS, N3, and NEAT program system's code into the JADC2 while operating in conjunction with the DoD. Defendants violated Plaintiff's 1st, 4th, 5th, and 8th amendments, caused Plaintiff property and personal injury damages, and committed the violations of cruel and unusual punishment, torture, non-consensual human experimentation, and human trafficking.

61.   Defendant Department of Defense National Reconnaissance Office is culpable due to their Advanced Systems and Technology Directorate's R&D testing, Office of Intelligence Liaison to NASIC, and 544th ISRG Detachment 5's deployment of the Starshield system's Starlink resources and, "ancillary equipment," via the SoSITE STITCHES integration of the Oversight Program, RFMLS, N3, and NEAT program system's code into the JADC2 operating TECHINT, MASINT, and IMINT while surpassing the statutorily mandated limitations on both extent and duration assigned to this activity. This violated Plaintiff's 1st, 4th, 5th, and 8th amendments, caused Plaintiff property and personal injury damages, and committed the violations of cruel and unusual punishment, torture, non-consensual human experimentation, and human trafficking.

62.   Defendant Central Intelligence Agency is culpable due to their Directorate of Science and Technology's guidance, supervision

- 193 -

of, and deployment of the Starshield system's Starlink resources and, "ancillary equipment," via the SoSITE STITCHES integration of the Oversight Program, RFMLS, N3, and NEAT program system's code into the JADC2 operating HUMINT, TECHINT, MASINT, and IMINT while surpassing the statutorily mandated limitations on both extent and duration assigned to this activity. Their, "joint-agency teaming," effort administered optically enhanced interrogation techniques. This violated Plaintiff's 1st, 4th, 5th, and 8th amendments, causing Plaintiff property and personal injury damages, and committed the violations of cruel and unusual punishment, torture, non-consensual human experimentation, attempted murder, and human trafficking.

63. Defendant National Security Agency is culpable due to their ADF-C's, ADF-E's, and Special Collections Service's support of the Department of Defense's deployment and testing of the Starshield system's Starlink resources and, "ancillary equipment," via the SoSITE STITCHES integration of the Oversight Program, RFMLS, N3, and NEAT program system's code into the JADC2 operating SIGINT through enabling signal and equipment exploitation as this was utilized in a joint-agency coalition effort in coordination with HUMINT, GEOINT, IMINT, MASINT, and HUMINT. This violated Plaintiff's 1st, 4th, 5th, and 8th amendments, causing Plaintiff property and personal injury damages, and committing the violations of cruel and unusual punishment, torture, non-consensual human experimentation, attempted murder, and human trafficking.

## VI. CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### Federal Tort Claims Act: First Amendment Violation

1.  Defendant United States Department of Defense: Department of the United States Air Force deployment of the Starshield System's Starlink resources and, "ancillary equipment," as integrated into the JADC2 supported Defendant United States Defense Intelligence Agency's, Defendant United States Defense Advanced Research Projects Agency's, Defendant United States Department of Defense: National Reconnaissance Office's, Defendant United States Central Intelligence Agency's, Defendant United States National Security Agency's multi-INT, or HUMINT, IMINT, MASINT, SIGINT, and TECHINT operations as the, "testing," and bulk data collection of the Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna's parabolic antenna subreflector-Cassegrain-system generated bi-directional self-multiplexing phased array antenna's emissions manipulated and weaponized Electromagnetic Interference Line Noise from FPL power supply, Radio frequency interference, second harmonic scattering, Thomson scattering, Raman spectroscopy, or reflection absorption spectroscopy, Thomson scattering, transient spectroscopy, voltage imaging, and two photon calcium imaging. This method of coercion enabled multi-target and moving target tomography with radiofrequency activity, electromagnetic interference, and radiation emissions described and documented to accompany Plaintiff's use of the freedom of speech and press to express dissent and criticism. The

- 195 -

escalation of malicious and intended emissions accompanied public disclosures where Plaintiff expressed dissent and criticism towards the illegal and unethical utilization of the Starshield system via JADC2 and the alleged utilization of IoT. Defendants coerced Plaintiff while abridging his freedom of speech and freedom of press through perpetrating retaliatory actions.

2.  Defendant United States Department of Defense: Department of the United States Air Force is liable due to their overt testing and deployment of the Starshield system, their EMS electromagnetic attack and use of their field disruption capability as intended to disrupt Plaintiff, to burden and suppress dissent while abridging his Freedom of press and freedom of speech. This activity overtly accompanied Plaintiff's disclosures pertaining to unwarranted EMS activity. Through abridging the freedom of speech and press, Defendant's actions constitute the suppression of criticism, opposition, and dissent.

3.  Defendant United States Defense Intelligence Agency is liable for their violations of Plaintiff's freedom of speech and press due to their overt testing of and deployment of the Starshield system and MASINT tracking movements and human activity as the MASINT-associated radiation emissions also caused Plaintiff's skin to exhibit irritation, Pavlovian Aversion conditioning, and electrodermal aggression conditioning. These actions occurred accompanying Plaintiff's public release of details pertaining to radiative emissions and unwarranted radiofrequency and electromagnetic spectrum activity. Thus, Defendant suppressed and burdened criticism, dissent, and

opposition through abridging the Freedom of press and abridging Plaintiff's freedom of speech.

4. Defendant United States Defense Advanced Research Projects Agency is liable due to their integration of the OVERSIGHT, Insight, NEAT, RFMLS, and N3 programs into the JADC2 via SoSITE's STITCHES as DARPA liaisons supported the Starshield system's Starlink resources' and, "ancillary equipment's," tests and deployment while monitoring and manipulating physiological, and neurological responses to EMS, EMF, RF interference with multi-point and Near-real-time scanning. These methods were utilized while coercing and burdening Plaintiff, suppressing criticism, dissent, and opposition through abridging the Freedom of speech and abridging the freedom of press.

5. Defendant United States Department of Defense: National Reconnaissance Office is liable for their violations of Plaintiff's freedom of speech and press for their overt testing and deployment of the Starshield System's Starlink resources and, "ancillary equipment," in "bulk data collection," and intelligence personnel training, implementing their SENTIENT program through the JADC2 platform. These actions occurred as their multi-INT with DIA, NSA, CIA, and DARPA followed Plaintiff's use of the freedom of speech and press as Defendant surpassed constitutional authority and statutorily permissible operational conduct overtly operating the Starshield system continuously while intending to burden and suppress criticism, dissent, and opposition.

6. Defendant United States Central Intelligence Agency is liable for their violations of Plaintiff's freedom of speech and press for their overt testing and deployment of the Starshield System's Starlink resources and, "ancillary equipment," in "bulk data collection," and intelligence personnel training. Defendant set objectives, guided multi-INT and optically deployed, "EIT's" and coercive interrogation techniques while gaslight psychologically manipulating Plaintiff intending to burden and suppress criticism, dissent, and opposition through undermining Plaintiff's credibility.

7. Defendant United States National Security Agency is liable for their violations of Plaintiff's freedom of speech and press for their joint-operation with the Department of Defense, Central Intelligence Agency, Defense Intelligence Agency, and DARPA during their overt testing and deployment of the Starshield System's Starlink resources and, "ancillary equipment," in "bulk data collection," and intelligence personnel training. Their SIGINT operations and methods of signal detection and exploitation supported illegal surveillance, HUMINT, IMINT, TECHINT, and MASINT following public disclosure of unwarranted Radiofrequency and EMS activity which surpassed constitutional authority and statutorily permissible operational conduct overtly operating the Starshield system continuously while intending to burden and suppress criticism, dissent, and opposition.

8. Plaintiff rightfully has exercised his freedom of speech and freedom of press. Defendant's actions escalated while Plaintiff utilized these freedoms as Defendant deployed a joint-agency

coalition effort with the objective of burdening and suppressing criticism, dissent, and opposition, abridging freedom of speech, and abridging the Freedom of press while violating all statutorily and Constitutionally mandated limitations and guidelines for procedure.

## SECOND CAUSE OF ACTION

## <u>Federal Tort Claims Act: Fourth Amendment Violation</u>

1.  Defendant United States Department of Defense: Department
    of the United States Air Force deployment of the Starshield
    System's Starlink resources and, "ancillary equipment," as
    integrated into the JADC2 supported Defendant United States
    Defense Intelligence Agency's, Defendant United States
    Defense Advanced Research Projects Agency's, Defendant
    United States Department of Defense: National Reconnaissance
    Office's, Defendant United States Central Intelligence Agency's,
    Defendant United States National Security Agency's multi-INT,
    or HUMINT, IMINT, MASINT, SIGINT, and TECHINT
    operations as the, "testing," and bulk data collection of the
    Starshield System's Rotman lens substrate integrated
    waveguide leaky wave antenna to parabolic antenna reflector-
    to-subreflector-Cassegrain system generated bi-directional self-
    multiplexing phased array antenna's emissions manipulated
    and weaponized Electromagnetic Interference Line Noise from
    FPL power supply, Radio frequency interference, second
    harmonic scattering, Thomson scattering, reflection absorption
    spectroscopy, Raman spectroscopy, electron energy loss
    spectroscopy, transient spectroscopy, voltage imaging, and two
    photon calcium imaging. Defendant deployed the LORO
    Method (Lobe On Receive Only) method to acquire Near-real-
    time updates and enabled multi-target and moving target
    tomography as this equipment testing and deployment
    surpassed all statutorily and Constitutionally mandated
    limitations and guidelines for procedure pertaining to bulk

radiofrequency data collection and acquisition, electronic surveillance equipment testing generally, and intelligence personnel training, and violated Plaintiff's freedom of privacy, and freedom from unreasonable search and seizure.

2. Plaintiff Kyle Malove alleges he was directly targeted, has continued to be directly targeted, and is not simply subject to bulk data collection.

3. Because Plaintiff establishes that the Starshield system has been proven to be in use for significantly more time than a single year, the electronic surveillance equipment has surpassed the legal extent to which the same equipment could legally have been tested without acquiring a warrant or approval from the Attorney General, regardless of the intelligence personnel trained within the relevant time period.

4. The alleged use of advanced methods includes but is not limited to: harmonic generation in the reflection of microwave radiation from semiconductor surfaces, second harmonic scattering, Raman spectroscopy, Thomson scattering, reflection absorption spectroscopy, transient spectroscopy, voltage imaging, and two photon calcium imaging, which was utilized during multi-INT equipment testing, personnel training, and general deployment, which consequentially violates Plaintiff's freedom from unreasonable search and seizure.

5. Defendant United States Department of Defense: Department of the United States Air Force is liable for their deployment of the Starshield System's Starlink resources and, "ancillary equipment," as integrated into the JADC2 due to their electronic surveillance equipment testing, and personnel

training through their deployment of the Department of Defense's Electromagnetic Superiority Strategy of 2020's electromagnetic attack and electromagnetic field disruption capabilities. Defendant's Space Delta 3-assigned 4th Electromagnetic Warfare Squadron utilized the Starshield system and Advanced Battle Management System's Electromagnetic Battle Management System, OVERSIGHT, and Insight programs in coordination with their NASIC's MASINT analysis squadron. This occurred as Defendant and their CSA's illegally tracked Plaintiff's movements. Defendant disrupted and detrimentally modified his activities with microwave band radiation, utilizing both, "through-the-wall," and, "off-the-wall," surveillance methods while subjecting Plaintiff to high levels of electromagnetic radiation and microwave band radiation. These actions violated Plaintiff's freedom of privacy, freedom from unreasonable search and seizure, and the Posse Comitatus Act. Thus, Defendant acted criminally while operating the Starshield system within the territorial bounds of the United States.

6.    Defendant United States Defense Intelligence Agency is liable for their deployment of the Starshield System's Starlink resources and, "ancillary equipment," as integrated into the JADC2 due to their electronic surveillance equipment testing, and personnel training through deployment of their Joint Staff Targeting J2T's, AI and Machine Learning Division's, DIE's, and JADC2 Data integration lead's implementation of SoSITE STITCHES integration of DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight programs as their MASINT, RINT,

IMINT, and HUMINT capabilities were deployed via harmonic generation of the reflection of microwave radiation from semiconductor surfaces, intersubband excitation, reflection absorption spectroscopy, transient spectroscopy, electron energy loss spectroscopy, or Raman spectroscopy, second harmonic scattering, and Thomson scattering. Both, "through-the-wall," and, "off-the-wall," surveillance methods were utilized to subject Plaintiff to high levels of electromagnetic radiation and microwave band radiation while violating Plaintiff's freedom of privacy and freedom from unreasonable search and seizure.

7.  Defendant United States Defense Advanced Research Projects Agency is liable for their liaison-based-support for the deployment and testing of the Starshield System's Starlink resources and, "ancillary equipment," as SoSITE STITCHES integrated DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight into the JADC2 platform and Advanced Battle Management System. The testing of DARPA's programs through the JADC2 is proven have occurred for significantly more time than a single year, regardless of which of Defendants was testing their system's code. The testing of the US's electronic surveillance equipment which concomitantly deployed their system's code, surpassed the legal extent to which the same equipment's capabilities could legally have been tested and accessed without acquiring a warrant or approval from the Attorney General. Regardless of the duration or status of approval, the extent to which the Starshield system's testing's deployment of Defendant's system's code

surpasses the extent to which would deem an unreasonable search and seizure and violation of Plaintiff's privacy.

8.  Defendant United States Department of Defense: National Reconnaissance Office is liable for their AS&T's, Office of Intelligence Liaison to NASIC's, and 544th ISRG Detachment 5's deployment of the Starshield System's Starlink resources and, "ancillary equipment," through SENTIENT pre-integration into the JADC2, due to their bulk data collection, electronic surveillance equipment's testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna to parabolic antenna reflector-to-subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's emissions via the LORO method. This utilizes "through-the-wall," and, "off-the-wall," surveillance methods as unminimized and unprocessed RF data and multi-INT support to Defendant DoD, Defendant DIA, Defendant, Defendant NSA, and Defendant DARPA which violated Plaintiff's freedom of privacy and freedom from unreasonable search and seizure because Defendant violated all statutorily and Constitutionally mandated limitations and guidelines for procedure.

9.  Defendant United States Central Intelligence Agency is liable for their DS&T's joint-agency deployment of the Starshield System's Starlink resources and, "ancillary equipment," as they set objectives, guided multi-INT and optically deployed, "EIT's" and coercive interrogation tactics while jointly operating with Defendant NRO, utilizing "through-the-wall,"

and, "off-the-wall," surveillance methods. This violated
Plaintiff's freedom of privacy and freedom from unreasonable
search and seizure because Defendant violated all statutorily
and Constitutionally mandated limitations and guidelines for
procedure.

10. Defendant United States National Security Agency is liable for
their support of the joint-agency deployment of the Starshield
System's Starlink resources and, "ancillary equipment," as the
SENTIENT was integrated into the JADC2. This occurred while
Defendant's warrantless SIGINT was utilized to target Plaintiff
while Defendant detected and exploited signals which require,
"through-the-wall," surveillance methods. These methods
violated Plaintiff's freedom of privacy and freedom from
unreasonable search and seizure because Defendant violated all
statutorily and Constitutionally mandated limitations and
guidelines for procedure.

### THIRD CAUSE OF ACTION

<u>**Federal Tort Claims Act: Fifth Amendment Violation**</u>

1. Defendant United States Department of Defense: Department of the United States Air Force's deployment of the Starshield System's Starlink resources and, "ancillary equipment," as integrated into the JADC2 supported Defendant United States Defense Intelligence Agency's, Defendant United States Defense Advanced Research Projects Agency's, Defendant United States Department of Defense: National Reconnaissance Office's, Defendant United States Central Intelligence Agency's, Defendant United States National Security Agency's multi-INT, or HUMINT, IMINT, MASINT, SIGINT, and TECHINT operations. The, "testing," and bulk data collection from the Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna to parabolic antenna reflector-to-subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's emissions manipulated and weaponized Electromagnetic Interference Line Noise from FPL power supply, Radio frequency interference, second harmonic scattering, Thomson scattering, reflection absorption spectroscopy, Raman spectroscopy, electron energy loss spectroscopy, or transient spectroscopy, voltage imaging, and two photon calcium imaging. Defendant deployed the LORO Method (Lobe On Receive Only) method to acquire Near-real-time updates and enabled multi-target and moving target tomography. Defendant's equipment testing and deployment deprived Plaintiff of life, liberty, property.

2. Through subjecting Plaintiff and surrounding constituents to high levels of the electromagnetic radiation, electromagnetic interference, radiofrequency interference, microwave radiation, and various types of scattering, Defendants deprived Plaintiff of life, liberty, and property for an extended duration.

3. Defendant United States Department of Defense: Department of the United States Air Force is liable because of their deployment of the Starshield System's Starlink resources and, "ancillary equipment," integrated into the JADC2, their electronic surveillance equipment testing, and personnel training through their deployment of Defendant Department of Defense's Electromagnetic Superiority Strategy of 2020. Defendant deployed their electromagnetic attack and electromagnetic field disruption capabilities as their Space Delta 3-assigned 4th Electromagnetic Warfare Squadron in coordination with their NASIC's MASINT squadrons utilized the Starshield system via ABMS EBMS and JADC2's SoSITE STITCHES integration of DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight programs. Defendant increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting radio frequency interference. Defendant caused physical property damages and subjected Plaintiff to electrodermal aggression and fear conditioning, non-consensual human experimentation on his KLS Martin titanium permanently embedded metal implants, Pavlovian aversion conditioning, and high levels of irradiation as these deprived Plaintiff of life, liberty and property.

4.   Defendant United States Defense Intelligence Agency is liable because of their deployment of the Starshield System's Starlink resources and, "ancillary equipment," as integrated into the JADC2 while operating MASINT and RINT as their use of Starshield increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level. This emitted radio frequency interference and caused physical property damages. This subjected Plaintiff to electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on his KLS Martin titanium permanently embedded metal implants, and high levels of irradiation in addition to RINT, as these deprived Plaintiff of life, liberty and property.

5.   Defendant United States Defense Advanced Research Projects Agency is liable for their liaison-based-support of the deployment and testing of the Starshield System's Starlink resources and, "ancillary equipment," as SoSITE STITCHES integrated DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight into the JADC2 platform and Advanced Battle Management System. Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level. Defendant emitted radio frequency interference, spike wave discharges, caused physical property damages, and subjected Plaintiff to electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on his KLS Martin titanium permanently embedded metal

implants, and high levels of irradiation in addition to RINT as these deprived Plaintiff of life, liberty, and property.

6.   Defendant United States Department of Defense: National Reconnaissance Office is liable for their AS&T's, Office of Intelligence Liaison to NASIC's, and 544th ISRG Detachment 5's deployment of the Starshield System's Starlink resources and, "ancillary equipment," through SENTIENT pre-integration into the JADC2, due to their bulk data collection, electronic surveillance equipment's testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna to parabolic antenna reflector-to-subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's emissions via the LORO method, while Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level. Defendant emitted audible and damaging radio frequency interference, caused physical property damages, and subjected Plaintiff to electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on his KLS Martin titanium permanently embedded metal implants, and high levels of irradiation in addition to RINT. Thus, Defendant deprived Plaintiff of life, liberty, and property.

7.   Defendant United States Central Intelligence Agency is liable for their DS&T's joint-agency deployment of the Starshield System's Starlink resources and, "ancillary equipment," due to their bulk data collection, electronic surveillance equipment's

testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna to parabolic antenna reflector-to-subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's emissions via the LORO method. Defendant set objectives, guided multi-INT (including RINT) and optically deployed, "EIT's" and coercive interrogation tactics while jointly operating from within the NRO. Defendant's Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level. Defendant emitted audible and damaging radio frequency interference, caused physical property damages, and subjected Plaintiff to electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on his KLS Martin titanium permanently embedded metal implants, and high levels of irradiation. Thus, Defendant deprived Plaintiff of life, liberty, and property.

8. Defendant United States National Security Agency is liable for their support of the joint-agency deployment of the Starshield System's Starlink resources and, "ancillary equipment," as the SENTIENT was integrated into the JADC2 as Defendant's warrantlessly operated SIGINT detection and exploitation of signals violated all statutorily and Constitutionally mandated limitations and guidelines for procedure while depriving Plaintiff of life, liberty, and property. The jointly operated NSA-NRO coalition utilized Starshield's emissions in RINT, to increase the local power supply's harmonics, electromagnetic

interference line noise level, and voltage microsurge level while emitting audible and damaging radio frequency interference. Defendant caused physical property damages and subjected Plaintiff to electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on his KLS Martin titanium permanently embedded metal implants, and high levels of irradiation accompanying RINT. Thus, Defendant deprived Plaintiff of life, liberty, and property.

## FOURTH CAUSE OF ACTION

### Federal Tort Claims Act: Eighth Amendment Violation

1.  Defendant United States Department of Defense: Department
    of the United States Air Force's deployment of the Starshield
    System's Starlink resources and, "ancillary equipment," as
    integrated into the JADC2 supported Defendant United States
    Defense Intelligence Agency's, Defendant United States
    Department of Defense: National Reconnaissance Office's,
    Defendant United States Central Intelligence Agency's,
    Defendant United States National Security Agency's multi-INT,
    or HUMINT, IMINT, MASINT, SIGINT, and TECHINT
    operations, and Defendant United States Defense Advanced
    Research Projects Agency's Insight, N3, NEAT, Oversight, and
    RFMLS programs. Defendant United States' equipment testing,
    personnel training, and bulk data collection from the Starshield
    System's Rotman lens substrate integrated waveguide leaky
    wave antenna to parabolic antenna reflector-to-subreflector-
    Cassegrain system generated bi-directional self-multiplexing
    phased array antenna's emissions manipulated and
    weaponized Electromagnetic Interference Line Noise from the
    local power supply, Radio frequency interference, spike wave
    discharges, second harmonic scattering, Thomson scattering,
    Raman spectroscopy, transient spectroscopy, electron energy
    loss spectroscopy, or reflection absorption spectroscopy,
    voltage imaging, and two photon calcium imaging. Defendants
    did so while deploying the LORO Method (Lobe-On-Receive-
    Only) method to acquire near-real-time updates and enabled
    multi-target and moving target tomography. Defendant's

equipment testing and deployment was conducted with the intent to gaslight manipulate and undermine the credibility of Plaintiff through covert non-consensual human experimentation via irradiating and utilizing the magnetically-induced-intersystem-crossing mechanism on Plaintiff's KLS Martin Titanium mandible implants as his TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerves, Glossopharyngeal Nerve, Facial Nerve, Vagus Nerve, Supraorbital Nerve, CNS, SNS, parietal and prefrontal cortex, primary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to microglia, myocytes, goblet cell, pyramidal cell, Betz cell, TMEM16A, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, unipolar neuron functions, C1-C2 innervation, T11-L2, S2-S3, and S4 innervation were non-consensually experimented on via radiofrequency, microwave radiation, and electromagnetic radiation. Plaintiff states this accompanied gasotransmitter manipulation as his CNS action potentials were exposed to controlled and manipulated Electromagnetic Interference Line Noise, where artificially stimulated CNS action potentials then produced sphincter muscular contractions which constitutes cruel and unusual punishment. Plaintiff states exposure to Defendant-generated and controlled Radiofrequency emissions manipulated bioelectric

gastrointestinal neuromodulation as this affected potassium channels, $Ca^{2+}$ channels, Voltage-gated-$Ca^{2+}$ channels, gasotransmitters, stimulated S11-L2, S2-S3, and S4 innervation, and produced $H_2S$, NO, and NOX constituting cruel and unusual punishment. Plaintiff also alleges Defendant's harmonic generation in the reflection of microwave radiation from semiconductor surfaces enabled radiofrequency interference to be generated, directed, and controlled factoring in the angular integration, oscillatory energy, and dissipative phenomenon which is alleged to be weaponized as this non-consensually delivered radiation, several methods of scattering, and radiofrequencies to Plaintiff while irradiating his permanent metal implants, causing significant amounts of pain, and affecting his goblet cell's mucus production. Through doing so, Defendants perpetrated electrodermal fear and aggression conditioning, Pavlovian-esque aversion conditioning, and deployed, "optically enhanced interrogation techniques," while torturing him, which constitutes cruel and unusual punishment.

2.  Defendant United States Department of Defense: Department of the United States Air Force is liable because their deployment of the Starshield System's Starlink resources and, "ancillary equipment," integrated into the JADC2, their electronic surveillance equipment testing, and personnel training through their enactment of the Department of Defense's Electromagnetic Superiority Strategy of 2020 deployed their electromagnetic attack and electromagnetic field disruption capabilities. The Space Delta 3-assigned 4th

Electromagnetic Warfare Squadron and NASIC MASINT analysis squadrons utilized the Starshield system and ABMS EBMS via JADC2's SoSITE STITCHES integration of DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight programs while increasing the local power supply's harmonic level, electromagnetic interference line noise level, and voltage microsurge level while emitting radio frequency interference and subjecting Plaintiff to covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Facial Nerve, Glossopharyngeal Nerve, Corneal Nerves, Cavernous Nerves, short Ciliary Nerve, Vagus Nerve, supraorbital nerve, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to gasotransmitter, microglia, myocytes, goblet cell, pyramidal cell, Betz cell, TMEM16A, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, and unipolar neuron functions, and C1-C2 innervation, T11-L2, S2-S3, and S4 innervation. Defendant's actions were conducted with the intent to gaslight manipulate and undermine the credibility of Plaintiff through PSYOPS and electronic warfare, which constitutes cruel and unusual punishment.

3.      Defendant United States Defense Intelligence Agency is liable because of their deployment of the Starshield System's Starlink

resources and, "ancillary equipment," as integrated into the JADC2 while operating MASINT and RINT in coordination with JADC2's SoSITE STITCHES integration of DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight programs. Defendant's use of Starshield increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level. This concurrently emitted radio frequency interference while subjecting Plaintiff to electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on his KLS Martin titanium permanently embedded metal implants, causing physical irritation on Plaintiff's hands and abdomen, and subjecting Plaintiff to covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Glossopharyngeal Nerve, Facial Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerve, Vagus Nerve, Supraorbital nerve, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to gasotransmitter, microglia, myocytes, TMEM16A, goblet cell, pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, and unipolar neuron functions, and C1-C2 innervation, T11-L2, S2-S3, and S4 innervation. Defendant's actions were intended to gaslight manipulate and

undermine the credibility of Plaintiff through PSYOP and electronic warfare methods, which constitutes cruel and unusual punishment.

4.    Defendant United States Defense Advanced Research Projects Agency is liable for their liaison-based-support of the deployment and testing of the Starshield System's Starlink resources and, "ancillary equipment," as SoSITE STITCHES integrated DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight into the JADC2 platform and Advanced Battle Management System. Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level. This concurrently emitted radio frequency interference while Defendant's system's code subjected Plaintiff to electrodermal aggression and fear conditioning, Pavlovian-esque aversion conditioning and covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Glossopharyngeal Nerve, Facial Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerve, Vagus Nerve, Supraorbital nerve, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to gasotransmitter, microglia, myocytes, TMEM16A, goblet cell, pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent

neuron, and unipolar neuron functions, C1-C2 innervation, S2-S3, T11-L2, and S4 innervation. Defendant intended to gaslight manipulate and undermine the credibility of Plaintiff which collectively constitutes cruel and unusual punishment. Defendant DARPA's actions subjected Plaintiff to gasotransmitter manipulation with EMI interacting with his CNS action potentials as this mimicked neuronal activity and initiated sphincter contractions. Plaintiff states his RF-stimulated microglia and bioelectric gastrointestinal neuromodulation produced unacceptably high levels of $H_2S$ and NOX, producing abdominal discomfort and pain which constitutes cruel and unusual punishment.

5.  Defendant United States Department of Defense: National Reconnaissance Office is liable for their AS&T's, NRO's Office of Intelligence Liaison to NASIC's, and 544th ISRG Detachment 5's deployment of the Starshield System's Starlink resources and, "ancillary equipment," through SENTIENT pre-integration into the JADC2, due to their bulk data collection, electronic surveillance equipment's testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna to parabolic antenna reflector-to-subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's emissions via the LORO method, while Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level. Defendant's actions emitted audible and damaging radio frequency interference. Defendant intended to

gaslight manipulate and undermine the credibility of Plaintiff through PSYOP and electronic warfare methods concurrently subjecting Plaintiff to non-consensual electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on Plaintiff's KLS Martin titanium permanently embedded metal implants, and covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Glossopharyngeal Nerve, Facial Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerve, Vagus Nerve, supraorbital nerve, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to gasotransmitter, microglia, myocytes, TMEM16A, goblet cell, pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, and unipolar neuron functions, C1-C2 innervation, S2-S3, T11-L2, and S4 innervation which constitutes cruel and unusual punishment.

6.  Defendant United States Central Intelligence Agency is liable for their DS&T's joint-agency deployment of the Starshield System's Starlink resources and, "ancillary equipment," due to their bulk data collection, electronic surveillance equipment's testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated

waveguide leaky wave antenna parabolic antenna to reflector-to-subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's emissions. Through the LORO method as they set objectives, guided multi-INT and optically deployed, "EIT's" and coercive interrogation tactics while jointly operating from within the NRO. Defendant's guidance and involvement in the deployment of Starshield produced emissions which increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting audible and damaging radio frequency interference. Defendant intended to gaslight manipulate and undermine the credibility of Plaintiff through non-consensual electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on Plaintiff's KLS Martin titanium permanently embedded metal implants, and covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Facial Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerve, Vagus Nerve, Supraorbital Nerve, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to gasotransmitter, microglia, myocytes, TMEM16A, goblet cell, Pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent

neuron, efferent neuron, and unipolar neuron functions, C1-C2 innervation, T11-L2, S2-S3, and S4 innervation. Defendant's actions constitute cruel and unusual punishment.

7.  Defendant United States National Security Agency is liable for their support of the joint-agency deployment of the Starshield System's Starlink resources and, "ancillary equipment," as their SENTIENT's JADC2 integration enabled Defendant's warrantlessly operated SIGINT's detection and exploitation of signals which has violated all statutorily and Constitutionally mandated limitations and guidelines for SIGINT procedure. Defendant's jointly operated NSA-NRO coalition utilized Starshield's emissions to increase the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge. Defendant emitted audible and damaging radio frequency interference which caused physical property damages. Defendant's actions subjected Plaintiff to SIGINT, exploiting the signal-producing devices and radiofrequency interference producing sources as Defendant enabled the warfighter to perpetrate electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on Plaintiff's KLS Martin titanium permanently embedded metal implants in addition to covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerve, Glossopharyngeal nerve, Facial Nerve, Vagus Nerve, Supraorbital nerve, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system,

cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to gasotransmitter, microglia, myocytes, TMEM16A, goblet cell, pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, and unipolar neuron functions, C1-C2 innervation, T11-L2, S2-S3, and S4 innervation. This constitutes cruel and unusual punishment.

## FIFTH CAUSE OF ACTION
### Outer Space Treaty

1. Consequentially, once Defendant United States' actions surpassed the constitutionally and statutorily mandated allowances and officially acknowledged operational capacity, Defendant's joint-agency multi-INT coalition effort, combat supporting effort, and operations surpassed International Law as Defendants tested, deployed, and weaponized the Starshield via the JADC2. Defendant's actions violated Article III of the Outer Space Treaty as Defendants violated International Law as this pertains to human rights, human experimentation and trialing procedure, Neuroethics, and Neurorights, from an orbiting satellite while generating property damages and personal injury damages. Once the Starshield system's Starlink resources and, "ancillary equipment," were found to be weaponized, Defendants violated Article IV of the Outer Space Treaty through utilizing functional weapons of mass destruction in space while generating property damages and personal injury damages.

2. Defendant United States Department of Defense Department of the Air Force Space Force Branch is liable due to their due to their deployment of the Starshield System's Starlink resources and, "ancillary equipment," integrated into the JADC2, their electronic surveillance equipment testing, and personnel training through their enactment of the Department of Defense's Electromagnetic Superiority Strategy of 2020 as Defendant deployed their electromagnetic attack and electromagnetic field disruption capabilities as the Space Delta

3-assigned 4th Electromagnetic Warfare Squadron and NASIC's MASINT analysis squadrons and liaisons utilized the Starshield system and ABMS EBMS via JADC2's SoSITE STITCHES integration of DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight programs. Defendant's actions increase the local power supply's harmonic level, electromagnetic interference line noise level, and voltage microsurge level while emitting radio frequency interference and subjecting Plaintiff high levels of microwave radiation, electromagnetic radiation, and spike wave discharges. Thus, Defendant violated Article III of the Outer Space Treaty as Defendants violated International Law pertaining to human rights, human experimentation and trialing procedure, Neuroethics, and Neurorights from an orbiting satellite while generating property damages and personal injury damages. Defendant violated Article IV of the Outer Space Treaty through utilizing functional weapons of mass destruction in space which generated property damages and personal injury damages.

3. Defendant United States Defense Advanced Research Projects Agency is liable due to their liaison-based-support for the deployment and testing of the Starshield System's Starlink resources and, "ancillary equipment," as SoSITE STITCHES integrated DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight into the JADC2 platform and Advanced Battle Management System. Defendant's equipment and systems' testing subjected Plaintiff to high levels of microwave radiation and electromagnetic radiation. Thus, Defendant violated Article III of the Outer Space Treaty as Defendants violated

- 224 -

International Law pertaining to human rights, human experimentation and trialing procedure, Neuroethics, and Neurorights from an orbiting satellite while generating personal injury and property damages. Defendants violated Article IV of the Outer Space Treaty through utilizing functional weapons of mass destruction in space which generated property damages and personal injury damages.

4.  Defendant United States Defense Intelligence Agency is liable for their deployment of the Starshield System's Starlink resources and, "ancillary equipment," as integrated into the JADC2 due to their electronic surveillance equipment testing, and personnel training through deployment of their Joint Staff Targeting J2T, AI and Machine Learning Division's personnel, DIE, and JADC2 integration lead's implementation of SoSITE STITCHES integration of DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight programs as their MASINT, IMINT, and HUMINT capabilities were deployed via microwave band reflection in semiconductors, intersubband excitation, electron energy loss spectroscopy, Raman spectroscopy, or reflection absorption spectroscopy, second harmonic scattering, and Thomson scattering as both, "through-the-wall," and, "off-the-wall," surveillance methods subjected Plaintiff to high levels of electromagnetic radiation and microwave band radiation. Thus, Defendant violated Article III of the Outer Space Treaty as Defendants violated International Law pertaining to human rights, human experimentation trialing procedure, Neuroethics, and Neurorights from an orbiting satellite while generating property damages and personal injury damages. Through

utilizing functional weapons of mass destruction in space, Defendant violated Article IV of the Outer Space Treaty while generating personal injury and property damages.

5. Defendant United States Central Intelligence Agency is liable for their DS&T's joint-agency deployment of the Starshield System's Starlink resources and, "ancillary equipment," due to their bulk data collection, electronic surveillance equipment's testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna parabolic antenna subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's emissions via the LORO method as they set objectives, guided multi-INT and optically deployed, "EIT's" and coercive interrogation techniques while jointly operating from within the NRO, while Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting audible and damaging radio frequency interference and exposing Plaintiff to high levels of microwave radiation, electromagnetic radiation, and spike wave discharges. Thus, Defendant violated Article III of the Outer Space Treaty as Defendants violated International Law pertaining to human rights, human experimentation trialing procedure, Neuroethics, and Neurorights from an orbiting satellite while generating personal injury and property damages. Defendant violated Article IV of the Outer Space Treaty through utilizing functional weapons of mass destruction in space which generated personal injury and property damages.

6.   Defendant United States Department of Defense National Reconnaissance Office is liable for their AS&T's, NRO's Office of Intelligence Liaison to NASIC, and 544th ISRG Detachment 5's deployment of the Starshield System's Starlink resources and, "ancillary equipment," through SENTIENT pre-integration into the JADC2, due to their bulk data collection, electronic surveillance equipment's testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna parabolic antenna reflector-to-subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's emissions via the LORO method. The Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting audible and damaging radio frequency interference and exposing Plaintiff to high levels of microwave radiation, electromagnetic radiation, and spike wave discharges. Thus, Defendant violated Article III of the Outer Space Treaty as Defendants violated International Law pertaining to human rights, human experimentation trialing procedure, Neuroethics, and Neurorights from an orbiting satellite and violated Article IV of the Outer Space Treaty through utilizing functional weapons of mass destruction in space which generated personal injury and property damages.

7.   Defendant United States National Security Agency is liable for their support of the joint-agency deployment of the Starshield System's Starlink resources and, "ancillary equipment," as the SENTIENT was integrated into the JADC2 and Defendant's

warrantlessly operated SIGINT detection and exploitation of signals. Defendant's actions violated all statutorily and Constitutionally mandated limitations and guidelines for procedure while depriving Plaintiff of life, liberty, and property as the jointly operated NSA-NRO coalition utilized Starshield's emissions to increase the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level. While doing so, Defendant emitted audible and damaging radio frequency interference and exposed Plaintiff to high levels of microwave radiation, electromagnetic radiation, and spike wave discharges. Thus, Defendant's SIGINT, RINT support, and MASINT support violated Article III of the Outer Space Treaty as Defendant violated International Law pertaining to human rights, human experimentation trialing procedure, Neuroethics, and Neurorights from an orbiting satellite and violated Article IV of the Outer Space Treaty through utilizing functional weapons of mass destruction in space. These actions generated personal injury and property damages.

## SIXTH CAUSE OF ACTION

### Federal Tort Claims Act: Personal Injury Damages

1. Plaintiff Kyle Malove has sustained damages to his mental and psychological health due to Defendant United States' actions and claims these occurred for over four years and claims these violations continuously occur.

2. Defendant United States Department of Defense Department of the Air Force is liable due to their deployment of the Starshield System's Starlink resources and, "ancillary equipment," integrated into the JADC2, their electronic surveillance equipment testing, and personnel training through their enactment of Defendant Department of Defense's Electromagnetic Superiority Strategy of 2020. Defendant deployed their electromagnetic attack and electromagnetic field disruption capabilities as the Space Delta 3-assigned 4th Electromagnetic Warfare Squadron and NASIC MASINT analysis squadron utilized the Starshield system and ABMS EBMS via JADC2's SoSITE STITCHES integration of Defendant DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight programs, coordinating with their NASIC's MASINT effort, while increasing the local power supply's harmonics level, electromagnetic interference line noise level, and voltage microsurge level while emitting radio frequency interference and subjecting Plaintiff to covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Facial Nerve, Glossopharyngeal nerve, Vagus Nerve, Supraorbital Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerves, CNS, SNS, parietal and prefrontal

cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to microglia, goblet cell, myocytes, Pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, and unipolar neuron functions intended to gaslight manipulate and undermine the credibility of Plaintiff. These actions resulted in personal injury damages; irreparable mental health and psychological health damages for Plaintiff, resulting in several hospitalizations. Thus, Defendant's activities violated Plaintiff's 1st, 4th, 5th, and 8th amendments, each constituting in a significant personal injury damage.

3.  Defendant United States Defense Advanced Research Projects Agency is liable because of their deployment of the Starshield System's Starlink resources and, "ancillary equipment," as integrated into the JADC2 while operating MASINT and RINT in coordination with JADC2's SoSITE STITCHES integration of DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight programs as their use of Starshield increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting radio frequency interference subjecting Plaintiff to electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on his KLS Martin titanium permanently embedded metal implants,

causing physical irritation on Plaintiff's hands and abdomen, and subjecting Plaintiff to covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Glossopharyngeal nerve, Facial Nerve, Vagus Nerve, Supraorbital Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerves, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to microglia, myocytes, goblet cell, pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, and unipolar neuron functions intended to gaslight manipulate and undermine the credibility of Plaintiff which constitutes cruel and unusual punishment. These actions resulted in personal injury damages; irreparable mental health and psychological health damages for Plaintiff, resulting in several hospitalizations. Thus, Defendant's activities violated Plaintiff's 1st, 4th, 5th, and 8th amendments, each constituting in a significant personal injury damage.

4. Defendant United States Defense Intelligence Agency is liable because of their deployment of the Starshield System's Starlink resources and, "ancillary equipment," as integrated into the JADC2 while operating MASINT and RINT in coordination with JADC2's SoSITE STITCHES integration of DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight programs, as their

use of Starshield increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting radio frequency interference subjecting Plaintiff to electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on his KLS Martin titanium permanently embedded metal implants, causing physical irritation on Plaintiff's hands and abdomen, and subjecting Plaintiff to covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Glossopharyngeal nerve, Facial Nerve, Vagus Nerve, Supraorbital Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerves, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to microglia, myocytes, goblet cell, Pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, and unipolar neuron functions intended to gaslight manipulate and undermine the credibility of plaintiff. These actions resulted in personal injury damages; irreparable mental health and psychological health damages for Plaintiff, resulting in several hospitalizations. Thus, Defendant's activities violated Plaintiff's 1st, 4th, 5th, and 8th amendments, each constituting in a significant personal injury damage.

5. Defendant United States Central Intelligence Agency is liable for their DS&T's joint-agency deployment of the Starshield System's Starlink resources and, "ancillary equipment," due to their bulk data collection, electronic surveillance equipment's testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna parabolic antenna to reflector-to-subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's emissions via the LORO method. Defendant CIA set objectives, guided multi-INT and optically deployed, "EIT's" (OEITs) and coercive interrogation tactics while jointly operating from within the NRO, as Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting audible and damaging radio frequency interference. Defendant intended to gaslight manipulate and undermine the credibility of Plaintiff through non-consensual electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on Plaintiff's KLS Martin titanium permanently embedded metal implants, and covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Glossopharyngeal Nerve, Facial Nerve, Vagus Nerve, Supraorbital Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerves, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar

networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to microglia, myocytes, goblet cell, pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, and unipolar neuron functions. Defendant DARPA's actions subjected Plaintiff to gasotransmitter manipulation with EMI interacting with his CNS action potentials as this mimicked neuronal activity and initiated sphincter contractions. Plaintiff states his RF-stimulated microglia and bioelectric gastrointestinal neuromodulation produced unacceptably high levels of $H_2S$ and NOX, inducing abdominal discomfort and pain. These actions resulted in personal injury damages; irreparable mental health and psychological health damages for Plaintiff, resulting in several hospitalizations. Thus, Defendant's activities violated Plaintiff's 1st, 4th, 5th, and 8th amendments, each constituting in a significant personal injury damage.

6. Defendant United States Department of Defense National Reconnaissance Office is liable for their AS&T's, Office of Intelligence Liaison to NASIC, and 544th ISRG Detachment 5's deployment of the Starshield System's Starlink resources and, "ancillary equipment," through SENTIENT pre-integration into the JADC2, due to their bulk data collection, electronic surveillance equipment's testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna parabolic antenna to reflector-to-subreflector-Cassegrain system

generated bi-directional self-multiplexing phased array antenna's emissions via the LORO method, while Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting audible and damaging radio frequency interference. Defendant intended to gaslight manipulate and undermine the credibility of Plaintiff through non-consensual electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on Plaintiff's KLS Martin titanium permanently embedded metal implants, and covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Glossopharyngeal Nerve, Facial Nerve, Vagus Nerve, Supraorbital Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerves, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex, prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to microglia, myocytes, goblet cell, pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, and unipolar neuron functions. These actions resulted in personal injury damages; irreparable mental health and psychological health damages Plaintiff, resulting in several hospitalizations. Thus, Defendant's activities violated Plaintiff's

1st, 4th, 5th, and 8th amendments, each constituting in a significant personal injury damage.

7. Defendant United States National Security Agency is liable for their support of the joint-agency deployment of the Starshield System's Starlink resources and, "ancillary equipment," as their SENTIENT's JADC2 integration enabled Defendant's warrantlessly operated SIGINT's detection and exploitation of signals which violated all statutorily and Constitutionally mandated limitations and guidelines for SIGINT procedure. Defendant's jointly operated NSA-NRO coalition utilized Starshield's emissions to increase the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting audible and damaging radio frequency interference. This caused personal injury damages when subjecting Plaintiff to SIGINT, exploiting the signal-producing devices and radiofrequency interference producing sources as Defendant supported the warfighter while perpetrating electrodermal aggression and fear conditioning, Pavlovian aversion conditioning, non-consensual human experimentation on Plaintiff's KLS Martin titanium permanently embedded metal implants in addition to covert non-consensual human experimentation on Plaintiff's TRPV I, TRPV II, TRPV IV, TRPV VI, Trigeminal Nerve, Glossopharyngeal nerve, Facial Nerve, Vagus Nerve, Supraorbital Nerve, Cavernous Nerves, Corneal Nerves, short Ciliary Nerves, CNS, SNS, parietal and prefrontal cortex, primary and secondary motor cortex, cerebellothalamocortical system, limbic system, cerebral cortex, idiotypic cortex,

prefrontotemporopolar networks, anterior cingulate cortex, bed nucleus of the stria terminalis, hypothalamus, caudate, nucleus accumbens, and amygdala functions in addition to microglia, myocytes, goblet cell, Pyramidal cell, Betz cell, axon, dendrite, motor neuron, somatosensory neuron, interneuron, afferent neuron, efferent neuron, and unipolar neuron functions. These actions resulted in personal injury damages; irreparable mental health and psychological health damages Plaintiff, resulting in several hospitalizations. Thus, Defendant's activities violated Plaintiff's 1st, 4th, 5th, and 8th amendments, each constituting in a significant personal injury damage.

### Federal Tort Claims Act: Property Damages

1.   Plaintiff Kyle Malove sustained property damages totaling over $10,000 due to the Defendants' actions.

2.   Defendant United States Department of Defense Department of the Air Force is liable due to their deployment of the Starshield System's Starlink resources and, "ancillary equipment," as integrated into the JADC2, their electronic surveillance equipment testing, and personnel training through their deployment of Defendant Department of Defense's Electromagnetic Superiority Strategy of 2020, which deployed their electromagnetic attack and electromagnetic field disruption capabilities as their Space Delta 3-assigned 4th Electromagnetic Warfare Squadron and NASIC utilized the Starshield system via ABMS EBMS and JADC2's SoSITE STITCHES integration of DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight programs to increase the local power supply's harmonics, electromagnetic interference line noise

level, and voltage microsurge level while emitting radio frequency interference. This caused damages to Plaintiff's property; his humidifiers, appliances, fan motors, appliance's condensers, water pumps, computers' logic boards, vehicle, etc.

3. Defendant United States Defense Advanced Research Projects Agency is liable for their liaison-based-support of the deployment and testing of the Starshield System's Starlink resources and, "ancillary equipment," as SoSITE STITCHES integrated DARPA's N3, NEAT, RFMLS, OVERSIGHT, and Insight into the JADC2 platform and Advanced Battle Management System while Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting radio frequency interference. This caused damages to Plaintiff's property; his humidifiers, appliances, fan motors, appliance's condensers, water pumps, computers' logic boards, vehicle, etc.

4. Defendant United States Defense Intelligence Agency is liable because of their deployment of the Starshield System's Starlink resources and, "ancillary equipment," as integrated into the JADC2 while operating MASINT and RINT as their use of Starshield increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting radio frequency interference. This caused damages to Plaintiff's property; his humidifiers, appliances, fan motors, appliance's condensers, water pumps, Computers' logic boards, vehicle, etc.

5. Defendant United States Central Intelligence Agency is liable for their DS&T's joint-agency deployment of the Starshield

System's Starlink resources and, "ancillary equipment," due to their bulk data collection, electronic surveillance equipment's testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna parabolic antenna reflector-to-subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's emissions via the LORO method as they set objectives, guided multi-INT and optically deployed, "EIT's" and coercive interrogation tactics while jointly operating from within the NRO, while Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting audible and damaging radio frequency interference. This caused damages to Plaintiff's property; his humidifiers, appliances, fan motors, appliance's condensers, water pumps, Computers' logic boards, vehicle, etc.

6. Defendant United States Department of Defense National Reconnaissance Office is liable for their AS&T's, Office of Intelligence Liaison to NASIC, and 544th ISRG Detachment 5's deployment of the Starshield System's Starlink resources and, "ancillary equipment," through SENTIENT pre-integration into the JADC2, due to their bulk data collection, electronic surveillance equipment's testing, and personnel training through deployment of Starshield System's Rotman lens substrate integrated waveguide leaky wave antenna parabolic antenna reflector-to-subreflector-Cassegrain system generated bi-directional self-multiplexing phased array antenna's

emissions via the LORO method, while Starshield's emissions increased the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level. Through doing so, Defendant emitted audible and damaging radio frequency interference. This caused damages to Plaintiff's property; his humidifiers, appliances, fan motors, appliance's condensers, water pumps, computers' logic boards, vehicle, etc.

7. Defendant United States National Security Agency is liable for their support of the joint-agency deployment of the Starshield System's Starlink resources and, "ancillary equipment," as the SENTIENT was integrated into the JADC2 as Defendant's warrantlessly operated SIGINT detection and exploitation of signals and passive intermodulation distortion which violated all statutorily and Constitutionally mandated limitations and guidelines for procedure while depriving Plaintiff of life, liberty, and property. The jointly operated NSA-NRO coalition utilized Starshield's emissions to increase the local power supply's harmonics, electromagnetic interference line noise level, and voltage microsurge level while emitting audible and damaging radio frequency interference as this caused damages to Plaintiff's property; his humidifiers, appliances, fan motors, appliance's condensers, water pumps, Computers' logic boards, vehicle, etc.

## Equitable Damages

1.   The Defendant United States' conduct as described above is insidious. Defendant's conduct demonstrates malicious and wanton behavior as directed towards the plaintiff. The actions and omissions explicated herein were intended and perpetrated maliciously. Thus, equitable damages are appropriate as the Court deems appropriate.

## Compensatory Damages

1.   The Defendant United States' conduct as described is pernicious. Defendant's conduct demonstrates malicious and wonton behavior as directed towards to the plaintiff while causing significant personal injury damages. The Defendant's acts and omissions explicated herein were intended and perpetrated maliciously. Thus, compensatory damages are appropriate for the plaintiff's personal injury and property damages as the Court deems fit.

## VII. Request for Relief

WHEREFORE, Plaintiff Kyle Malove respectfully prays for a judgment against Defendant United States for:

1.  Injunctive and equitable relief as the Court deems appropriate including:

    Requiring Defendant to:

    > Cease and desist unwarranted electronic surveillance equipment testing, intelligence personnel training, and DoD and multi-INT operations which are unconstitutional under Executive Order 12333, Executive Order 13491, Executive Order 14086, Posse Comitatus Act, Presidential Policy Directive 28, and National Security Council Intelligence Directive No. 6.

2.  Compensatory damages of $7,000,012,454.28 or an amount to be proven at trial and;

    Requiring Defendant to;

    > Compelling Defendant to test and monitor DoD's and respective CSAs' (Combat Supporting Agency) radiofrequency emissions, EMS emissions, EMI interference generated, RF interference generated, and EMF emissions from the accompanying power systems underneath their operational space and;

3.  Compensatory damages to be paid by Defendant, according to proof at trial;

4.  Equitable damages as the court deems appropriate;

5.  Injunctive Relief;

6.  Any other relief as the court deems appropriate.

## VIII. Jury Trial Demanded

Plaintiff demands a jury trial on all issues so triable.

## IX. *Pro Se* Reassurances

Plaintiff agrees to provide the Clerk's Office with any changes to his address where case-related papers may be served. He understands his failure to keep a current address on file with the Clerk's Office may result in dismissal of the case.

Dated: July 12th, 2024

Kyle Malove.

Plaintiff